**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re

MAHALO ENERGY (USA) INC.,                                Case No. 09-80795
                                                         Chapter 11
                         Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DISCLOSURE STATEMENT WITH RESPECT TO
DEBTOR'S PLAN OF REORGANIZATION**
(DATED OCTOBER 16, 2009)

# SUMMARY INFORMATION

Debtor: Mahalo Energy (USA) Inc.

Plan: The Debtor is a debtor in possession under chapter 11 of the federal Bankruptcy Code. The Debtor has proposed a plan of reorganization, which is attached hereto as Exhibit 1. If confirmed, the Plan will govern the manner in which Claims against and Interests in the Debtor and its property will be treated. The Court has not yet confirmed the Plan. If you are a creditor with a Claim in one of the Classes entitled to vote on the Plan, you should concurrently receive a Ballot with which you may vote to accept or reject the Plan.

Recommendation: **The Debtor recommends that you vote to accept the Plan.**

Vote Required to Accept the Plan: Acceptance of the Plan requires the affirmative vote of two-thirds in amount and a majority in number of the Allowed Claims actually voted in each Class of "Impaired" Claims entitled to vote. The Classes that are Impaired and entitled to vote are: Classes 2, 3, 4, 5, 6, 7, 8, 9, and 10. If one of these Classes rejects the Plan, however, the Bankruptcy Court nevertheless may confirm the Plan if the "cramdown" requirements of Bankruptcy Code section 1129(b) are satisfied.

Voting Information: If you are entitled to vote, you should have received a ballot with this Disclosure Statement. After completing and signing your ballot, you should return it to:

Kline, Kline, Elliott & Bryant, P.C.
Attn: G. David Bryant and Stephen W. Elliott
720 NE 63rd Street
Oklahoma City, OK 73105

For your ballot to be counted, Kline, Kline, Elliott & Bryant, P.C. must receive it no later than 5:00 p.m. Central Time on [_____], 2009.

Confirmation Hearing: The Confirmation Hearing with respect to the plan has been scheduled for _____, 2009, at __:___ __.m., prevailing Central time, before the Honorable Terrence L. Michael, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder Avenue, Tulsa, Oklahoma 74103. The Confirmation Hearing may be continued from time to time without further notice.

Treatment of Claims and Interests: The treatment that creditors and shareholders will receive if the Bankruptcy Court confirms the Plan is set forth in Section II of the Plan, described in Section [__] of this Disclosure Statement, and summarized in the following chart entitled "Summary of Claims Treatment and Voting Status Under Plan."

Binding Nature of the Plan: If the Plan is confirmed and becomes effective, the terms of the Plan will be controlling on all creditors, shareholders and interested parties, irrespective of whether they vote on the Plan or how they voted on the Plan. You therefore are urged to read the Plan in its entirety. All discussion and summary of the terms and conditions of the Plan in this Disclosure Statement are qualified in their entirety by the Plan, which should be reviewed in its entirety by creditors, shareholders and interested parties.

**Effective Date:** The Plan will not become binding or effective until and unless the Effective Date occurs. The Effective Date will be the first Business Day, as determined by the Debtor, in its reasonable discretion, on which the following conditions have been satisfied: (1) the Confirmation Order has been entered and is not stayed; and (2) All agreements and other documents reasonably necessary to implement the Plan have been executed and delivered.

**Questions:** All inquiries about the Plan and Disclosure Statement should be sent in writing to:

Kline, Kline, Elliott & Bryant, P.C.
Attn: G. David Bryant and Stephen W. Elliott
720 NE 63rd Street
Oklahoma City, OK 73105

**IMPORTANT NOTICE:** **THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS CONTAIN IMPORTANT INFORMATION THAT IS NOT INCLUDED IN THIS SUMMARY. THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS. YOU SHOULD THEREFORE READ THE PLAN, DISCLOSURE STATEMENT, AND BALLOTS IN THEIR ENTIRETY. YOU SHOULD ALSO CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLAN.**

# SUMMARY OF CLAIMS TREATMENT AND VOTING STATUS UNDER PLAN

| DESCRIPTION | TREATMENT | ESTIMATED RECOVERY | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|---|
| | *UNCLASSIFIED CLAIMS* | | | |
| **U.S. Trustee Fees**<br><br>Estimated Amount Owing On Effective Date: $7,000 | Paid in full, in cash, on the Distribution Date. | 100% | Unimpaired | Not Entitled to Vote |
| Cure Payments Under Assumed Contracts and Leases<br><br>Estimated Amount: $217,000 | Paid in full, in cash, on the Distribution Date or, in the event of a dispute, within fifteen (15) days after entry of a Final Order resolving the dispute and approving the subject contract or lease assumption. | 100% | Unimpaired | Not Entitled to Vote |
| **Professional Fee Claims**<br><br>Estimated Unpaid Amount: Owing on Effective Date: $624,000 | Paid in full, in cash, within fifteen (15) days after entry of a Final Order allowing the Professional Fee Claim. | 100% | Unimpaired | Not Entitled to Vote |
| **Prepetition Administrative Goods Claims**<br><br>Estimated Amount: $30,000 | Paid in full, in cash, on or before the latest of: (i) the Distribution Date, (ii) fifteen (15) days after entry of a Final Order allowing the Prepetition Administrative Goods Claim, and (iii) the date the Claim is due according to its terms. | 100% | Unimpaired | Not Entitled to Vote |
| **Ordinary Course Administrative Claims**<br><br>Estimated Unpaid Amount Due Owing On Effective Date: $2.8 million | Paid in full, in cash, pursuant to terms and conditions of relevant transaction | 100% | Unimpaired | Not Entitled to Vote |
| **Non-Ordinary Course Administrative Claims**<br><br>Estimated Amount: $0 | Paid in full, in cash, on or before the latest of: (i) the Distribution Date, (ii) fifteen (15) days after entry of a Final Order allowing the Non-Ordinary Course Administrative Claim, and (iii) the date the claim is due | 100% | Unimpaired | Not Entitled to Vote |

iv

| DESCRIPTION | TREATMENT | ESTIMATED RECOVERY | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|---|
| | according to its terms. | | | |
| Priority Tax Claims<br><br>Estimated Amount: $60,000 | At the election of Reorganized Mahalo, each Allowed Priority Tax Claim will be (i) reinstated and paid on the date that it first becomes due and payable in accordance with its terms, (ii) paid in cash, in full, on the Distribution Date, (iii) satisfied with a promissory note equal to the Allowed amount of such Allowed Priority Tax Claim, bearing interest at the prime rate, payable in equal quarterly installments beginning on the last day of the first full calendar quarter following the Effective Date, due no later than the fifth (5th) anniversary of the Petition Date, or (iv) will be paid as otherwise agreed by the Claim holder and Reorganized Mahalo. | 100% | Unimpaired | Not Entitled to Vote |
| | ***CLASSIFIED CLAIMS*** | | | |
| **Class 1**<br><br>**O&G Royalty Trust Claims**<br><br>This Class comprises the O&G Royalty Trust Claims listed on Exhibit B to the Plan, the O&G Royalty Claims Exhibit.<br><br>Estimated Amount: $1.3 million | The "Claim Amount" indicated on the O&G Royalty Claims Exhibit for each creditor listed thereon will be deemed the Allowed amount of all Claims held by that creditor. The Claim Amount will be paid in full on the Distribution Date, *i.e.*, within 20 days of the Effective Date of the Plan. | 100% | Unimpaired | Not Entitled to Vote |
| **Class 2**<br><br>**Secured Claims of Wells Fargo Foothill**<br><br>This Class comprises all of the Secured Claims of Wells Fargo Foothill.<br><br>Estimated Amount: approximately $35.4 million as of the Petition Date plus post-petition interest and reasonable fees and expenses through the Effective Date. | Loan restructured pursuant to terms set forth in Section II.C.2 of the Plan. To be paid in full, over time. | 100% | Impaired | Entitled to Vote |

v

| | | | | |
|---|---|---|---|---|
| **Class 3**<br><br>**Claims of Ableco**<br><br>This Class comprises all of the Claims of Ableco.<br><br>Estimated Amount:<br>in excess $38 million | Ableco is to be allowed a Secured Claim in the amount of $27.5 million. Ableco to receive the New Common Stock in Reorganized Mahalo on account of $2 million of such Secured Claim and the Ableco Adequate Protection Claim. The balance, $25.5 million, will be satisfied pursuant to a restructured debt facility, as set forth in Section II.C.3 of the Plan, in full over time. Ableco will not receive any distribution on account of its Unsecured Deficiency Claim, which includes amounts in respect of both prepetition and postpetition attorneys fees and other expenses. | Less than 100% | Impaired | Entitled to Vote |
| **Class 4**<br><br>**Secured Claims of Williams**<br><br>This Class comprises all Claims of Williams, including claims for amounts due in connection with the drilling and construction of wells, and the maintenance of wells, in which Mahalo holds a working interest.<br><br>Estimated Amount:<br>approximately $3.9 million | Williams may elect one of two alternative treatments.<br><br>Williams Compromise Treatment: If Williams elects this treatment, Reorganized Mahalo will: (i) pay Williams $500,000 in four 4 equal quarterly installments beginning with the first full quarter after the Effective Date; (ii) waive its rights to payment by Williams on account of certain Oklahoma drilling credits received by Williams of up to $600,000; (iii) satisfy Allowed Administrative Claims of Williams on the later of the Distribution Date and the due date in the ordinary course of business; and (iv) enter into joint operating agreements with Williams regarding wells in which they jointly hold working interests in accordance with Exhibit D to the Plan. Williams to receive releases from the Estate.<br><br>Williams Non-Compromise Treatment: If Williams elects not to accept the compromise treatment, the validity, priority, enforceability and value of its alleged Secured Claims will be adjudicated by the Court following the Effective Date. To the extent the Court determines that a Claim is an Allowed Secured Claim, Reorganized Mahalo will satisfy the Allowed Secured Claim, at its option, (i) with payments in full, over a period of 4 to 7 years (depending on | Compromise Treatment: Apx. 30%<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Non-Compromise Treatment: Unknown | Impaired | Entitled to Vote |

| | | | | |
|---|---|---|---|---|
| | the amount thereof) and/or (ii) release to Williams the Collateral securing such Allowed Secured Claim. To the extent the Court determines that a Claim is an Allowed Trust Claim, it will be paid within fifteen (15) days of the Allowance Date.  To the extent the Court determines that a Claim of Williams is an Allowed Unsecured Claim, it will be treated as an Allowed General Unsecured Claim pursuant to Class 9.  Any existing joint operating agreements with Williams will be deemed rejected. The Williams Avoidance Actions will be vested in Reorganized Mahalo. | | | |

| Class 5 | The holders of Class 5 Claims may elect one of two alternative treatments. | Compromise Treatment: 7.5% | Impaired | Entitled to Vote |
|---|---|---|---|---|
| **Compromised O&G Mechanics/Materialmen Claims** | | | | |
| This Class comprises those claimants asserting oil and gas mechanics or materialmen liens, or trust claims based thereon, that are listed on Exhibit C to the Plan, the Compromised O&G Mechanics/Materialmen Claims Exhibit | Compromise O&G Mechanics/Materialmen Claim Treatment: The "Claim Amount" indicated on the Compromised O&G Mechanics/Materialmen Claims Exhibit for each creditor listed thereon will be deemed the Allowed amount of all Claims held by that creditor. Any creditor that does not opt out of this treatment will receive the "Distribution Amount" set forth for such creditors on the Exhibit, which is equivalent to 7.5% of the "Claim Amount" listed thereon. The Distribution Amount will be paid on the Distribution Date, *i.e.*, within 20 days of the Effective Date of the Plan. As of the Effective Date, the obligation to satisfy such amount shall be a general unsecured obligation. | | | |
| If a listed claimant exercises its right to make the Class 5 Opt-Out Election its Claim will be treated under Class 6 as a Non-Compromised Lien/Trust Claim. | | | | |
| If a listed claimant makes the Small Claims Election and agrees to reduce its Claim to $5,000, then it will be treated under Class 10, as a Small Claim. | | | | |
| Estimated Amount: approximately $8.8 million | Class 5 Opt-Out Election: The holder of a Claim listed on Exhibit C to the Plan may opt out of the compromise treatment described in the preceding paragraph by electing to do so in writing on its Ballot. The holder's Claim thereafter (i) will be treated as a Non-Compromised Lien/Trust Claim under Class 6 and litigated before the Court, and (ii) will receive the treatment provided under Class 6, which treatment will depend upon the outcome of litigation regarding such Claim. | Non-Compromise Treatment: Unknown | | |

| Class 6 | The validity, priority, enforceability and value of the Class 6 Claims, as Secured Claims and/or Trust Claims will be litigated following the Effective Date before the Court. | Depends On Nature of Allowed Claims Determined by Court Following Litigation — | Impaired | Entitled to Vote |
|---|---|---|---|---|
| **Non-Compromised Lien/Trust Claims**<br><br>This Class comprises any lien or trust claim that is not listed on Exhibits B or C, or that is listed on Exhibit C, but the holder of which has made the Class 5 Opt-Out Election.<br><br>Estimated Amount: To be determined | Reorganized Mahalo will satisfy the Allowed Secured Claim, at its option, (i) with payment in full, over a period of 4 to 7 years (depending on the amount thereof) and/or (ii) release to the holder thereof the Collateral securing such Allowed Secured Claim. To the extent the Court determines that a Class 6 Claim is an Allowed Trust Claim, it will be paid within fifteen (15) days of the Allowance Date.  To the extent the Court determines that a Class 6 Claim is an Allowed Unsecured Claim, it will be treated as an Allowed General Unsecured Claim pursuant to Class 9. | Allowed Secured Claims: 100%<br><br>Allowed Trust Claims: 100%<br><br>Allowed Unsecured Claims: Unknown. |  |  |
| **Class 7**<br><br>**Secured Tax Claims.**<br><br>This Class comprises tax claims of governmental units that purportedly are secured by liens on Estate property.<br><br>Estimated Amount: $0 | At the election of Reorganized Mahalo, each Allowed Secured Tax Claim will be (i) reinstated and paid on the date that it first becomes due and payable in accordance with its terms, (ii) paid in cash, in full, on the Distribution Date, (iii) satisfied with a promissory note equal to the Allowed amount of such Allowed Priority Tax Claim, bearing interest in accordance with Bankruptcy Code section 511, or the Prime Rate in effect on the Effective Date, payable in equal quarterly installments beginning on the last day of the first full calendar quarter following the Effective Date, due no later than the fifth (5th) anniversary of the Petition Date, or (iv) will be paid as otherwise agreed by the Claim holder and Reorganized Mahalo. | 100% | Impaired | Entitled to Vote |

| Class 8<br><br>**Priority Claims.**<br><br>This Class comprises unsecured claims entitled to priority under the Bankruptcy Code that are not tax claims.<br><br>Estimated Amount: $0 | At the election of Reorganized Mahalo, each Allowed Priority Tax Claim will be (i) reinstated and paid on the date that it first becomes due and payable in accordance with its terms, (ii) paid in cash, in full, on the Distribution Date, (iii) satisfied with a promissory note equal to the Allowed amount of such Allowed Priority Tax Claim, bearing interest at the Prime Rate, payable in equal quarterly installments beginning on the last day of the first full calendar quarter following the Effective Date, due no later than the fifth (5th) anniversary of the Petition Date, or (iv) will be paid as otherwise agreed by the Claim holder and Reorganized Mahalo. | 100% | Impaired | Entitled to Vote |
|---|---|---|---|---|
| Class 9<br><br>**General Unsecured Claims, other than Small Claims**<br><br>This class comprises all non-priority unsecured claims, including prepetition claims for goods and services and working interest payments in respect of oil and gas wells, other than Small Claims.<br><br>Any non-priority unsecured claims that are equal to or less than $5,000 in amount, as to which the holder makes the Small Claims Election and agrees to reduce its Claim to $5,000, are classified and will be treated under Class 10.<br><br>Estimated Amount: approximately $4 million in non-insider claims and approximately $22 million in intercompany claims of the Parent. See Section VII.B.5 for further discussion of the intercompany claim of the Parent. | Holders of Allowed General Unsecured Claims in Class 9 will receive a pro rata interest in the net proceeds of a Liquidating Trust.<br><br>The Liquidating Trust will receive either (A) the Specified Assets (*i.e.*, interests in certain undeveloped oil and gas leaseholds listed on Exhibit F to the Plan) and $50,000 or (B) $300,000. The Creditors Committee is permitted to select one of these options by Filing a written election prior to the hearing on the Disclosure Statement. If no timely election is made, option (A) shall apply.<br><br>Also, the Liquidating Trust will receive the Designated Avoidance Actions. | Unknown; will depend on election of Creditors' Committee, and litigation recoveries. | Impaired | Entitled to Vote |

| Class 10<br><br>**Small Claims**<br><br>This Class comprises each Claim (i) that is a General Unsecured Claim less than or equal to $5,000 or (ii) a General Unsecured Claim or Compromised O&G Mechanics/Materialmen Claim that the holder thereof voluntarily reduces to $5,000.<br><br>The holder of a General Unsecured Claim or Compromised O&G Mechanics/Materialmen Claim may voluntarily reduce its Claim to $5,000 by making the Small Claims Election on its Ballot. Such election shall not effect whether the Claim is an Allowed Claim or Disallowed Claim.<br><br>Estimated Amount:<br>To Be Determined | Holders of Allowed Small Claims in Class 10 will receive cash equal to 30% of such Allowed Small Claim on the Distribution Date. | 30% | Impaired | Entitled to Vote |
|---|---|---|---|---|
| Class 11<br><br>**Subordinated Claims**<br><br>This class comprises Claims legally subordinated to all general unsecured claims.<br><br>Estimated Amount: $0 | The holders of Subordinated Claims are entitled to receive funds generated by the Liquidating Trust, but only if the holders of Allowed General Unsecured Claims have been paid in full, with accrued interest thereon. The Debtor does not believe that this is likely to occur. | 0% | Impaired | Deemed to Reject |
| *CLASSIFIED INTERESTS* | | | | |
| Class 12<br><br>**Interests**<br><br>This Class comprises all of the common stock in the Debtor. | Holders of Interests will neither receive nor retain property under the Plan on account of such Interests. | 0% | Impaired | Deemed to Reject |

## OPPORTUNITY TO PARTICIPATE IN O&G DRILLING VENDOR PROGRAM

Each holder of a Claim may elect on its Ballot, in lieu of the treatment provided for such holder under the Plan to participate in and undertake the obligations required to participate in the O&G Drilling Vendor Program, as discussed in Section III of the Plan and Exhibit D to the Plan. The effectiveness of and participation in the program is subject to various restrictions. If it becomes effective, those Claim holders that participate in the O&G Drilling Vendor Program may realize a recovery greater than otherwise available to such holder under the treatment described above, although the program requires participants to provide new goods and/or services to Reorganized Mahalo on credit, and is subject to various risks not associated with the distributions contemplated by the Plan treatment described above.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. OVERVIEW OF THE PLAN AND ITS STRUCTURE ............................................. 2

III. GENERAL DISCLAIMERS AND INFORMATION ............................................... 5

IV. THE PLAN CONFIRMATION PROCESS ............................................................... 6

      A.     Who May Vote To Accept Or Reject The Plan. .......................................... 6

            1.     Allowed Claims and Interests. ........................................................ 6

            2.     Impaired Claims and Interests. ...................................................... 7

      B.     Votes Necessary To Confirm The Plan. ..................................................... 8

      C.     Confirmation Hearing. ................................................................................. 8

      D.     Cramdown: Treatment Of Non-Consenting Classes................................... 8

V. INFORMATION REGARDING VOTING IN THIS CASE ....................................... 9

      A.     Voting Instructions...................................................................................... 9

VI. WHO MAY OBJECT TO PLAN CONFIRMATION ............................................ 10

VII. DESCRIPTION OF THE DEBTOR'S BUSINESS, EVENTS LEADING THE
      CHAPTER 11 FILING, AND SIGNIFICANT EVENTS IN THIS CHAPTER 11
      CASE ............................................................................................................. 10

      A.     Description of the Debtor's Business and Assets........................................ 10

      B.     Description of the Debtor's Major Liabilities. ........................................... 11

            1.     Prepetition Credit Agreement. ...................................................... 11

            2.     Mechanics and Materialmen Claims.............................................. 12

            3.     O&G Royalty Claims....................................................................... 13

            4.     Other Unsecured Liabilities. .......................................................... 13

            5.     Intercompany Claims. .................................................................... 13

            6.     Hedge Agreements.......................................................................... 13

            7.     Joint Operating Agreements. .......................................................... 14

                   a.     JOAs Re: Wells Operated By The Debtor. ......................... 14

Case: 09-80795    Doc #: 445    Filed: in USBC ED/OK on 10/16/09  Page 13 of 104

| | | (1) | Southeast Poteau Field JOA. | 14 |
| | | (2) | Kepco JOA. | 14 |
| | b. | | JOAs Re: Wells Operated By Third Parties. | 15 |
| | | (1) | Island Shelton JOA. | 15 |
| | | (2) | Pittsburg County JOAs. | 15 |
| | | (3) | Disposition of the JOAs. | 16 |
| C. | | | Debtor's Board and Management. | 16 |
| D. | | | Events Leading To The Chapter 11 Filing. | 16 |
| E. | | | Significant Events During The Chapter 11 Case. | 17 |
| | 1. | | Continuation of Business. | 17 |
| | 2. | | Recusal of Judge Cornish. | 17 |
| | 3. | | Postpetition Financing Motion. | 17 |
| | 4. | | Cash Collateral Motions. | 18 |
| | 5. | | Sale Motion. | 18 |
| | 6. | | Creditors' Committee Formation. | 19 |
| | 7. | | Retention of Professionals. | 19 |
| | 8. | | Employee Retention Program. | 20 |
| | 9. | | Vectra Relief From Stay Motion. | 20 |
| | 10. | | SemGas Motion To Compel Assumption or Rejection. | 20 |
| | 11. | | Claims. | 20 |
| | | a. | Scheduled and Filed Claims. | 20 |
| | | b. | Claim Objections. | 21 |
| | 12. | | Potential Turnover Issues. | 22 |
| | | a. | Gas Proceeds. | 22 |
| | | b. | Oklahoma Drilling Credits. | 22 |
| | 13. | | Stayed Prepetition Litigation. | 23 |
| | 14. | | Potential Avoidance Actions. | 23 |

15. Potential Issues Regarding Scope and Enforcement of Secured Lenders' Liens and Claims. .................................................................. 24

VIII. SUMMARY OF MATERIAL PLAN PROVISIONS ................................. 26

A. Designation of Classes and Treatment of Claims and Interests Generally. ................ 26

B. Distinction Between Secured Claims and Unsecured Claims and Valuation of Collateral. ................................................................................................. 26

C. Summary of Classification and Treatment of Claims and Interests Under the Plan. ................................................................................................................ 27

1. Allowance and Treatment of Unclassified Claims. .......................................... 29

    a. Administrative Claims. ............................................................................ 29

        (1) U.S. Trustee Fees. ....................................................................... 29

        (2) Cure Payments. ........................................................................... 29

        (3) Professional Fee Claims. ............................................................ 29

        (4) Prepetition Administrative Goods Claims. .............................. 30

        (5) Ordinary Course Administrative Claims. ............................... 30

        (6) Non-Ordinary Course Administrative Claims. ...................... 31

        (7) Costs of the Liquidating Trust. ................................................ 31

    b. Priority Tax Claims. ................................................................................ 31

2. Classification and Treatment of Classified Claims and Interests. .................. 32

    a. Class 1 (O&G Royalty Trust Claims). ................................................. 32

    b. Class 2 (Secured Claims of Wells Fargo Foothill). ............................ 32

    c. Class 3 (Claims of Ableco). .................................................................... 35

    d. Class 4 (Claims Of Williams). ............................................................... 37

        (1) Background. .................................................................................. 37

        (2) Treatment. .................................................................................... 41

    e. Class 5 (Compromised O&G Mechanics/Materialmen Claims). ....... 43

        (1) Background. .................................................................................. 43

        (2) Treatment. .................................................................................... 45

Case: 09-80795   Doc #: 445   Filed: in USBC ED/OK on 10/16/09   Page 15 of 104

  f.  Class 6 (Non-Compromised Lien/Trust Claims). ............................... 45

  g.  Class 7 (Secured Tax Claims). ............................................... 47

  h.  Class 8 (Priority Claims). ..................................................... 48

  i.  Class 9 (General Unsecured Claims). ................................... 48

  j.  Class 10 (Small Claims). ...................................................... 49

  k.  Class 11 (Subordinated Claims). .......................................... 50

  l.  Class 12 (Interests). .............................................................. 50

IX. OPPORTUNITY TO PARTICIPATE IN O&G DRILLING VENDOR PROGRAM ............... 50

X. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................... 51

 A.  Rejection of Executory Contracts and Unexpired Leases. .......................................... 51

  1.  Rejected Contracts and Leases. ........................................................ 51

  2.  Bar Date for Rejection Damage Claims. ........................................ 51

 B.  Assumption of Executory Contracts and Unexpired Leases. ...................................... 52

  a.  Assumed Contracts and Leases. .......................................... 52

  b.  Cure Payments. .................................................................... 52

  c.  Objections to Assumption Or Proposed Cure Payment. ............... 52

  d.  Resolution of Claims Relating to Assumed Contracts and Leases. ............................................................................ 53

XI. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN. ............................ 53

 A.  Exit Financing. ................................................................................................ 53

 B.  Funding of the Plan. ....................................................................................... 54

 C.  Vesting of Assets Generally; Suspense Funds. ............................................. 55

 D.  Preservation/Vesting of Rights of Action. .................................................... 55

 E.  The Liquidating Trust. ................................................................................... 55

  1.  Appointment of the Liquidating Trustee. ........................................ 55

  2.  Powers and Duties of the Liquidating Trustee. .............................. 57

  3.  Termination of the Liquidating Trust. ............................................ 57

Case: 09-80795  Doc #: 445  Filed: in USBC ED/OK on 10/16/09  Page 16 of 104

| | 4. | Formation of the Advisory Committee. | 57 |
|---|---|---|---|
| F. | | Claim Objections. | 57 |
| G. | | Distribution of Property Under the Plan. | 58 |
| | 1. | Manner of Cash Payments Under the Plan. | 58 |
| | 2. | No De Minimis Distributions. | 58 |
| | 3. | No Distribution with Respect to Disputed Claims. | 58 |
| | 4. | Delivery of Distributions and Undeliverable/Unclaimed Distributions. | 58 |
| | | (1) Delivery of Distributions in General. | 58 |
| | | (2) Undeliverable and Unclaimed Distributions. | 59 |
| | | (3) Estimation of Disputed Claims for Distribution Purposes. | 59 |
| | 5. | Setoff, Recoupment and Other Rights. | 59 |
| | 6. | Cancellation of Interests. | 60 |
| H. | | Reorganized Mahalo. | 60 |
| | 1. | Board of Reorganized Mahalo. | 60 |
| | 2. | Officers of Reorganized Mahalo. | 60 |
| | 3. | Articles of Incorporation and Bylaws. | 60 |
| | 4. | Terms of the New Common Stock. | 60 |
| | 5. | Securities Exemption. | 61 |
| | 6. | Employee Equity Incentive Plan. | 61 |
| | 7. | Employee Benefit Plans. | 61 |
| I. | | Dissolution of the Creditors' Committee. | 61 |
| J. | | Post-Confirmation U.S. Trustee Fees. | 61 |
| XII. | | EFFECT OF CONFIRMATION OF THE PLAN | 62 |
| A. | | Binding Effect of Plan/Injunction. | 62 |
| B. | | Compromise of Claims By The Debtor. | 63 |
| C. | | Exculpation and Limitation of Liability. | 64 |

D.    Injunctive Relief Relating To Claims and Releases. .................................................. 64

XIII. OTHER PLAN PROVISIONS ......................................................................... 65

A.    The Effective Date. ......................................................................... 65

B.    Stay of Confirmation Order Shortened. ......................................... 65

C.    Revocation of Plan/No Admissions. ............................................... 65

D.    Exemption from Certain Transfer Taxes. ....................................... 66

E.    Modifications of Plan. .................................................................... 66

F.    Cram-Down. .................................................................................... 66

G.    Post-Effective Date Effect of Evidences of Claims or Interests. ............................... 66

H.    Post-Effective Date Notices. ........................................................... 66

I.    Successors and Assigns. .................................................................. 67

J.    Saturday, Sunday or Legal Holiday. ............................................... 67

K.    Headings. ........................................................................................ 67

L.    Severability of Plan Provisions. ...................................................... 67

M.    Governing Law. .............................................................................. 67

N.    Retention of Jurisdiction. ................................................................ 67

O.    Plan Embodies Settlements. ............................................................ 69

P.    Term of Bankruptcy Injunctions or Stays. ...................................... 69

Q.    Objections to Confirmation. ........................................................... 69

R.    Notices. ........................................................................................... 69

XIV. FINANCIAL PROJECTIONS AND FEASIBILITY ....................................... 70

XV. LIQUIDATION ANALYSIS AND "BEST INTERESTS" TEST ....................... 71

XVI. RISKS ................................................................................................................. 72

A.    Certain Bankruptcy Considerations. ............................................... 72

1.    Undue Delay in Confirmation May Significantly Disrupt the Operation of the Debtor. .................................................. 72

2.    The Debtor May Fail to Obtain Confirmation or Consummation of the Plan. ..................................................... 72

3. The Debtor May Object to the Amount, Security or Priority Status of a Claim and Procedures for Contingent and Unliquidated Claims................... 73

B. Risks Related to Reorganized Debtor's Business and Financial Condition. .............. 73

1. Reorganized Mahalo May Not be Able to Reach Its Financial Forecasts. ......................................................................................... 73

2. The Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They are Based.................................. 73

3. The Disclosure Statement Does Not Reflect Events That May Occur Subsequent to the Date of the Disclosure Statement. ...................................... 73

4. Transfer Restrictions. ........................................................................ 74

5. Natural Gas Price Declines and Volatility Could Adversely Affect Reorganized Mahalo's Income. ......................................................... 74

6. The Oil and Gas Industry Has Numerous Operating Risks; Insurance May Not Be Adequate to Protect Against All These Risks. .......................... 74

7. Operations are Subject to Numerous Risks Related to Gas Drilling and Production Activities. ....................................................................... 74

8. Possibility of Production Curtailments. ............................................. 75

9. The Oil and Gas Industry is Subject to Regulation........................... 75

XVII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........ 75

A. Liquidation under Chapter 7. ....................................................................... 75

B. Alternative Plan of Reorganization................................................................ 75

XVIII. SECURITIES LAW MATTERS. ....................................................................... 76

XIX. CERTAIN POTENTIAL TAX CONSEQUENCES ................................................. 77

A. Tax Consequences to the Debtor. ................................................................. 78

1. Cancellation of Debt. ........................................................................ 78

2. Limitation on NOL Carryforwards. ................................................... 79

3. Alternative Minimum Tax. ................................................................ 80

4. Abandonment of Collateral................................................................ 80

B. Consequences to Certain Creditors of the Debtor........................................ 80

1. Withholding/Reporting Requirements. ............................................. 80

XX. RECOMMENDATION AND CONCLUSION ............................................................................ 82

Case: 09-80795    Doc #: 445    Filed:  in USBC ED/OK on 10/16/09  Page 20 of 104

# EXHIBITS TO DISCLOSURE STATEMENT

Exhibit 1:      Plan of Reorganization

Exhibit 2:      Pending Litigation

Exhibit 3:      Historical and Current Financial Information

Exhibit 4:      Projected Financial Information

Exhibit 5:      Liquidation Analysis

# I.

## INTRODUCTION

Mahalo Energy (USA) Inc. (the "Debtor") filed its petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") on May 21, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the Eastern District of Oklahoma, Okmulgee Division (the "Bankruptcy Court" or the "Court"). Since the Petition Date, the Debtor has continued to operate its business and manage its properties and assets as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor in possession has the opportunity to reorganize its business and financial affairs for the benefit of the debtor, its creditors and other parties in interest. The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The chapter 11 plan sets forth the means for satisfying the claims of creditors against, and the interests of equity security holders in, the debtor.

The commencement of a chapter 11 case creates an "Estate" comprising all the legal and equitable interests of the Debtor in property as of the Petition Date. Unless the Bankruptcy Court orders the appointment of a trustee, a chapter 11 debtor may continue to operate its business and control the assets of its estate as a debtor in possession. The Debtor has so operated since the Petition Date. The filing of a chapter 11 case also triggers the automatic stay, which is set forth in section 362 of the Bankruptcy Code. The automatic stay halts, among other things, all attempts to collect prepetition claims from the Debtor or to otherwise interfere with the Debtor's business or its Estate.

The Debtor is the proponent of the *Debtor's Plan of Reorganization (Dated October 16, 2009)* (the "Plan"). The Plan is attached hereto as Exhibit 1. The document that you are reading is the "Disclosure Statement" for the attached Plan. The Plan sets forth the manner in which the Claims against and Interests in the Debtor will be treated in conjunction with Debtor's reorganization under chapter 11. This Disclosure Statement describes the Debtor's prior business operations, the sale of substantially all of its assets during the Case, and the principal terms of the Plan, pursuant to which a Liquidating Trustee will liquidate the remaining assets of the Debtor's bankruptcy estate, and distribute the proceeds to the holders of Allowed Claims under the Plan.

 **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THESE DOCUMENTS IN THEIR ENTIRETY.** Capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan. Section of I of the Plan contains most of the defined terms used in the Plan and the Disclosure Statement.[1]

This Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Court will follow when determining whether to confirm the Plan, and describes how the Plan will be implemented if it is confirmed by the Bankruptcy Court. Bankruptcy Code section

---

[1] The Plan is the legally operative document regarding the treatment of Claims and Interests and the terms and conditions of the Debtor's reorganization. Accordingly, to the extent that there is any inconsistency between the terms contained herein and those contained in the Plan, the terms of the Plan govern.

1

1125 requires that a disclosure statement contain "adequate information" concerning a plan of reorganization. 11 U.S.C. § 1125(a). The Court has [NOT YET] approved the form of this document as an adequate disclosure statement that contains enough information to enable entities affected by the Plan to make an informed judgment when deciding whether to vote to accept or to reject the Plan.

Court approval of the adequacy of this Disclosure Statement, however, does not constitute a determination by the Court with respect to the fairness or the merits of the Plan or the accuracy or completeness of the information contained in the Plan or Disclosure Statement. **THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THEREFORE, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF THE COURT LATER CONFIRMS THE PLAN, AND THE EFFECTIVE DATE OCCURS, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.**

The Debtor believes that the Plan provides the greatest and earliest possible recoveries to creditors, that acceptance of the Plan is in the best interests of all parties in interest, and that any alternative would result in unnecessary delay, uncertainty, and expense to the Estate. The Debtor therefore strongly recommends that all eligible creditors entitled to vote on the Plan cast their ballots to accept the Plan.

**II.**

**OVERVIEW OF THE PLAN AND ITS STRUCTURE**

The Debtor is in the business of natural gas exploration and development. The Debtor owns interests in approximately 300 gas wells in Oklahoma, prospective well opportunities and undeveloped acreage and mineral interests. The Debtor operates approximately half of the wells in which it holds interests. As a result of a sharp decline in the price of natural gas, following a peak in 2008, the Debtor experienced a substantial decline in its revenue and liquidity, precipitating its chapter 11 filing.

The Debtor has in excess of $73 million in obligations owing to prepetition lenders Ableco[2] and Wells Fargo Foothill ("Secured Lenders") secured by liens against the Debtor's property. The Debtor believes this debt exceeds the value of its assets. Additionally, approximately 40 other creditors assert disputed liens against the Debtor's wells and mineral lease interests, and/or trust claims, in excess of $16.5 million, including $3.9 million asserted by Williams Production Mid-Continent Company and its Affiliates (collectively, "Williams"). Finally, certain creditors assert Claims on account of overriding or other royalties in oil or gas wells and/or oil or gas leases.

There are numerous disputes between and among the Debtor, the Secured Lenders, Williams, and/or other creditors asserting liens and trust claims regarding, among other things, the validity of their lien and trust claims and the value and relative priority of the liens asserted against the Debtor's property. None of these disputes has been adjudicated.

The Plan has been structured to enable the Debtor to emerge as a going concern under new ownership. The alternative to the Plan -- liquidation of the Debtor's assets in or outside of bankruptcy -- likely would generate substantially less value for all creditors. In particular, the

---

[2]     "Ableco" comprises Ableco Finance LLC and its affiliate assigns.

2

Debtor believes that the Plan is far superior to the alternative, chapter 7, which would irreparably harm the value of the Debtor's operating assets, result in the unnecessary loss of employment opportunities (not only at Mahalo but among its trade vendors), and undoubtedly result in a morass of litigation between competing stakeholders.

The Plan is being funded from cash generated from the Debtor's continued operations, but also as a result of significant financial support from Ableco. First, Ableco will not receive any distribution on account of the Ableco Unsecured Deficiency Claim, which exceeds $10 million, and includes a substantial amount of fees and expenses incurred by Ableco both before and during the pendency of this Case.

Second, Ableco is foregoing any cash distribution on account of the Ableco Adequate Protection Claim. Pursuant to the entered in this Case authorizing the Debtor to use cash collateral, Ableco was granted, as adequate protection, (i) a replacement lien on all property of the Estate in respect of the diminution in the value of its collateral and proceeds thereof resulting from the Debtor's expenditure of cash collateral,[3] and (ii)to the extent such liens are inadequate, a senior administrative expense under Bankruptcy Code section 507(b).[4] The replacement lien and administrative expense apply not only Ableco's prepetition collateral and/or its proceeds, but the free and clear assets of the estate, including Avoidance Actions and the Specified Assets, which under the Plan are being made available to the holders of Allowed General Unsecured Claims.

Absent the Plan, the Ableco Adequate Protection Claim would attach to all free and clear assets and, to the extent such assets do not cover such amounts, would constitute an expense of administration under Bankruptcy Code section 507(b). Millions of dollars of cash collateral have been expended to date in these cases that have not been replaced by new cash or equivalent collateral. A substantial portion of these funds are recoverable pursuant to the cash collateral orders from the assets of the Estate because they did not otherwise confer on the Secured Lenders a "quantifiable and direct benefit." with respect to the Secured Lenders' collateral [5] One example, but

---

[3] For instance, the Fifth Interim Order (which subsequently was approved on a final basis) provides at Paragraph 3(a): "As security in respect of any diminution in value of the collateral, including Cash Collateral, securing the obligations (the "Prepetition Obligations") to the Finance Parties under the Prepetition Loan Documents (collectively the "Prepetition Collateral"), resulting from use, sale or otherwise, the Finance Parties are hereby granted (*nunc pro tunc* to the Petition Date), a valid, perfected replacement security interest in and lien (an "Adequate Protection Lien") on all property of the Debtor's estate (as defined in 11 U.S.C. section 541(a)) (the "Debtor's Property"), subject and subordinate only to (i) valid, perfected and enforceable prepetition liens (if any) that are senior to the Prepetition Agent's security interests and liens as of the Petition Date, (ii) valid and unavoidable liens that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code that are senior in priority to the Finance Parties' security interests and liens, and (iii) payment of any unpaid fees of the clerk of the Bankruptcy Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a). Nothing herein shall affect or impair any post-petition liens that may arise."

[4] For instance, the Fifth Interim Order provides at Paragraph 3(c): "To the extent that the replacement liens prove insufficient to provide adequate protection as required under the Bankruptcy Code, each secured creditor, including, without limitation each of the Finance Parties, entitled to adequate protection hereunder whose adequate protection proves to be inadequate shall be afforded an allowed administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in the full amount of the insufficiency, consistent with requirements provided in this paragraph 3 . . . ."

[5] *See TNB Fin., Inc. v. James F. Parker Interests (In re Grimland, Inc.)*, 243 F.3d 228, 233 (5th Cir. Tex. 2001)

3

by no means the only example, are funds that will be expended on payment of the fees and expenses of the Creditors' Committee professionals.

Third, Ableco is providing the Exit Financing, with availability of up to $5 million, to ensure that Reorganized Mahalo has ample access to additional liquidity if the need arises, and to encourage the extension of trade credit from its vendors.

Without the substantial economic concessions and funding being provided by Ableco, the Plan would not be possible. Under the Plan, Ableco will be restructuring a substantial portion of its debt, converting a portion of its debt to equity and effectively waiving the balance. From the cash made available: (i) Claims on account of royalty interests and overriding royalties in oil or gas wells and/or oil or gas leases will be unimpaired and satisfied in the amounts set forth in the O&G Royalty Claims Exhibit, (ii) substantial distributions will be made to lien creditors that are junior to the liens of the Secured Lenders , and (iii) substantial distributions will be made to other unsecured creditors — all of whom would not otherwise receive those distributions.

The chapter 11 plan process affords a debtor the opportunity to resolve disputes globally and in a manner that is fair to all constituents. Such a global resolution is particularly important in this chapter 11 case if the Debtor is to successfully reorganize. As noted, the Debtor believes that numerous parties assert disputed lien and/or trust claims. Litigation over each and every individual claim could take months or years.

To attempt to address these claims comprehensively, the Plan sets forth a mechanism to compromise them, as reflected in the Williams Compromise Treatment and the Compromise O&G Mechanics/Materialmen Claim Treatment. The Debtor believes that the proposed compromises are appropriate in light of the applicable law and the circumstances presented. Nevertheless, the Plan also affords parties the right under the Plan to opt out of the proposed compromise treatments for their claims and to litigate, at their own expense, the amount, validity and priority of their claims. (These opt-out opportunities are referred to herein as the Williams Non-Compromise Treatment and the Class 5 Opt-Out Election.).

If a creditor chooses to litigate and prevails, the Plan provides treatment for the resulting secured claim or trust claim, as reflected in Class 6 (Non-Compromised Lien/Trust Claims). If the creditor loses, the Plan provides treatment for such claim as an unsecured, non-priority claim, as reflected in Class 9 (General Unsecured Claims). Those holders of disputed liens against the Debtor's wells and mineral lease interests and/or trust claims who choose to agree to the proposed compromise of their claims in Class 5 will receive a significant payment and avoid the risks and costs associated with litigation.

The Plan also enables each holder of an Allowed Claim, in lieu of the treatment provided under the Plan for such holder, to participate in the O&G Drilling Vendor Program, under which holders of Allowed Claims will have an opportunity to provide new trade credit to Reorganized Mahalo for goods and services necessary to drill certain new gas wells and receive a share of the revenue that may be derived from such wells. As discussed in Section IX below, both the entitlement of any holder to participate in the O&G Drilling Vendor Program and the effectiveness of the program are subject to certain conditions.

Under Class 9 of the Plan, the holders of Allowed General Unsecured Claims will share in a cash "pot" and the proceeds generated from the pursuit of potential avoidance actions.

4

The balance of this Disclosure Statement contains detailed descriptions of the Plan, including the proposed compromises contained therein, as well as pertinent information regarding the Debtor's assets, liabilities and operations.

## III.

## GENERAL DISCLAIMERS AND INFORMATION

Please carefully read this document and the Exhibits to this document. These documents explain who may object to confirmation of the Plan, who is entitled to vote to accept or reject the Plan, and the treatment that holders of Claims against the Debtor and holders of Interests in the Debtor may expect to receive if the Court confirms the Plan. The Disclosure Statement also describes the Debtor's history, the events precipitating the Case, other events in the Case, the effect of Plan confirmation, and some of the things the Court may consider in deciding whether to confirm the Plan.

The statements and information contained in the Plan and Disclosure Statement, however, do not constitute financial, legal or tax legal advice. You therefore should consult your own advisors if you have questions about the impact of the Plan on your Claims or Interests. The summary information and all other statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the Exhibits annexed to the Plan, and the Exhibits to the Disclosure Statement.

The financial information used to prepare the Plan and Disclosure Statement was prepared by the Debtor (and its financial professionals) from information in the Debtor's books and records and is the sole responsibility of the Debtor. The Plan was prepared with the review, input, and assistance of, the Debtor's management. The Plan and Disclosure Statement were approved by the Debtor's board of directors. Neither the professionals for the Debtor or any other party involved in the preparation of the Plan has independently verified this information.

The statements and information that concern the Debtor and that are set forth in this document constitute the only statements and information that the Bankruptcy Court has approved for the purpose of soliciting votes to accept or reject the Plan and may not be relied upon for any other purpose. Statements or information that are inconsistent with anything contained in this Disclosure Statement are not authorized unless otherwise ordered by the Bankruptcy Court.

You may not rely on the Plan and Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan. Nothing contained in the Plan or Disclosure Statement constitutes an admission of any fact or liability by any party or may be deemed to constitute evidence of the tax or other legal effects that the Debtor's reorganization may have on entities holding Claims or Interests. As to contested matters, adversary proceedings and other actions or threatened actions, this disclosure statement shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.

Unless another time is expressly specified in this Disclosure Statement, all statements contained in this document are made as of the date of this Disclosure Statement, October 16, 2009. Under no circumstances will the delivery of this Disclosure Statement or the exchange of any rights made in connection with the Plan create an implication or representation that there has been no subsequent change in the information included in this document. Neither the Debtor nor any other party assumes any duty to update or supplement any of the information contained in this document,

5

nor do they intend to undertake any such updates or supplements.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with federal or state securities laws or other applicable law.

CAUTIONARY STATEMENT:  Some statements in this document may constitute forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 and any amendments to those acts.  Such statements are based upon information available when the statements were made and are subject to risks and uncertainties that could cause actual results materially to differ from those expressed in the statements.  Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the Disclosure Statement, the Plan, or any exhibits to either document.

## IV.

## THE PLAN CONFIRMATION PROCESS

What follows in this Section IV is a general discussion of the rules governing who may vote to accept or reject a chapter 11 plan of reorganization, the votes necessary to confirm a chapter 11 plan, and the circumstances under which a plan may be confirmed, even if a particular class of creditors or interest holders does not accept the plan.[6]

### A.  Who May Vote To Accept Or Reject The Plan.

To vote to accept or reject the Plan, your claim or interest must be "allowed" and "impaired," and the plan must provide that you will receive or retain some value.  Holders of unimpaired claims are deemed to have accepted the plan and do not vote, though they may object to confirmation of the plan to the extent they otherwise have standing to do so.  Holders of claims or interests that do not receive or retain any value under the plan are deemed to reject the plan.  As defined by the Bankruptcy Code, a claim generally includes all rights to payment from a debtor, while an interest generally represents an ownership stake in the debtor.

### 1.  Allowed Claims and Interests.

With the exceptions explained below, under the Bankruptcy Code, a claim or interest is generally allowed only if a proof of the claim or interest is properly filed before the bar date for doing so, and either no party in interest has objected or the court has entered an order allowing the claim or interest.[7]  Under certain circumstances as provided in the Bankruptcy Code, a creditor may have an allowed claim even if a proof of claim was not filed and the bar date for filing a proof of claim has passed.  For example, a claim may be deemed allowed if the claim is listed on the debtor's

---

[6]  Where a particular word (such as "Debtor") or term (such as "Allowed Claim" or "Allowed Interest") is capitalized in this Disclosure Statement, and not otherwise defined herein (as noted in footnote 1 above), that word or phrase has the meaning provided in Section I (Definitions) of the Plan.  Where, however, a particular word (such as "debtor") or phrase (such as "allowed claim" or "allowed interest") is not capitalized in this Disclosure Statement, that word or phrase is not intended to refer to the definitions provided in Section I of the Plan, but rather, the word or phrase is intended to have the general meaning ascribed to it in common bankruptcy practice parlance.

[7]  See Section VII.E.11.a for specific information regarding the Bar Date in the Case.

schedules of liabilities filed with the court, and is not scheduled as disputed, contingent, or unliquidated.

A holder's Claim must be an allowed Claim, or must be allowed for purposes of voting, for the holder of such Claim to have the right to vote on the Plan. Generally, for voting purposes only, a claim is deemed allowed to the extent that: (1) either (a) a proof of claim was timely filed, or (b) a proof of claim was deemed timely filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a final order; and (2) (a) the claim is not a claim subject to an objection, or (b) the claim is allowed either by a final order or under the plan.

Under a plan, a creditor whose claim is not an allowed claim nevertheless may be entitled to vote to accept or reject the plan if the creditor has timely filed a proof of claim that is not the subject of an objection filed before the plan confirmation hearing or a Bankruptcy Court order disallowing the Claim entered before the confirmation hearing. An entity whose claim is subject to an objection is not eligible to vote on the plan unless and until (1) that objection is resolved in such entity's favor or (2) after notice and a hearing under Bankruptcy Rule 3018(a), the Bankruptcy Court temporarily allows the entity's claim for the purpose of voting to accept or reject the Plan. Any entity that seeks temporary allowance of its claim for voting purposes must promptly take steps necessary to arrange for an appropriate and timely hearing with the Court.

### 2. Impaired Claims and Interests.

Section II.A of the Plan and Sections VIII.A and VIII.C.2 of this Disclosure Statement, describe the Classes of Claims and Interests that the Debtor believes to be impaired (or unimpaired) under the Plan.

Generally speaking, under the Bankruptcy Code, a class of claims or interests is "impaired" if the plan alters the legal, equitable, or contractual rights of the members of the class, even if the alteration is beneficial to the creditors or interest holders. More specifically, Bankruptcy Code section 1124 provides that a claim or interest is impaired for purposes of chapter 11 unless the Plan:

(i) leaves unaltered the legal, equitable and contractual rights of the holder of such claim or interest; or

(ii) notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

(a) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default that consists of a breach of any provision relating to the insolvency or financial condition of the debtor at any time before the closing of the case, the commencement of a case under the Bankruptcy Code, or the appointment of or taking possession by a trustee in a case under the Bankruptcy Code.

(b) reinstates the maturity of such claim or interest as it existed prior to the default;

(c) compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law;

7

(d)     if such claim or interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or interest (other than the debtor or an insider of the debtor) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(e)     does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitled the holder of such claim or interest.

**B.    Votes Necessary To Confirm The Plan.**

Under the Bankruptcy Code, impaired claims or interests are placed in classes under a plan, and it is the class that must accept that plan. Section II.A of the Plan and Section VIII.B of this Disclosure Statement summarize the classification of all Claims and Interests under the Plan. There also are some types of claims that are unclassified because the Bankruptcy Code requires that they be treated a certain way. These claims are considered unimpaired, and their holders cannot vote. Section II.B of the Plan and Section VIII.C.1 of this Disclosure Statement describe these Claims in detail.

Under the Bankruptcy Code, a bankruptcy court may confirm a plan if at least one class of impaired claims has voted to accept that plan (without counting the votes of any insiders whose claims are classified within that class) and if certain statutory requirements are met both as to non-consenting members within a consenting class and as to rejecting classes. A class of claims has accepted the plan only when at least a majority in number and at least two-thirds in amount of the allowed claims actually voting in that class vote to accept the plan. A class of interests has accepted the plan only when at least two-thirds in amount of the allowed interests actually voting in that class vote to accept the plan.

**C.    Confirmation Hearing.**

Following the voting on a plan, the Bankruptcy Court will hold a hearing on confirmation of the plan. Even if a plan receives the requisite votes, a plan will not become binding unless and until, among other things, the Bankruptcy Court makes an independent determination that the plan satisfies the various confirmation requirements set forth in Bankruptcy Code section 1129. This determination will be made at the confirmation hearing. As discussed in Section VI of this Disclosure Statement, any holder of an allowed claim or interest may appear and object to confirmation of the Plan.

**D.    Cramdown: Treatment Of Non-Consenting Classes.**

Even if all classes do not consent to the proposed treatment of their claims under a plan, a plan nonetheless may be confirmed if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code. The process by which a plan is confirmed, notwithstanding the existence of a dissenting class, is commonly referred to as "cramdown." The Bankruptcy Code allows dissenting classes to be crammed down if the plan does not "discriminate unfairly" and is "fair and equitable." The Bankruptcy Code does not define unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment.

For a class of secured claims, "fair and equitable" can mean that the secured claimants retain their liens and receive deferred cash payments, the present value of which equals the value of the

8

secured claimant's interest in collateral. For a class of unsecured claims, a plan is fair and equitable if the claims in that class receive value equal to the allowed amount of the claims, or, if the unsecured claims are not fully satisfied, no claim or interest that is junior to such claims receives or retains anything under the plan.

Accordingly, if a class of unsecured claims rejects a plan under which a junior class (*e.g.*, a class of interest holders) will receive or retain any property under the plan, the plan cannot be confirmed (with certain possible exceptions not relevant to the Plan) unless the plan provides that the class of unsecured creditors receives value equal to the allowed amount of the claims in that class.

## V.

## INFORMATION REGARDING VOTING IN THIS CASE

### A.      Voting Instructions.

The Debtor believes that Classes 2, 3, 4, 5, 6, 7, 8, 9, and 10 are impaired and the holders of Claims in those Classes are entitled to vote on the Plan. Further, the Debtor believes that Classes 11 and 12 are impaired; however, because the holders of the Claims in Class 11 and of the Interests in Class 12 will neither receive nor retain value under the Plan on account of those Claims and Interests, they are not entitled to vote and these Classes are deemed to reject the Plan. Administrative Claims and Priority Tax Claims are not classified under the Plan and the holders thereof are not entitled to vote.

In voting to accept or reject the Plan, please use only the ballot (if any) sent to you with this Disclosure Statement, and please carefully read the voting instructions on the ballot for an explanation of the applicable voting procedures and deadlines. If you have received this Disclosure Statement without a ballot, the Debtor believes that you are: (i) a holder of a Claim that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan; (ii) a holder of an Interest that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan, or (iv) otherwise not the holder of a Claim that is entitled to vote to accept or reject the Plan.

If you nevertheless believe that you are entitled to vote on the Plan, you must file and serve a motion requesting a determination that you are entitled to vote on the Plan and arrange for such motion to be heard by the Court prior to the hearing on confirmation of the Plan. Before doing so, you should first confirm that the absence of a ballot was not inadvertent by contacting Kline, Kline, Elliott & Bryant, P.C., Attn: G. David Bryant, Esq., Stephen W. Elliott, Esq. & Mark Monfort, Esq., 720 NE 63rd Street, Oklahoma City, OK 73105, Facsimile: 405-842-4539.

If you wish to vote to accept or reject the Plan, your ballot must be received by the Ballot Tabulator, Maribeth Mills, legal assistant for Kline, Kline, Elliott & Bryant, P.C., at the address or facsimile number listed above, no later than 5:00 p.m. prevailing Central Time, on [_____], 2009. If your ballot is not timely received by the Ballot Tabulator, it will not be counted. Ballots must be provided to the Ballot Tabulator by mail, overnight delivery, messenger, or facsimile. Ballots sent by e-mail will <u>not</u> be accepted by the Ballot Tabulator and will <u>not</u> be counted in tabulating votes accepting or rejecting the Plan.

Any interested party desiring further information with respect to the Plan, or seeking additional copies of this document, should contact in writing the Debtor's Counsel, Kline, Kline, Elliott & Bryant, P.C., Attn:  G. David Bryant, Stephen W. Elliott & Mark Monfort, 720 NE 63rd

Street, Oklahoma City, OK 73105, Facsimile: 405-842-4539. All pleadings and other papers filed in this Case may be inspected by interested parties during regular business hours at the office of the Clerk of the Court, 111 W. 4th Street, Okmulgee, OK, 74447, and are available online through the Court's PACER service (see www.okeb.uscourts.gov for more information). Certain key pleadings and information regarding the Case also are available through a link at www.mahaloenergy.com.

## VI.

## WHO MAY OBJECT TO PLAN CONFIRMATION

A hearing has been scheduled for [_____], 2009 at __:00 __.m. prevailing Central Time before the Honorable Terrence L. Michael, United States Bankruptcy Judge, at the United States Bankruptcy Court, 224 South Boulder Avenue, Tulsa, Oklahoma 74103, to determine whether the Bankruptcy Court will confirm the Plan. By [_____], 2009, the Debtor will File a memorandum of points and authorities and evidence supporting the entry of an order confirming the Plan. This memorandum will be served on the U.S. Trustee and those parties that have requested special notice in this Case.

Any party that objects to confirmation of the Plan must file and serve its objection and evidence in support thereof by [_____], 2009 ("Confirmation Objection Deadline"). Any objection to confirmation of the Plan must be in writing, specify the name and address of the party objecting, set forth the amount of the objecting party's claims and any other grounds giving the objector standing to object, set forth the specific grounds for the objection, and be accompanied by the evidence the objecting party intends to present in support of its objection. Such objection and evidence in support thereof shall be served on the parties identified above in this paragraph.

Any affiant or declarant with respect to an affidavit or declaration filed in support of an objection to Plan confirmation, must be present at the Confirmation Hearing for cross-examination without the necessity of a subpoena. Failure to properly and timely File an opposition to Plan confirmation or appear at the Confirmation Hearing may be deemed to be consent to the Plan's confirmation. If you wish to obtain more information, you should contact: Debtor's Counsel, Kline, Kline, Elliott & Bryant, P.C., Attn: G. David Bryant, Stephen W. Elliott & Mark Monfort, 720 NE 63rd Street, Oklahoma City, OK 73105, Facsimile: 405-842-4539.

## VII.

## DESCRIPTION OF THE DEBTOR'S BUSINESS, EVENTS LEADING THE CHAPTER 11 FILING, AND SIGNIFICANT EVENTS IN THIS CHAPTER 11 CASE

### A.    Description of the Debtor's Business and Assets.

The Debtor is a Delaware corporation, with its business office located in Tulsa, Oklahoma. The Debtor employs approximately 15 persons. The Debtor is wholly-owned by Mahalo Energy Ltd., an Alberta, Canada corporation (the "Parent"), which is itself under the protection of the Companies' Creditor Arrangement Act, under Canadian law.

The Debtor's primary business is the acquisition of, exploration for, and development and production of coalbed methane and shale gas. The Debtor owns interests in approximately 300 producing gas wells, located in Hughes, LeFlore, McIntosh, Okfuskee and Pittsburg Counties in Oklahoma (the "Gas Producing Counties"). The Debtor is the operator of approximately half of the

gas wells in which it owns an interest and leases over 60,000 net acres of coalbed methane and shale gas acreage and mineral interests.

**B.      Description of the Debtor's Major Liabilities.**

**1.      Prepetition Credit Agreement.**

The Debtor is a party to that certain Second Amended and Restated Credit Agreement, dated as of July 11, 2008, among Ableco, as administrative agent, Wells Fargo Foothill, as processing agent, the lenders party thereto, the Debtor, as Borrower, and the Parent, as guarantor, as amended by that certain Amendment Number One to Second Amended and Restated Credit Agreement and Waiver, and Amendment Number Two to Second Amended and Restated Credit Agreement and Consent and Forbearance Agreement dated as of February 20, 2009 (as the same have been amended, restated or modified from time to time, the "Prepetition Credit Agreement").

As of the Petition Date, the Debtor was indebted to the Secured Lenders for secured obligations under this facility (the "Prepetition Credit Agreement") in excess of $73 million ("Outstanding Credit Facility Balance").

As of the Petition Date, the Outstanding Credit Facility Balance included approximately $35.4 million owing to Wells Fargo Foothill (the "WFF Debt") and approximately $38 million owing to Ableco (the "Ableco Debt"). Subject to the detailed terms and conditions of the Prepetition Credit Agreement (and certain exceptions set forth therein), amounts received on account of the indebtedness thereunder generally are to be applied first to satisfy the WFF Debt, before being applied to satisfy the Ableco Debt. Post-petition interest on the WFF Debt accrues in the amount of approximately $250,000 per month plus fees and expenses allowable as part of the Secured Claim of Wells Fargo Foothill. If the value of the Collateral securing the Ableco Debt exceeded the amount of such indebtedness, post-petition interest on that indebtedness would accrue at the rate of approximately $466,000 per month.

The Debtor's obligations under the Prepetition Credit Agreement are secured by liens and security interests against virtually all of the Debtor's assets, including its interests in all of its mineral leaseholds and interests, and all oil, gas other hydrocarbons and other minerals extracted and/or produced from those leased properties, and the proceeds thereof, as well as the rights of the Debtor under the Hedge Agreements described below in Section VII.B.6.

These liens and security interests were first perfected in December 2005 pursuant to a certain Mortgage, Assignment, Security Agreement, Fixture Filing and Financing Statement from Mahalo Energy (CA) Inc. to Union Bank of California, N.A. dated December 2005 ("Union Bank Mortgage"), which was recorded on various dates between December 15, 2005 and December 21, 2005 in each of the Gas Producing Counties, and a UCC-1 Financing Statement filed with the Delaware Secretary of State on December 15, 2005.

The indebtedness under the Prepetition Credit Agreement originated under that certain Credit Agreement dated as of December 12, 2005 between Union Bank, the Debtor, and the Parent, which agreement was amended as of May 31, 2006, and again as of August 15, 2006 (as amended, the "Original Credit Agreement"). On June 30, 2008, Ableco acquired the loans under the Original Credit Agreement and the security documents securing those loans, and the parties amended and restated the Original Credit Agreement. The assignment from Union Bank to Ableco was duly recorded in each of the Gas Producing Counties on July 10, 2008 and July 11, 2008, and a UCC

11

Financing Statement Amendment assigning Union Bank's prior 2005 financing statement was filed with the Delaware Secretary of State on June 30, 2008.

On July 11, 2008, Ableco assigned a portion of the debt under the Prepetition Credit Agreement to Wells Fargo Foothill. In connection with that transaction: (i) the Original Credit Agreement was amended and restated again (*i.e.*, resulting in the Prepetition Credit Agreement), (ii) that certain Amended and Restated Mortgage, Assignment, Security agreement, Fixture Filing and Financing Statement was recorded in each of the Gas Producing Counties on July 17, 2008 and July 18, 2008, and (iii) a supplemental UCC financing statement was filed with the Delaware Secretary of State.

The guaranty granted by the Parent is secured by the assets of the Parent, including its stock in Mahalo. To date, the Secured Lenders have realized approximately $200,000 from the liquidation of the Parent's assets in the Canadian Proceeding, which have been remitted toWells Fargo Foothill in reduction of the WFF Debt. The Debtor estimates that the value of Parent's remaining assets is approximately $250,000, and that the Secured Lenders ultimately may realize an amount that is substantially less from the assets being administered in the Canadian proceeding. Nothing in the Plan or this Disclosure Statement, is intended, nor should it be construed, to alter, modify or prejudice the rights of the Secured Lenders against the Parent or its assets.

As of November 2008, the Debtor and the Canadian Parent were in default on various financial and other covenants under the Prepetition Credit Agreement and had essentially no availability under the revolving facility provided under that agreement. Pursuant to the Amendment Number One to Second Amended and Restated Credit Agreement dated as of November 28, 2008 (the "Amendment"), the Prepetition Credit Agreement was modified to provide for the waiver of specified events of default under the Prepetition Credit Agreement, to modify and reset the financial covenants, to provide for the Secured Lenders to make available to the Debtor and the Parent a "Revolving B Loan" in the aggregate principal amount of $5,000,000 (which was utilized at closing to repay an equal amount of outstanding revolving loan advances under the Prepetition Credit Agreement) and provide additional availability under the Prepetition Credit Facility. The Amendment provided that the Debtor and the Canadian parent would have until March 31, 2009 to repay the Revolving B Loan, and to pay the Secured Lenders a fee ("Facility Fee") equal to $10,000,000. The Facility Fee was subject to reduction depending on the occurrence of specified circumstances, such that if by January 31, 2009, the obligations owing under the Prepetition Credit Agreement had been paid, the Facility Fee would be reduced in half, if by March 31, 2009 the Debtor and Canadian Parent raised $11 million in subordinated debt or equity, the Facility Fee would be reduced to $6 million, and if by March 31, 2009 the Debtor and Canadian Parent raised $15 million in subordinated debt or equity, the Facility Fee would be reduced to $5 million. The Debtor and the Canadian Parent did not meet these thresholds.

The Creditors' Committee has asserted informally that the Facility Fee should not be Allowed, and has further contended that the Collateral securing the Secured Lenders' Claims does not extend to certain leases of undeveloped property  These matters are discussed below in Section VII.E.15.

### 2.   Mechanics and Materialmen Claims.

Over 40 vendors and gas well operators have recorded lien notices or otherwise asserted Secured Claims against Mahalo and its various oil and gas interests on account of labor or goods provided, prior to the Petition Date, in the digging, drilling, torpedoing, completing, operating, or

repairing of gas wells in which Mahalo holds a working interest. These asserted Claims total approximately $12.7 million, including Claims of approximately $3.9 million asserted by Williams. For the reasons discussed below at Sections VIII.C.2.d(1) and VIII.C.2.e(1), Mahalo believes that (i) all of the liens asserted by these vendors and operators (to the extent valid) are junior and subordinate to the liens and security interests of the Secured Lenders, and (ii) the value of those liens in property of the Estate is zero -- rendering these claims as Unsecured Claims.

### 3.　　O&G Royalty Claims.

In the ordinary course of business, the Debtor distributes the proceeds derived from the production of gas wells that it operates to those parties entitled to royalties or overriding royalties with respect to those proceeds ("O&G Royalty Claims"). As of the Petition Date, the Debtor owed parties amounts due on account of O&G Royalty Claims in the approximate amount of $1.3 million.

### 4.　　Other Unsecured Liabilities.

The Debtor estimates that as of the Petition Date there were approximately $4 million in unsecured obligations owed by the Debtor, with respect to which no lien filing has been made by the holders asserting those Claims, with the exception of the intercompany claims described below. This amount includes approximately $900,000 in prepetition working interest obligations owed by Mahalo to working interest holders in wells operated by Mahalo.

### 5.　　Intercompany Claims.

As of the Petition Date, the Debtor's books and records reflect that it owes approximately $22 million to the Parent on account of intercompany obligations. The Parent's right to payment from the Debtor is subject to a first priority security interest in favor of the Secured Lenders. Moreover, pursuant to that certain Intercompany Subordination Agreement dated June 30, 2008, by and among the Debtor, the Parent and Ableco, as administrative agent for the Secured Lenders, the Parent agreed to subordinate its Claims against the Debtor and turnover to the Secured Lenders any and all amounts received in respect of those Claims, until and unless all indebtedness under the Prepetition Credit Agreement (including interest accrued before and after the Petition Date) was paid in full. Under the Plan, the Liquidating Trustee will have the authority to, and may elect to object to the allowance of this intercompany claim and/or seek to have such claim recharacterized as equity. Nothing in the Plan or this Disclosure Statement is intended nor should it be construed to limit the Liquidating Trustee's rights to do so, or the rights of any interested party to oppose such relief.

### 6.　　Hedge Agreements.

Pursuant to the ISDA Master Agreement, dated as of July 16, 2008 (as subsequently amended or modified), and various confirmations and addenda executed in connection therewith, the Debtor is party to certain commodity swap and cap transactions with respect to the market for natural gas (collectively, "Hedge Agreements"), with Wells Fargo Bank, N.A. (the "Hedge Counterparty"). Pursuant to the Hedge Agreements, the Debtor hedged the price that it would realize from the sale of natural gas, through various dates in 2009 and 2010.

Given the decline in the market price of natural gas below the fixed price specified in each of the Hedge Agreements, these agreements currently require the Hedge Counterparty to make net payments to the Debtor. (If the price of natural gas were to rise above the fixed price specified in each of those agreements, then conceivably the Debtor would have to make payments to Wells Fargo Bank, N.A.). The Debtor estimates that if the Hedge Agreements were terminated as of September

30, 2009, such termination would require the Hedge Counterparty to remit no less than $6.5 million in net payments to the Debtor.

### 7. Joint Operating Agreements.

The Debtor is a party to six written and executed joint operating agreements ("JOAs") governing the management and operation of wells. Under two of these JOAs, Mahalo holds working interests in the subject wells and serves as operator of the wells. Under four of these JOAs, Mahalo holds working interests in the wells, but is a non-operator. Each of these JOAs is described below.

As discussed in Section VIII.C.2.d(1), a series of issues exists concerning one or more alleged joint operating agreements between Mahalo and Williams with respect to 56 wells under which Williams serves as operator.

### a. JOAs Re: Wells Operated By The Debtor.

### (1) Southeast Poteau Field JOA.

The Debtor is the operator (as successor) under that certain Operating Agreement dated January 1, 2005, between Vectra CBM, LLC ("Vectra"), as Operator, and Mahalo Energy (USA), Inc., Belport Resources, Inc., Alpine Virtual, LLC, Black Diamond Energy, Inc., Calmar Holdings, LLC, Herco CBM, LLC, Heringer Energy, LLC, Mark A. Erickson, Paul E. Hyams, and Rubicon Oil & Gas, Inc., as Non-Operators (the "SE Poteau Field JOA"). The SE Poteau Field JOA covers lands in LeFlore County, Oklahoma (such lands being T6N-R26E Sections 1-5, 8-11 and 14-16). Black Stone Minerals Company, LP and/or its Affiliate succeeded to Vectra's working interest in the Contract Area, and Mahalo succeeded Vectra as Operator. The SE Poteau Field JOA is based on an industry-standard form, the AAPL Form 610-1989 Model Form Operating Agreement, with minor modifications. As with most operating agreements, it remains in effect for so long as any of the oil and gas leases that are subject thereto remain in effect.

### (2) Kepco JOA.

The Debtor is the operator under that certain Operating Agreement, dated June 25, 2007, between Mahalo Energy (USA), Inc., as Operator, and Kepco Energy, Inc., as Non-Operator, covering T9N-R16E, Section 7, McIntosh County, Oklahoma. This Operating Agreement is based on an industry-standard form, the AAPL Form 610-1982 Model Form Operating Agreement, with minor modifications.

## b. JOAs Re: Wells Operated By Third Parties.

### (1) Island Shelton JOA.

The Debtor is a non-operator under that certain Operating Agreement, dated March 31, 2004, between Vectra, as Operator, and CH4 Production Company, Inc., as Non-Operator ("Island Shelton JOA"). The Island Shelton JOA covers lands in Pittsburg County, Oklahoma, being T7N-R16E Sections 1-18, T7N-R17E Sections 6 and 7, T8N-R16E Sections 10-36, T8N-R17E Sections 7, 18, 19, 30 and 31, and T9N-R17E, Sections 11 and 15. The Island Shelton JOA is depth limited, covering lands within its Contract Area only from the surface of the earth to the base of the Hartshorne Formation. Currently, the parties to the Island Shelton JOA are Vectra, as operator, and Mahalo and CH4 Production Company, Inc., as non-Operators. The Island Shelton JOA is based on an industry-standard form, the AAPL Form 610-1989 Model Form Operating Agreement, with minor modifications.

### (2) Pittsburg County JOAs.

The Debtor is a non-Operator under three (3) Operating Agreements under which Vectra is the Operator, covering small tracts in Pittsburg County, Oklahoma. These Operating Agreements are described as follows.

- Operating Agreement, dated March 8, 1978, between Nelson Petroleum Company, as Operator, and Southeast Energy Company, et al,[8] as Non-Operators. Vectra is the successor Operator under this Operating Agreement, and Mahalo is a Non-Operator. The agreement covers the Nita Basden 1-11 Well, T8N-R17E, Section 11, Pittsburg County, Oklahoma from the surface of the earth to the base of the Cromwell Formation. The Operating Agreement is in the form of the 1956 version of the industry standard form, *i.e.*, the AAPL Form 610-1956 Model Form Operating Agreement, with minor modifications.

- Operating Agreement, dated February 11, 1980, between Potts-Stephenson Exploration Co., as Operator, and Ray H. Potts, et al,[9] as Non-Operators. Vectra is the successor Operator under this Operating Agreement, and Mahalo is a Non-Operator. The agreement covers the Estella George #1-25A Well, T8N-R16E, Section 25, Pittsburg County, Oklahoma. The Operating Agreement is in the form of the 1977 version of the industry standard form, i.e. AAPL Form 610-1977 Model Form Operating Agreement, with minor modifications.

---

[8] The original Non-Operators were: Agate Petroleum, Inc., Southeast Energy Company, K&B Oil Co., John M. Kennedy, Mel Priddy, Rolley Caplinger, James A. Naush, Ronald & Betty Testa, M.W. Priddy, Jr., Amos K. Bass, Oxy USA, Inc., TRC Energy Co., Grace Petroleum Corporation, and Harwill Resources, Inc.

[9] The original Non-Operators were: Ray H. Potts, Robert L. Stephenson, H. Marshall Farrier, Hadson Petroleum Corporation, S.J. Rulewicz, Inc., John L. Cox, and W.O. Pettit.

- Operating Agreement, dated April 17, 2003, between Vectra CBM, LLC, as Operator, and Chatfield Energy, LLC, et al, as Non-Operators,[10] covering T7N-R16E, NE/4 and SW/4 of Section 1 and the N/2 and SE/4 of Section 12. Mahalo is a Non-Operator under this agreement. The Operating Agreement is based on an industry-standard form, the AAPL Form 610-1989 Model Form Operating Agreement, with minor modifications.

### (3)     Disposition of the JOAs.

The Debtor intends to renegotiate and enter into new JOAs to replace some or all of the JOAs. If the Debtor is unable to renegotiate a JOA, it likely will reject the JOA pursuant to the Plan. The Debtor believes that notwithstanding such rejection, where the Debtor currently is operator, it will continue to be the operator of the subject wells, subject to Oklahoma law. Where the Debtor is a non-operator, the Debtor believes that following rejection of a JOA, its rights and obligations in respect of the subject wells will be determined pursuant to Oklahoma law, but that the Debtor will in all instances retain its working interest in the wells that were subject to the rejected JOA.

### C.     Debtor's Board and Management.

The board of directors for the Debtor currently is comprised of a single director, Gary Dundas. Mr. Dundas also is a director of the Parent. On the Petition Date, James Burns served as the President and Chief Executive Officer ("CEO") of the Debtor. On June 30, 2009, Mr. Burns resigned as President and CEO of the Debtor. On July 10, 2009, David Burton was appointed President and CEO of the Debtor and currently holds those positions. As President and CEO, Mr. Burton is responsible for the overall operations of the Debtor, management of its business and financial affairs, and overseeing its reorganization effort.

### D.     Events Leading To The Chapter 11 Filing.

In early 2008, the Debtor began an aggressive effort to exploit its gas properties and develop its shale gas resources. These development decisions were made in an environment of rapidly increasing commodity prices, with many oil and gas companies drilling and producing at near record levels. During the same period, shale gas mineral rights achieved all-time high prices in Southeast Oklahoma.

To fund its development plan, the Debtor entered into the Prepetition Credit Agreement, which provided the Debtor with increased liquidity. The Debtor's capital spending plan resulted in increased production but not in quantities sufficient to meet the Debtor's targets or the thresholds required under the Prepetition Credit Agreement. Additionally, the Debtor experienced operational issues with a major interstate gas transmission line, which caused price differentials for the Debtor's gas to increase dramatically for several months and consequently reduced the price realized by the Debtor for its gas production.

---

[10]  The original Non-Operators were: Chatfield Energy, LLC, Alpine Virtual, LLC, Roger C. DeMuth, Crow Creek Energy, LLC, JDS Investments LLC, Andrew J. & Shelly D. Iseman, Christopher J. Nightengale, Freeport Drilling, LLC, Herco Okl CBM, LLC, Methane Engineering, LLC, E.C. Yegen, Jr., Adelaide Energy, LLC, Heringer Energy, LLC, Dakake, LLC, Calvin Cahill, Paul E. Hyams, Rubicon Oil & Gas, Inc., and CH4 Production Company.

16

In the second half of 2008, a major and rapid decline in natural gas prices occurred. The impact to the Debtor of lower commodity prices was mitigated by a hedging program implemented by the Debtor in July 2008, when commodity prices were close to the highest point of the year. The weakened global economy and restricted access to capital markets, however, limited the Debtor's access to alternative sources of capital. In the fourth quarter of 2008, the Debtor suspended its development program.

As of September 30, 2008, the Debtor was in default under the Prepetition Credit Agreement. As noted above, the Debtor and the Secured Lenders entered into the Amendment to the Prepetition Credit Agreement in November 2008. At that time, the Debtor also retained GMP Securities L.P. to assist it in evaluating and seeking financial alternatives, including a sale, merger, equity financing or other financial restructuring. GMP's efforts did not result in a sale, merger or other financial restructuring that was satisfactory to the Debtor or sufficient to satisfy the Debtor's obligations to the Secured Lenders. See Section VII.B.1 (discussing Amendment and milestone requirements set forth therein).

On March 5, 2008, the Debtor received a reservation of rights letter from the Secured Lenders notifying the Debtor that it was again in default under the Prepetition Credit Agreement for failure to comply with certain covenants thereunder.

Faced with these defaults, inadequate purchase proposals, and inadequate capital resources to maintain and grow its business, the Debtor determined that a chapter 11 case would provide it the best alternative for restructuring its financial obligations and maximizing the value of its assets for the benefit of all stakeholders. Accordingly, the Debtor entered into negotiations with the Secured Lenders regarding limited debtor in possession financing to fund a chapter 11 case and a chapter 11 sale of the Debtor's assets to Ableco, subject to higher and better bids. Shortly after reaching agreements with respect to those transactions, the Debtor filed its voluntary chapter 11 petition.

### E. Significant Events During The Chapter 11 Case.

#### 1. Continuation of Business.

The Debtor filed its voluntary petition for relief on May 21, 2009. Subsequent to the Petition Date, the Debtor has continue to operate as a debtor-in-possession subject to the supervision of the Bankruptcy Court.

#### 2. Recusal of Judge Cornish.

On May 22, 2009, Judge Tom R. Cornish, of the United States Bankruptcy Court for the Eastern District of Oklahoma, recused himself from the Case. The Case was transferred to Judge Terrence L. Michael, of the United States Bankruptcy Court for the Northern District of Oklahoma, who presides over the Case. The Case, however, remains pending in the United States Bankruptcy Court for the Eastern District of Oklahoma, where the Case was originally filed.

#### 3. Postpetition Financing Motion.

On the Petition Date, the Debtor filed its *Emergency Motion for Order Under 11 U.S.C. §§ 105(a), 361, 363, and 364 and Fed. R. Bankr. P. Rules 2002, 4001, & 9014: (I) Authorizing Debtor to Incur Postpetition Secured Indebtedness, (II) Granting Security Interests and Superpriority Claims, (III) Approving Use of Cash Collateral, and (IV) Scheduling Final Hearing* [Docket No. 24] (the "DIP Financing Motion"), seeking authorization to obtain $2,000,000 in post-petition financing.

On May 27, 2009, the Bankruptcy Court determined that there had been insufficient notice of the DIP Financing Motion and scheduled a hearing to consider the motion on June 8, 2009. At the May 27 hearing, the Debtor orally moved the Bankruptcy Court for entry of a stipulation authorizing the emergency use of cash collateral through June 8, 2009; the Bankruptcy Court entered the Interim Stipulation and Order [Docket No. 75] on June 1, 2009.

On June 8, 2009, the Bankruptcy Court conducted a hearing on the DIP Financing Motion. On June 9, 2009, the Bankruptcy Court rendered findings of fact and conclusions of law and entered an order denying the DIP Financing Motion without prejudice to refiling [Docket No. 129]. As indicated in the following Section VII.E.4, the Debtor has been operating on the cash generated from its business, pursuant to month-to-month cash collateral budgets and orders. To date, the Debtor has not refiled any postpetition financing motion.

### 4. Cash Collateral Motions.

On June 10, 2009, the Debtor filed its *Emergency Motion for Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection in the Form of Security Interests and Protection Under 507(b), and (III) Scheduling a Final Hearing* [Docket No. 134] (as amended, the "Second Interim Cash Collateral Motion"). On June 12, 2009, the Bankruptcy Court entered an order granting the Second Interim Cash Collateral Motion, authorizing the use of cash collateral pursuant to a budget attached to the Second Interim Cash Collateral Motion for the period from June 8, 2009 through the earlier of (i) June 25, 2009 or (ii) the occurrence of an early-termination event [Docket No. 171]

Upon the Debtor's subsequent motions, the Court has entered a series of cash collateral orders, authorizing the Debtor to use cash collateral pursuant to an agreed-upon budget for periods of approximately one month each, unless terminated earlier by one of number of enumerated termination events.

Currently, the Debtor is using cash collateral pursuant to the *Sixth Interim Order (I) Authorizing the Continued Use of Cash Collateral, and (II) Granting Adequate Protection In the Form Of Security Interests and Protection Under 507(b) and (III) Directing That Notice Be Given of a Final Hearing Pursuant to Federal Rule of Bankruptcy Procedure 4001(b)(2)* [Docket No.424] ("Sixth Interim Order"). That order authorizes the use of cash collateral for the period from October 7, 2009 through the earlier of (i) November 9, 2009 or (ii) the occurrence of an early-termination event.

### 5. Sale Motion.

On the Petition Date, the Debtor filed its *Motion for an Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Rules 2002 and 6006, Fed. R. Bank. P.: (I) (A) Authorizing and Scheduling an Auction at Which the Debtor Will Solicit Higher and Better Offers in Connection with the Sale of Substantially All Assets of the Estate; (B) Approving the Bidding Procedures for Such Assets; and (C) Approving the Form and Scope of Notice of the Bidding Procedures and Auction; (II) Approving the Sale of the Assets Free and Clear of All Liens, Claims and Encumbrances; and (III) Granting Related Relief as Requested Herein* [Docket No. 23] (as amended, the "Sale Motion"). On June 8, 2009, the Bankruptcy Court conducted a hearing on the Sale Motion. On June 9, 2009, the Bankruptcy Court rendered findings of fact and conclusions of law and entered an order denying the Sale Motion without prejudice [Docket No. 128].

18

## 6. Creditors' Committee Formation.

The U.S. Trustee gave notice of the appointment of the Creditors' Committee on June 5, 2009 [Docket No. 93] and amended notice on June 11, 2009 [Docket No. 144]. The current members of the Creditors' Committee are as follows (with the representative for each indicated in parenthesis): Mustang Fuel Corporation (Rand Phipps); West Rock Energy Consultants (Ryan Ganske); Scientific Drilling International, Inc. (Rosa E. Rivera); Baker Hughes Oilfield Operations, Inc. (Chistopher J. Ryan); and River Valley Oilfield Enterprises. During the Case, Rose Resources Oil & Gas, Inc. (Timothy J. Stanley) resigned from the Creditors' Committee.

## 7. Retention of Professionals.

The Debtor requested that the Bankruptcy Court enter orders authorizing the employment of (i) Kline, Kline, Elliott & Bryant, P.C., as attorneys for the Debtor [Docket No. 13; supplemented at Docket No. 100]; (ii) GMP Securities L.P., as financial advisor for the Debtor in connection with the proposed asset sale [Docket No. 22]; (iii) Alvarez & Marsal North America, LLC, as restructuring advisors [Docket No. 247]; (iv) William Huffman as special counsel before the Oklahoma Corporation Commission [Docket No. 332], and (v) Michael D. Stack, P.C. as special counsel before the Oklahoma Corporation Commission [Docket No. 332].

On June 15, 2009, the Bankruptcy Court entered an order approving the retention of Kline, Kline, Elliott & Bryant, P.C. [Docket No. 173]. The Debtor withdrew its application to retain GMP Securities L.P. On August 14, 2009, the Bankruptcy Court entered an order approving the retention of Alvarez & Marsal North America, LLC [Docket No. 328]. On August 26, 2009, the Bankruptcy Court entered orders approving the retention of William Huffman [Docket No. 343] and Michael D. Stack, P.C. [Docket No. 344].

The Creditors' Committee filed applications requesting that the Bankruptcy Court enter orders authorizing the employment of (i) Baker & McKenzie LLP, as counsel for the Committee [Docket Nos. 195, 233]; and (ii) Federman & Sherwood, P.C., as local counsel for the Committee [Docket Nos. 198, 289]. On July 31, 2009, the Bankruptcy Court entered orders approving the retention of (i) Federman & Sherwood P.C. [Docket No. 298] and (ii) Baker & McKenzie LLP [Docket No. 299].

Three of the professional applications filed in the Case were filed approximately one month or more after the Petition Date: Baker & McKenzie LLP (June 22, 2009), Federman & Sherwood (June 22, 2009), and Alvarez and Marsal North America LLC (July 2, 2009). In an Order to Show Cause [Docket No. 216], and during the course of several hearings regarding these matters, the Court indicated that these applications were not timely filed and that under applicable law, these professionals may not be entitled to be compensated for work performed prior to the filing of their applications, absent a showing of "extraordinary circumstances." The Court ultimately chose to defer a determination of that issue until such time as the Court considers the affected professionals' fee applications.

On the Petition Date, the Debtor filed its Motion for Order Establishing Interim Compensation and Expense Reimbursement Procedure, Combined with Brief in Support [Docket No. 19]. The Bankruptcy Court entered an order granting the motion on June 26, 2009 [Docket No. 232].

### 8. Employee Retention Program.

On July 22, 2009, the Debtor filed the Debtor's Motion For Authority To Implement Retention Plan, Combined With Brief In Support [Docket No. 276], seeking approval of a retention incentive program for non-insider employees of the Debtor.  Pursuant to the program, the Debtor proposed to pay each non-insider employee who remained employed by the Debtor after the Petition Date one week's salary for each month the employee remained employed by the Debtor after the Petition Date, payable upon termination for any reason, other than termination for cause.  The Bankruptcy Court entered an order approving the program on August 12, 2009 [Docket No. 276].  Pursuant to the program, the aggregate retention bonus payable to eligible employees accrues at approximately $22,000 per month.  As of the date of this Disclosure Statement, approximately $13,000 had been disbursed under the program and the accrued potential payout liability under the program was approximately $151,000.

### 9. Vectra Relief From Stay Motion.

On June 12, 2009, Vectra CBM, LLC ("Vectra"), the operator of certain gas wells in which the Debtor holds a working interest filed its *Motion For Order under 11 U.S.C. §§ 362 and 553 For Relief From The Automatic Stay To Allow Recoupment and Setoff* [Docket No. 165].  By its motion, Vectra sought relief from the automatic stay to permit the recoupment and setoff of expenses incurred by Vectra and owed by the Debtor against payments due to the Debtor.  The Debtor filed an objection to the Motion on June 22, 2009 [Docket No. 200].  On June 25, 2009, the Bankruptcy Court entered an agreed form of order under which the Debtor was directed (subject to having authority to use cash collateral) to pay monthly joint interest billings submitted by Vectra to the Debtor and Vectra was directed to pay the revenue generated from the Debtor's working interests, when due in the ordinary course of business.  The parties' rights were reserved with respect to all other issues, and the adjudication of all other issues raised by the motion were held in abeyance.

### 10. SemGas Motion To Compel Assumption or Rejection.

On June 25, 2009, SemGas, LP ("SemGas"), a firm that provides gas gathering and transportation services to Mahalo filed its *Motion For An Order Requiring The Debtor To Assume or Reject An Executory Contract With SemGas, L.P.* [Docket No. 225].  The Debtor [Docket No. 262], Ableco [Docket No. 266], and the Creditors' Committee [Docket No. 267] objected to the motion.  On August 12, 2009, the Bankruptcy Court entered an agreed order providing a mechanism by which postpetition amounts due to SemGas would be paid directly from the proceeds of postpetition gas sales [Docket No. 317].  On August 12, 2009, however, the Bankruptcy Court also entered an order denying SemGas' request to compel the Debtor to assume or reject its gas gathering agreement with SemGas [Docket No. 318].

### 11. Claims.

#### a. Scheduled and Filed Claims.

Pursuant to its Schedules of Assets and Liabilities filed by the Debtor on May 21, 2009 [Docket No. 4], the Amendments thereto filed on June 5, 2009 [Docket No. 101], (collectively, the "Schedules"), the Debtor estimated the total amount of the Claims against the Debtor to be approximately $113 million.  Secured Claims accounted for approximately $82 million of that total amount; Priority Claims and Priority Tax Claims accounted for approximately $4,800, and General Unsecured Claims accounted for $30.8 million.  With the exception of the secured indebtedness under the Prepetition Credit Agreement, the Debtor indicated in its June 5 amendments that all of the

20

Secured Claims it had scheduled were "Disputed." For a discussion of the disputes regarding the secured status of these claims for purposes of the Bankruptcy Code, please see Sections VIII.C.2.d(1) and VIII.C.2.e(1)herein.

The Court has set October 13, 2009 as the last day ("Bar Date") for filing proofs of Claim in the Case, and November 17, 2009 as the Bar Date for governmental units to file proofs of Claim in the Case. The Debtor has provided notice of the bar date to thousands of parties that are creditors or potential creditors of the Debtor. As a result, approximately 200 claims have been filed to date, asserting $85.3 million in secured claims, $710,000 in priority unsecured claims, and $5.9 million in non-priority unsecured claims.

The Debtor has commenced an evaluation of the proofs of claim filed in its case and preliminarily concluded that some of the claims asserted are objectionable and ultimately should be disallowed. As the Debtor's analysis of these Claims has not been completed, however, the extent to which proofs of claim filed by creditors exceed the amounts set forth in the Schedules, and the extent to which there may be allowable claims not reflected in the Schedules, is not yet clear.

### b. Claim Objections.

Prior to the Effective Date of the Plan, the Debtor will retain the right to object to Claims. Upon the Effective Date of the Plan, the Reorganized Debtor shall have the right to object to Claims, except with respect to General Unsecured Claims, which right shall be vested in the Liquidating Trustee, on behalf of the holders of General Unsecured Claims. The deadline for the filing of objections to Claims under the Plan is, unless extended by Order of the Court, the later of: (a) 180 days after the Effective Date, and (b) 180 days after the date on which the subject proof of Claim was Filed.

**ALL RIGHTS ARE RESERVED ON BEHALF OF THE DEBTOR, THE ESTATE, REORGANIZED MAHALO, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, AND ANY OTHER PARTIES WITH STANDING, WITH RESPECT TO THE ALLOWANCE OR DISALLOWANCE OF ANY AND ALL CLAIMS, INCLUDING CLAIMS NOT REFERENCED IN THE DISCLOSURE STATEMENT.**

**THEREFORE, IN VOTING ON THE PLAN, NO CREDITOR MAY RELY ON THE ABSENCE OF AN OBJECTION TO ITS PROOF OF CLAIM AS ANY INDICATION THAT THE DEBTOR, THE ESTATE, REORGANIZED MAHALO, THE LIQUIDATING ESTATE, THE LIQUIDATING TRUSTEE, OR OTHER PARTIES IN INTEREST ULTIMATELY WILL NOT OBJECT TO THE AMOUNT, PRIORITY, SECURITY, OR ALLOWABILITY OF SUCH CLAIM, OR SEEK TO SUBORDINATE SUCH CLAIM. CREDITORS SHOULD ASSUME INSTEAD THAT ANY SUCH PARTY THAT IS ENTITLED TO DO SO: (I) WILL FILE AN OBJECTION TO ANY PROOF OF CLAIM THAT IS NOT LISTED IN THE DEBTOR'S SCHEDULES, DIFFERS IN AMOUNT OR PRIORITY FROM THE AMOUNT OR PRIORITY OF SUCH CREDITOR'S CLAIM AS LISTED IN THE SCHEDULES, OR IF SUCH CREDITOR'S CLAIM IS LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, (II) WILL PROSECUTE, ALL OBJECTIONS TO CLAIMS AND COUNTERCLAIMS THEY MAY HAVE WITH RESPECT TO CLAIMS ASSERTED, AND (III) EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, WILL PROSECUTE CLAIMS OF THE DEBTOR OR THE ESTATE (INCLUDING RIGHTS TO AFFIRMATIVE RECOVERY, RIGHTS TO SUBORDINATE CLAIMS, AND RIGHTS TO AVOID TRANSFERS).**

12. **Potential Turnover Issues.**

    a. **Gas Proceeds.**

In the ordinary course of business, the Debtor sells the natural gas produced by its wells through gas marketing firms, who effectively serve as distributors of natural gas to wholesale gas purchasers. Typically, following a completed sale, the gas marketing firm remits the proceeds of sale to Mahalo. Mahalo, in turn, distributes to the holders of working interests, royalty interests and overriding royalty interest holders an amount equal to the amount owing to such holders.

As of the Petition Date and thereafter, several of the gas marketing firms suspended payment of certain gas proceeds to Mahalo based upon their receipt of noticing from various vendors asserting liens in those funds. The gas marketing firms have been unwilling to release these funds either to Mahalo or the lien claimants based upon a concern that they might incur double-liability if they release the funds to the "wrong" party.

As of August 31, 2009, the following gas marketing firms were holding suspended gas sale proceeds: Clearwater Enterprises (including its Affiliates, "Clearwater") was holding approximately $1.9 million, Oneok Energy Services Company (including its Affiliates, "Oneok") was holding approximately $209,000, and Enerfin Resources (including its Affiliates, "Enerfin") was holding approximately $14,000 (collectively, the "Suspense Funds").

During the Case, the Debtor has been in negotiations with Clearwater, Oneok and Enerfin (each a "Gas Marketer") and various lien claimants regarding a consensual order that would facilitate the payment of these suspended funds to the Debtor and eliminate the risk of double liability with which the Gas Marketers are concerned. As of the date of this Disclosure Statement, the Debtor has negotiated a consensual order, but had not obtained signatures from all of the relevant parties. If the consensual order is not endorsed by all parties, the Debtor may elect to bring a turnover action in the Bankruptcy Court or other appropriate request to resolve this matter and ensure that these funds are turned over to the Estate.

    b. **Oklahoma Drilling Credits.**

The Debtor holds working interests in, among others, wells that currently are operated by Williams Production Mid-Continent Company ("Williams Production"). In connection with certain of these wells, the Debtor is entitled -- as a working interest holder -- to a pro rata share of the cash resulting from certain drilling credits issued by the State of Oklahoma prepetition with respect to those wells -- approximately $600,000 (the "Williams/Oklahoma Drilling Credits"). To date, Williams Production has yet to remit the Debtor's share of those funds. The Debtor may elect to bring a turnover motion in the Bankruptcy Court or other appropriate motion to resolve this matter and ensure that these funds are turned over to the Estate. Under the Plan, as further described below, if Williams accepts the compromise treatment proposed under Class 4 of the Plan, the Debtor will waive its rights to payment on account of the Williams/Oklahoma Drilling Credits. If, however, Williams elects instead to litigate its Claims, the Debtor and/or Reorganized Mahalo will seek relief requiring Williams to remit that amount to the Estate.

* * *

**THE DEBTOR, THE ESTATE, AND REORGANIZED MAHALO EXPRESSLY RESERVE THEIR RIGHTS TO SEEK THE TURNOVER OF THESE AND ANY OTHER MONIES OR PROPERTY TO WHICH THEY MAY BE ENTITLED FROM ANY PARTY,**

22

**IRRESPECTIVE OF WHETHER SUCH MONIES OR PROPERTIES ARE SPECIFICALLY IDENTIFIED HEREIN.**

### 13. Stayed Prepetition Litigation.

The litigation identified on Exhibit 2 to this Disclosure Statement was pending in non-bankruptcy forums on the Petition Date. In all of these matters the Debtor was the defendant and the litigation was stayed on the Petition Date as a result of the automatic stay under Bankruptcy Code section 362(a). The Debtor expects that any Claims against the Debtor and/or the Estate arising from this litigation will be resolved by the Court through the Claims objection and allowance process and that the litigation will therefore be dismissed without further prosecution.

**NO PERSON SHOULD VOTE TO ACCEPT OR REJECT THE PLAN IN THE EXPECTATION THAT THE DEBTOR AND/OR REORGANIZED MAHALO MAY PURSUE OR REFRAIN FROM PURSUING ANY ACTION WHETHER OR NOT THAT ACTION WAS COMMENCED PREPETITION. EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, THE PLAN RELEASES NONE OF THE DEBTOR'S RIGHTS TO COMMENCE ANY ACTION. INSTEAD THE ESTATE'S RIGHTS TO PURSUE THOSE ACTIONS ARE PRESERVED AND VESTED IN REORGANIZED MAHALO.**

### 14. Potential Avoidance Actions.

Payments made by the Debtor within 90 days and one-year of the Petition Date may be recoverable under Bankruptcy Code section 547 as preferential transfers. Also, the Debtor may have other potential "Avoidance Actions," including actions to set aside and/or recover fraudulent transfers arising under Bankruptcy Code sections 544 and 548 and applicable state law, which may apply to transfers preceding the Petition Date by four or more years.

Preferences are the most commonly prosecuted Avoidance Actions. A debtor in possession may recover a payment or other transfer of property made the prior to its bankruptcy filing as preferential if that transfer: (a) was made to or for the benefit of a creditor, (b) on account of a debt owed prior to the payment, (c) at a time when the debtor was insolvent, (d) that allowed the transferee to receive more than it would have received had the transfer not been made and the debtor had been liquidated under chapter 7 of the Bankruptcy Code; and (e) was made during the 90 days immediately prior to its bankruptcy filing (or, if the transferee was an insider, during the one year immediately prior to the bankruptcy filing). A debtor is presumed to be insolvent within the 90 days preceding a bankruptcy filing. If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.

There are certain defenses to preference actions. For example, a transfer made in the ordinary course of the debtor's and transferee's business or according to ordinary business terms may not be recoverable. Furthermore, if the transferee gave, subsequent to the transfer, new value to the debtor (and for which the transferee was not paid), the new value constitutes an offset against the amount of any recovery. Likewise, if in a case filed by a debtor with primarily business debts, the debtor in possession may not recover a preference from a party if the property affected by the transfer is less than $5,475. There are additional defenses as well.

On May 21, 2009 [Docket No. 4], the Debtor filed its Statement of Financial Affairs and certain Amendments thereto on June 5, 2009 [Docket No. 101] (collectively, the "SOFA"). The SOFA lists payments made in the 90 days immediately preceding the Petition Date and a listing of all payments to insiders within one-year of the Petition Date. In the SOFA, the Debtor has identified

approximately $4.5 million in prepetition payments that may constitute preferential transfers under chapter 5 of the Bankruptcy Code.

At this point, the Debtor cannot estimate potential recoveries from possible litigation surrounding such payments. However, the Debtor does note that a substantial amount of these payments include a large number of small payments to individual recipients on account of working interests, royalty interests and/or overriding royalty interests in oil wells, and/or to vendors that may assert mechanics or materialmen liens. To the extent a representative of the Estate sought to recover such amounts as preferential, it would be barred from doing so where the payment it sought to recover is less than $5,475. Further, many of these recipients are likely to assert that the payments were made on account of a secured claim or trust claim -- such that the payment did not improve the creditor's position as compared to a hypothetical chapter 7 liquidation. The Debtor cannot estimate the amounts that are likely to be recoverable as preferential transfers.

Under the Plan, most of the Debtor's potential Avoidance Actions will be vested in a Liquidating Trust, whose trustee will be charged with liquidating those potential causes of action for the benefit of holders of Allowed General Unsecured Claims. Specifically, the Liquidating Trust will be vested with the Designated Avoidance Actions: *i.e.*, the Avoidance Actions of the Estate, excluding (i) Avoidance Actions against the parties listed on the Avoidance Exception Exhibit, (ii) Avoidance Actions against Williams, and (iii) Avoidance Actions that are released pursuant to the Plan or the Confirmation Order.

The Debtor believes that the Avoidance Actions listed on the Avoidance Actions Exceptions Exhibit comprise those parties whose continued services and support are essential to the Debtor's continued operations and/or the prevention of any interruption in operations or loss of value. The Debtor estimates that the parties listed on the Avoidance Actions Exceptions Exhibit collectively received payments within the 90 days prior to the Petition Date, in the aggregate, of less than $370,000. The Debtor respectfully submits that the exclusion of these potential actions from the scope of actions vested in the Liquidating Trust is a reasonable and appropriate part of the comprehensive compromise reflected under the Plan, under which, among other things, Ableco is permitting junior creditors to receive significant distributions.

Likewise, the exclusion of the Williams Avoidance Actions is reasonable and beneficial. If Williams accepts the compromise treatment embodied in the Plan, the Estate (including the holders of Unsecured Claims) will benefit from the elimination of approximately $3.9 million in Unsecured Claims from the aggregate claims pool sharing in the consideration being made available for Allowed General Unsecured Claims, and avoiding the costs and risks associated with the litigation of those issues. If Williams rejects the compromise treatment embodied in the Plan, the retention of the Williams Avoidance Actions also is appropriate, as the facts, circumstances and issues relating to such causes of action are inextricably linked with the facts, circumstances and issues relating to the defenses of the Estate to the Claims of Williams, and other causes of action that do not constitute Avoidance Actions, and it is appropriate to resolve these matters in a single forum.

### 15. Potential Issues Regarding Scope and Enforcement of Secured Lenders' Liens and Claims.

The cash collateral orders entered by the Court to date, including the Sixth Interim Order, contain provisions requiring that any motion or proceeding by a non-debtor party with standing to challenge the validity, perfection, or enforceability of the claims and liens held by the Secured Lenders and/or Wells Fargo Bank, N.A. (the "Finance Parties") would have to have been filed no

later than September 15, 2009, unless the Finance Parties agreed to a later date, or the Court specified a different date. (To the extent set forth in those orders, such deadline does not apply to disputes between and among lienholders regarding the relative priority of their liens.)

As of September 15, 2009, no party in interest had filed a challenge to the liens or claims of the Finance Parties. As a result, the validity, perfection and enforceability of the liens and claims of the Finance Parties, all as more fully described in those orders, became binding on the Estate and all parties in interest, with the exception of certain parties as to which the Finance Parties agreed to a later date.

Specifically, the Finance Parties agreed to extend the deadline for the filing of any such challenge to November 16, 2009 for the following parties, but only the following parties: the Creditors' Committee, Savanna Energy Services, Trailblazer Drilling Corp, Penn Virginia Oil & Gas Corporation, Penn Virginia MC Operating Company, LLC, Williams Arkoma Gathering Company, LLC, and Williams Production Mid-Continent Company. The Finance Parties also agreed to extend such deadline to October 15, 2009 for United States Trustee (on behalf of itself and any chapter 7 trustee that hypothetically might assume control of the Estate if the case were to be converted to chapter 7).

With respect to the Secured Lenders' liens and claims, the Creditors' Committee has informally raised several potential issues. First, the Creditors' Committee has contended that there are certain oil and gas leases and/or wells that are not covered by the Secured Lenders' liens and security interests, either directly or indirectly (*i.e.*, by virtue of "after acquired" property clauses), and/or as to which the Secured Lenders' liens and security interests are not perfected. The Creditors' Committee contends that these oil and gas wells and leases are unencumbered property of the Estate that should be made available to the holders of Allowed General Unsecured Claims. As set forth in Section II.C.9 of the Plan, the Debtor has proposed to address this contention by providing the Creditors' Committee the option under the Plan of having Reorganized Mahalo transfer to the Liquidating Trust, for the benefit of the holders of Allowed General Unsecured Claims, its interests in the oil and gas leases described on Exhibit F to the Plan. *See* Section VIII.C.2.i.

Second, the Creditors Committee has suggested that it may seek to disallow or avoid the Claim of the Secured Lenders on account of the Facility Fee. This fee, which is discussed above at Section VII.B.1, is part of the Ableco Debt. Ableco contends that the Facility Fee was fully earned prepetition, outside the 90-day preference period, and following an arm's length negotiation, and that it is enforceable as a matter of New York law (the law that is applicable under the Prepetition Credit Agreement and determinative of the allowance of the claim under Bankruptcy Code section 502(b)). In Ableco's view, the fact that the Facility Fee may have been reduced in the event that certain conditions subsequent may occurred (which did not occur) does not alter this analysis. Further, $5 million of the Facility Fee was not subject to reduction in any event. The Creditors Committee has expressed its view that notwithstanding the foregoing, there may be a basis to disallow or avoid the Facility Fee. Ultimately, however, the resolution of this issue is of no practical import to the feasibility Plan or the extent of the distributions to be realized by the holders of Allowed General Unsecured Claims because Ableco is not receiving a distribution on account of its Unsecured Deficiency Claim, which exceeds $10 million -- the amount of the Facility Fee.

# VIII.

## SUMMARY OF MATERIAL PLAN PROVISIONS

The following is a narrative description of certain provisions of the Plan. The Plan is attached hereto as Exhibit 1. The following summary of the Plan is qualified in its entirety by the actual terms of the Plan. In the event of any conflict, the terms of the Plan will control over any summary set forth in this Disclosure Statement.

### A.    Designation of Classes and Treatment of Claims and Interests Generally.

The Bankruptcy Code requires that a chapter 11 plan divide the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated "unclassified claims."

A chapter 11 plan must designate each separate class of claims and equity interests either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). See Section IV.A.2. If a class of claims is "impaired" under the Bankruptcy Code, the holders of claims in that class are entitled to vote on the plan (unless the plan provides for no distribution to the class, in which case the class is deemed to reject the plan) see Section IV.A, and to receive, under the plan, property with a value at least equal to the value that the holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. See Section 0. If a class of claims is unimpaired, the holders of claims in that class are deemed to accept the plan.

### B.    Distinction Between Secured Claims and Unsecured Claims and Valuation of Collateral.

Under the Bankruptcy Code, a claim is divided between a "secured" and an "unsecured" claim. A claim is secured only to the extent that the lien securing such claim is valid and enforceable and the value of the collateral securing such claim (in this Case determined as of the Confirmation Date) exceeds the allowed portion of the claim. The rest of the claim is unsecured.

In this Case, as noted at the outset of this Disclosure Statement at Section II, the Claims allegedly secured by liens against Collateral vastly exceed the value of the Collateral securing such Claims. The liens and security interests held by Wells Fargo Foothill first arose in December 2005, and as a result, the Debtor believes that these liens are senior to all other liens asserted in this Case. In fact, the Debtor believes that the only fully Secured Claim in this Case is held by Wells Fargo Foothill, which holds the senior interest under the Prepetition Credit Agreement securing the WFF Debt of approximately $34.5 million, plus post-petition interest and fees.

The value of the Collateral securing the Ableco Debt is insufficient to render the entire Ableco Debt of approximately $38 million secured for purposes of the Plan. The Plan proposes to treat $27.5 million of the Ableco Debt as an Allowed Secured Claim, and the rest (approximately $10 million in indebtedness, not including any fees and expenses Allowed under Bankruptcy Code section 502) as an Allowed General Unsecured Claim. This is referred to in the Plan as the Ableco Unsecured Deficiency Claim. Of the $27.5 million in Allowed Secured Claims, $25.5 million will be repaid pursuant to an instrument under which the Debtor will not be obligated to pay principal until maturity and may defer the cash payment of interest unless Reorganized Mahalo's senior

26

leverage ratio is less than 3:00 to 1, in which case interest shall be cash pay. Ableco will receive the New Common Stock in respect of the remaining $2 million in Ableco Secured Claims and the Ableco Adequate Protection Claim. The Plan provides for Ableco to receive no share of the consideration being distributed to the holders of Allowed General Unsecured Claims on account of the Ableco Unsecured Deficiency Claim.

At the Confirmation Hearing, the Bankruptcy Court will be requested to determine that the proposed allocation of the Ableco Debt between a Secured Claim and Unsecured Claim is appropriate under the circumstances. The Debtor believes that this allocation is appropriate under the circumstances in light of the value available for satisfaction of the Debtor's liabilities and the provisions of the Plan. The sole effect of a determination that the value of the Collateral securing the Ableco Debt is greater than $27.5 million would be to increase the amount of Ableco's Secured Claim and to reduce the Ableco Unsecured Deficiency Claim. Although gas prices and market conditions recently have improved somewhat, the Debtor believes based in part on offers and/or expressions of interest received in 2009 that is highly unlikely that the value of the Collateral securing the Ableco Debt would be greater than the amount of that of Ableco's Secured Claim. Thus, the only party affected by a higher value of its Secured Claim would be Ableco, and Ableco is consenting to the allocation proposed under the Plan. Likewise, if the Court were to determine that the value of the Collateral securing the Ableco Debt is less than $27.5 million, this would not affect Reorganized Mahalo's ability to meet is other obligations to creditors under the Plan because the Plan provides that (i) no principal will be paid on Ableco's Secured Claim before maturity and (ii) cash payment of interest is deferred.

As noted at the outset of this Disclosure Statement, while the Debtor is hopeful that Williams and the holders of the Compromised O&G Mechanics/Materialmen Claims will accept the compromise treatment proposed to those holders under the Plan, those holders may not agree. The Plan affords those holders the opportunity to require Reorganized Mahalo (if Mahalo has not done so already) to seek a determination that such holders do not hold Secured Claims. In light of the value available under the Plan, the only way a creditor could prevail in such litigation is if such holder were able to establish that its lien is senior to the liens in favor of the Secured Lenders (*i.e.*, Wells Fargo Foothill and Ableco). Because of the magnitude of the Ableco Unsecured Deficiency Claim, only a holder whose lien is senior in priority to the Secured Claims of the Secured Lenders could establish entitlement to a Secured Claim. Even if such lien were senior to the liens of the Secured Lenders, the holder of that lien could hold a Secured Claim only to the extent the lien securing such Claim has not been avoided under chapter 5 of the Bankruptcy Code, or is otherwise determined to be invalid under the Bankruptcy Code or applicable law, and, if the preceding is satisfied, only to the extent of the value, as such value existed as of the date of the Confirmation Hearing, of the claimholder's interest in Collateral or to the extent of the amount subject to setoff, whichever is applicable.

C.  **Summary of Classification and Treatment of Claims and Interests Under the Plan.**

This Section describes the classification of Claims and Interests under the Plan — except for Administrative Claims and Priority Tax Claims, which are not classified — for all purposes, including voting, confirmation, and distributions under the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the Class description. To the extent that part of the Claim or Interest falls within a different Class description, the Claim or Interest is classified in that different Class. In addition, this Section describes the treatment of Claims and Interests under the Plan. The following table summarizes the classification of Claims

27

and Interests under the Plan, subject to the more specific provisions of the Plan and the following, more detailed discussion of the Plan:

| CLASS/ UNCLASSIFIED CLAIMS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Unclassified Claims | Administrative Claims and Priority Tax Claims | Unimpaired | Not Permitted to Vote |
| Class 1 | O&G Royalty Trust Claims | Unimpaired | Deemed to Accept; Vote Not Solicited |
| Class 2 | Secured Claims of Wells Fargo Foothill | Impaired | Permitted to Vote |
| Class 3 | Claims of Ableco | Impaired | Permitted to Vote |
| Class 4 | Claims Of Williams | Impaired | Permitted to Vote |
| Class 5 | Compromised O&G Mechanics/ Materialmen Claims | Impaired | Permitted to Vote |
| Class 6 | Non-Compromised Lien/Trust Claims | Impaired | Permitted to Vote |
| Class 7 | Secured Tax Claims. | Impaired | Permitted to Vote |
| Class 8 | Priority Claims | Impaired | Permitted to Vote |
| Class 9 | General Unsecured Claims (other than Small Claims) | Impaired | Permitted to Vote |
| Class 10 | Small Claims | Impaired | Permitted to Vote |
| Class 11 | Subordinated Claims | Impaired | Deemed to Reject – Vote Not Solicited |
| Class 12 | Interests | Impaired | Deemed to Reject – Vote Not Solicited |

**Notwithstanding anything to the contrary contained in the Plan, (i) no Claim may constitute an Allowed Secured Claim unless such Claim is an Allowed Secured Claim of the Secured Lenders or is a Claim that is senior in priority to the Allowed Secured Claims of the Secured Lenders and (ii) no distributions will be made and no rights will be retained on account of any Claim or Interest that is not Allowed.**

Except as otherwise expressly provided in the Plan, the treatment in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any Liens) that each person or entity holding an Allowed Claim or an Allowed Interest may have in or against the Debtor, the Estate, Reorganized Mahalo, the Liquidating Trust or their respective property. This treatment

supersedes and replaces any agreements or rights those persons or entities may have in or against the Debtor, the Estate, Reorganized Mahalo, the Liquidating Trust or their respective property. All distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed Claim, if any.

1. **Allowance and Treatment of Unclassified Claims.**

   a. **Administrative Claims.**

   (1) **U.S. Trustee Fees.**

U.S. Trustee Fees are fees payable to the Office of the United States Trustee, as required by law. The Debtor estimates that U.S. Trustee Fees as of the Effective Date will be approximately $7,000. U.S. Trustee Fees shall be allowed in accordance with 28 U.S.C. § 1930. Reorganized Mahalo will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 in cash on the Distribution Date.

   (2) **Cure Payments.**

Cure Payments are those payments necessary to cure monetary defaults under executory contracts and unexpired leases that are being assumed under the Plan. The distribution of Cure Payments with respect to executory contracts and unexpired leases assumed pursuant to the Plan is discussed below at Section X.B.b. The Debtor estimates that the total Cure Payments required by the Plan are $217,000.

   (3) **Professional Fee Claims.**

Professional Fee Claims are those Claims of professionals employed by order of the Bankruptcy Court to represent the Debtor or the Creditors' Committee in the Case. The Debtor estimates that the unpaid Professional Fee Claims as of the Effective Date will be approximately $624,000 (assuming certain projected interim payments are made to professionals prior thereto). A Professional Fee Claim of one of the Debtor's Professionals or one of the Committee Professionals will be allowed only if:

   (a) On or before 60 days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Court a final fee application or a motion requesting allowance of the fees and serves the application or motion on the Debtor's Counsel, counsel to Reorganized Mahalo, counsel to Ableco, counsel to Wells Fargo Foothill, and the U.S. Trustee; and

   (b) The Court allows the Claim pursuant to a Final Order.

Reorganized Mahalo, the Secured Lenders or any other party in interest may File an objection to such application or motion within 20 days of the filing of such application or motion. **Any party holding a Professional Fee Claim that does not timely File and serve a fee application or motion for payment thereof will be forever barred from asserting such Claim against the Debtor, the Estate, Reorganized Mahalo, the Liquidating Trust, or their respective property.**

Reorganized Mahalo will pay or cause to be paid an Allowed Professional Fee Claim, in cash, within (a) fifteen (15) days after the date on which the Bankruptcy Court allows such Claim

pursuant to a Final Order, or (b) such other terms as may be mutually agreed upon between the holders of such Professional Fee Claim and the Reorganized Debtor.

### (4)     Prepetition Administrative Goods Claims.

Prepetition Administrative Goods Claims are those Claims for the value of any goods received by the Debtor within 20 days before the Petition Date, where the goods were sold to the Debtor in the ordinary course of the Debtor's business.  The Debtor estimates that the aggregate of all Prepetition Administrative Goods Claims that may be allowed is $30,000.  Unless the Debtor or Reorganized Mahalo otherwise agree, or unless otherwise expressly provided in the Plan, a Prepetition Administrative Goods Claim will be allowed only if:

(a)     On or before 60 days after the Effective Date (unless the deadline to do so has otherwise expired), the entity holding a Prepetition Administrative Goods Claim both Files with the Court a motion requesting allowance of such Administrative Claim and serves the motion on the Debtor's Counsel, counsel to Reorganized Mahalo, counsel to Ableco, counsel to Wells Fargo Foothill, and the U.S. Trustee; and

(b)     The Court allows the Claim by Final Order.

Reorganized Mahalo, the Secured Lenders or any other party in interest may File an objection to such motion within 20 days of the filing of such motion.  **Any party holding a Prepetition Administrative Goods Claim that does not timely File and serve a motion for payment thereof will be forever barred from asserting such Claim against the Debtor, the Estate, Reorganized Mahalo, the Liquidating Trust, or their respective property.**

Unless the entity holding an Allowed Prepetition Administrative Goods Claim agrees to different treatment, Reorganized Mahalo will pay to the entity holding such Allowed Administrative Claim cash in the full amount of such Allowed Administrative Claim, on or before the latest of: (a) the Distribution Date; (b) fifteen (15) days after the date on which the Prepetition Administrative Goods Claim becomes an Allowed Prepetition Administrative Goods Claim pursuant to a Final Order; and (c) the date on which the Allowed Prepetition Administrative Goods Claim first becomes due and payable in accordance with its terms.

### (5)     Ordinary Course Administrative Claims.

An Ordinary Course Administrative Claim is an Administrative Claim — other than a Claim for U.S. Trustee Fees, Cure Payments, Professional Fee Claims and Prepetition Administrative Goods Claims —  that is based upon a liability that the Debtor has incurred after the Petition Date, in the ordinary course of its business and that is unpaid as of the Effective Date.  The Debtor estimates that Ordinary Course Administrative Claims as of the Effective Date will be approximately $2.8 million, including approximately $2.1 million in O&G Production Claims accrued postpetition.

An entity holding an Ordinary Course Administrative Claim may, but need not, File a motion or request for payment of its Claim.  The Debtor, Reorganized Mahalo or the Secured Lenders may File an objection to an Ordinary Course Administrative Claim in their discretion.

Unless the Debtor, Reorganized Mahalo or a Secured Lender objects to an Ordinary Course Administrative Claim, such Claim will be allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Claim, subject to all defenses, rights of recoupment, offsets

and other rights arising under any agreements between the holder of such Claim and the Debtor, and/or applicable law.

### (6)   Non-Ordinary Course Administrative Claims.

A Non-Ordinary Course Administrative Claim **is** any Administrative Claim other than an Ordinary Course Administrative Claim, a Claim for U.S. Trustee Fees, Cure Payment, Professional Fee Claim or Prepetition Administrative Goods Claim.  The Debtor currently is not aware of any Non-Ordinary Course Administrative Claims asserted against the Estate.  Unless the Debtor or Reorganized Mahalo otherwise agree, or unless otherwise expressly provided in the Plan, a Non-Ordinary Course Administrative Claim will be allowed only if:

> (a)   On or before 60 days after the Effective Date, the entity holding such Non-Ordinary Course Administrative Claim both Files with the Court a motion requesting allowance of the Administrative Claim and serves the motion on the Debtor's Counsel, counsel to Reorganized Mahalo, counsel to Ableco, counsel to Wells Fargo Foothill, and the U.S. Trustee; and

> (b)   The Court allows the Claim by Final Order.

Reorganized Mahalo, the Secured Lenders or any other party in interest may File an objection to such motion within 20 days of the filing of such motion.  **Any party holding a Non-Ordinary Course Administrative Claim that does not timely File and serve a motion for payment thereof will be forever barred from asserting such Claim against the Debtor, the Estate, Reorganized Mahalo, the Liquidating Trust, or their respective property.**

Unless the party holding an Allowed Non-Ordinary Course Administrative Claim agrees to different treatment, Reorganized Mahalo will pay to the party holding such Allowed Administrative Claim cash in the full amount of such Allowed Administrative Claim, on or before the latest of: (a) the Distribution Date; (b) fifteen (15) days after the date on which the Non-Ordinary Course Administrative Claim becomes an Allowed Non-Ordinary Course Administrative Claim pursuant to a Final Order; and (c) the date on which the Allowed Non-Ordinary Course Administrative Claim first becomes due and payable in accordance with its terms.

### (7)   Costs of the Liquidating Trust.

Allowance and payment of the post-Effective Date fees and expenses of the Liquidating Trustee, the fees and expenses of any professionals employed by the Liquidating Trustee, and all other costs and liabilities incurred by the Liquidating Trustee and/or Liquidating Trustee shall be borne exclusively by the Liquidating Trust, as discussed below in Section XI.E.

### b.   Priority Tax Claims.

Priority Tax Claims are those claims of governmental units for taxes entitled to priority treatment under the Bankruptcy Code.  The Debtor estimates that the Allowed Priority Tax Claims will be approximately $60,000.  At the election of Reorganized Mahalo, each Allowed Priority Tax Claim (i) will be reinstated and paid on the date that such Allowed Priority Tax Claim first becomes due and payable in accordance with its terms, (ii) will be paid cash in the Allowed amount of such Allowed Priority Tax Claim on the Distribution Date, (iii) will be satisfied with a promissory note equal to the Allowed amount of such Allowed Priority Tax Claim, bearing interest accruing from the Effective Date at the rate applicable under Bankruptcy Code section 511 or, if no such specific rate is established

31

in conjunction with the Confirmation Hearing, the Prime Rate in effect on the Effective Date, payable in equal quarterly installments beginning on the last day of the first full calendar quarter following the Effective Date, due no later than the fifth (5th) anniversary of the Petition Date, or (iv) will be paid on such alternate terms as Reorganized Mahalo and the holder of such Claim otherwise agree.

### 2. Classification and Treatment of Classified Claims and Interests.

#### a. Class 1 (O&G Royalty Trust Claims).

Class 1 comprises all O&G Royalty Trust Claims listed on the O&G Royalty Claims Exhibit. Class 1 is unimpaired under the Plan and the holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

The Plan will not alter the legal, equitable, and contractual rights of holders of O&G Royalty Trust Claims. The "Claim Amount" indicated on the O&G Royalty Claims Exhibit shall be deemed the Allowed amount of all Claims held by the creditor listed in respect of such amount on such Exhibit and the amount to which such holder is entitled under the Plan. Unless the holder of the Allowed Class 1 Claim agrees to other treatment, on the Distribution Date Reorganized Mahalo shall pay to such holder cash equal to the Claim Amount specified for each such holder on the O&G Royalty Trust Claims Exhibit.

To the extent the holder of an O&G Royalty Trust Claim also asserts a Lien against one or more oil and gas wells, oil and gas leases, oil and gas interests, and/or the proceeds thereof, including Liens asserted under 52 Okla. Stat. §548.2, Article 9 of the Uniform Commercial Code, or other applicable law, for the same amounts owing on account of such O&G Royalty Trust Claim, the treatment provided under the Plan on an account of O&G Royalty Trust Claim shall satisfy and extinguish any such Lien.

#### b. Class 2 (Secured Claims of Wells Fargo Foothill).

Class 2 comprises the Secured Claims of Wells Fargo Foothill, which totaled approximately $35.4 million in principal as of the Petition Date, plus postpetition interest, fees and expenses, including attorneys' fees, under the Prepetition Credit Agreement, incurred through the Effective Date. Class 2 is Impaired under the Plan. The holder of the Class 2 Claims is entitled to vote to accept or reject the Plan.

On the Effective Date, the Secured Claim in favor of Wells Fargo Foothill shall be deemed Allowed in the amount of approximately $37.5 million (collectively, the "Wells Fargo Restructured Debt Amount"), which amount shall include Claims for principal, interest, fees and expenses incurred prior to the Petition Date under the Prepetition Credit Agreement, all post-Petition Date interest, attorneys' fees and expenses incurred thereunder through the Effective Date, and a restructuring fee in respect of the Wells Fargo Foothill Restated Credit Agreement in the amount of $500,000.[11] This Secured Claim shall be satisfied pursuant to the terms of the Wells Fargo Foothill Restated Credit Agreement, which agreement shall have the following material terms:

---

[11] The amount set forth here is an approximate amount. The actual amount shall be determined based upon the actual post-petition fees and expenses incurred by Wells Fargo Foothill following the Petition Date through the Effective Date.

**Principal Face Amount of Debt:** the Wells Fargo Foothill Restructured Debt Amount.

**Type of Loan**:  Term loan.

**Security**:  The Wells Fargo Foothill Restructured Debt Amount shall continue to be secured by all or substantially all presently existing and hereafter arising property of the Debtor and Reorganized Mahalo and shall constitute a senior Lien against such property subject only to (a) Liens that are adjudicated to be senior to the Liens in favor of the Secured Lenders and constitute Allowed Secured Claims.

**Maturity Date**:  Third (3rd) anniversary of Effective Date.

**Term Loan Amortization**:  Equal monthly installments of principal in the amount of $100,000 per month, beginning on the first day of the 19th full calendar month following the month in which the Effective Date occurs.  The balance shall be due and payable on the Maturity Date.

**Interest Rate**:  The principal under the Wells Fargo Foothill Restated Credit Agreement shall bear interest at the rate per annum equal to LIBOR plus 6%, of which 4% shall be payable on a cash basis and 2% shall be payable on a payment-in-kind basis ("Wells Fargo Foothill PIK Interest").  LIBOR shall be adjusted quarterly, but shall be subject to a floor of 3%.  The Wells Fargo Foothill PIK Interest shall be paid-in-kind by adding such accrued Wells Fargo Foothill PIK Interest quarterly to the principal balance under the Wells Fargo Foothill Restated Credit Agreement.

**Financial Covenants:** Financial covenants shall include the following:

- "Borrowing Base" covenant, to be tested monthly, using the most recently completed semi-annual reserve report (and any supplemental report as provided above).  The value of Proved Reserves shall be determined, as of the effective date of such report, on a PV-10 basis, using NYMEX 2-year strip pricing for oil and natural gas as of the effective date of such report, taking into account the price floors under Reorganized Debtor's outstanding hedge agreements.  Borrowing Base to be calculated by applying the following percentages to the values for each of the following categories of Proved Reserves oil and natural gas assets: Proved Developed Producing (100%), Proved Developed Not Producing (100%), and Proved Undeveloped (40%).  Reorganized Mahalo shall be in compliance with this covenant as long as the borrowing base is equal to or greater than the principal balance under the Wells Fargo Foothill Restated Credit Agreement.

- Asset coverage ratio to be tested following the completion of each semi-annual reserve report (and any supplemental report as provided above), but in no event sooner than six months following the Effective Date, not less than 1.2x with respect to any Borrowing Base redetermination prior to or on 06/30/10, and not less than 1.25x with respect to any Borrower Base redetermination after 06/30/10,

33

calculated by dividing the Borrowing Base by the principal balance under the Wells Fargo Foothill Restated Credit Agreement..

- Capital expenditures shall not exceed 100% of the capital expenditure amounts set forth in the cash flow projections for Reorganized Mahalo in the approved Disclosure Statement, or such other budget as Wells Fargo Foothill and Ableco shall mutually agree.

- Minimum production shall meet or exceed 75% of the projected production set forth in the cash flow projections for Reorganized Mahalo in the approved Disclosure Statement, or such other budget as Wells Fargo Foothill and Ableco shall mutually agree. Minimum production shall be tested on a quarterly basis.

**Other Covenants:** Other affirmative and negative covenants shall be based on such affirmative and negative covenants as contained in the Prepetition Credit Agreement, modified to reflect the capital structure and post-Effective Date operations of Reorganized Mahalo, as Wells Fargo Foothill and Ableco shall mutually agree.

**Cash Dominion:** The cash of Reorganized Mahalo shall be maintained in one or more accounts subject to a blocked account control agreement in favor of Wells Fargo Foothill, in such form as Wells Fargo Foothill and Ableco shall mutually agree ("Blocked Account Control Agreement"). For purposes of perfecting their liens in such accounts, Ableco and the Exit Financing Lenders shall also be parties to the Blocked Account Control Agreement and hold control rights thereunder, subject to the control rights of Wells Fargo Foothill.

**Reserve Reports:** Wells Fargo Foothill shall receive an updated reserve report to be completed by Lee Keeling & Associates or another 3rd party engineering firm acceptable to Wells Fargo Foothill and Ableco. Following the Effective Date, Wells Fargo Foothill shall be entitled to semi-annual reserve update reports, and up to two additional update reports each year.

**Fees:** Wells Fargo Foothill shall be entitled to a closing fee of $500,000, which amount is included in the Wells Fargo Foothill Restructured Debt Amount, as set forth above. There shall be no unused line fee, no collateral management fee and no anniversary fee.

**Events of Default**: Events of Default in the Wells Fargo Foothill Restated Credit Agreement shall be based on such events of default as contained in the Prepetition Credit Agreement, modified to reflect the capital structure and post-Effective Date operations of Reorganized Mahalo. Events of Default shall include, among other things, default under the Restated Ableco Credit Agreement and the Exit Financing Agreement, defaults based on non-payment of principal and interest, breach of representations and warranties, failure to comply with affirmative or negative covenants, change of control, cessation of a substantial part of the business, the occurrence of an event that could result in a material adverse effect on the business.

**Governing Law:** Laws of the State of New York.

**Compromise:** Wells Fargo Foothill, as a Secured Lender, shall be deemed a Compromise Party for purposes of the provisions set forth in Section VI.B of the Plan.

**Wells Fargo Foothill Restated Credit Agreement:** Reorganized Mahalo and Wells Fargo Foothill shall enter into the Wells Fargo Foothill Restated Credit Agreement, which shall be in a form acceptable to Wells Fargo Foothill and Ableco. The Wells Fargo Foothill Credit Agreement shall set forth terms of repayment of the Wells Fargo Foothill Restructured Debt Amount; the terms of repayment for other debts owing to other creditors of the Debtor shall be set forth in separate agreements. The Wells Fargo Foothill Credit Agreement shall be subject to an intercreditor agreement between and among Wells Fargo Foothill, Ableco, and the Exit Financing Lenders that shall be in a form acceptable to each of the parties (the "Intercreditor Agreement").

### c.    Class 3 (Claims of Ableco).

Class 3 comprises the Claims of Ableco in respect of the Ableco Debt: its Secured Claims, the Ableco General Unsecured Deficiency Claim and the Ableco Adequate Protection Claim.[12] The Ableco Debt was approximately $38 million as of the Petition Date. Class 3 is Impaired under the Plan. The holders of Class 3 Claims are entitled to vote to accept or reject the Plan. Class 3 provides the following treatment in respect of the Claims of Ableco:

Ableco's Secured Claims shall be deemed Allowed in the aggregate amount of $27.5 million**.**

(a)    On the Effective Date, in consideration for $2 million of Ableco's Secured Claim and the Ableco Adequate Protection Claim, Ableco or its designee shall receive the New Common Stock, less any shares reserved for management and employees under the Employee Equity Incentive Plan.

(b)    On the Effective Date, Allowed Secured Claims of Ableco in the amount of $25.5 million (the "Ableco Restructured Debt Amount") shall be satisfied pursuant to the terms of the Restated Ableco Credit Agreement, which agreement shall have the following material terms:

**Principal Face Amount of Debt:** $25.5 million

**Type of Loan:** Term loan.

**Securit**y: The Ableco Restructured Debt Amount shall continue to be secured by all or substantially all presently existing and hereafter arising property of the Debtor and Reorganized Mahalo. Ableco's Lien on such Collateral of the Debtor and Reorganized Mahalo shall be senior to all other Liens, subject only to (i) the Liens that are adjudicated pursuant to a Final Order to be senior to the Liens in favor of the Secured Lenders and that constitute Allowed Secured Claims, (ii) the Liens in favor of Wells Fargo Foothill securing the debt under the Wells Fargo Foothill Restated Credit Agreement, and (iii) the Liens

---

[12]   To the extent required by the Bankruptcy Court, Class 3 shall be deemed to comprise separate sub-classes comprising, respectively, the Secured Claims and Unsecured Claims of Ableco, provided, that the collective treatment of such Claims in such sub-classes shall be the same as the treatment set forth herein under Class 3.

securing the obligations under the Exit Financing.

**Maturity Date**: Immediately after the maturity of the indebtedness owing to Wells Fargo Foothill under the Wells Fargo Foothill Restated Credit Agreement, provided that to the extent any Secured Claims are Allowed in favor of Williams or the holder of a Non-Compromised Lien/Trust Claim, the maturity date under the Restated Ableco Credit agreement shall be the later of (i) immediately after the maturity of the indebtedness owing to Wells Fargo Foothill under the Wells Fargo Foothill Restated Credit Agreement and (ii) the payment in full of any such Allowed Secured Claim in favor of Williams or the holder of a Non-Compromised Lien/Trust Claim in accordance with the terms of the Plan.

**Term Loan Amortization:** The principal under the Restated Ableco Credit Agreement plus all accrued and unpaid interest thereon shall be due at maturity.

**Interest Rate**: The principal under the Restated Ableco Credit Agreement shall bear interest at the rate per annum equal to LIBOR plus 13%, adjusted quarterly, which shall be paid-in-kind (the "Ableco PIK Interest") by adding such accrued Ableco PIK Interest quarterly to the principal balance under Restated Ableco Credit Agreement; provided, however, that in the event that Reorganized Mahalo's senior leverage ratio is less than or equal to 3.00:1.00, an amount equal to the Ableco PIK Interest shall be payable in cash quarterly until such time as the senior leverage ratio exceeds more than 3.00:1.00.

**Financial Covenants:** Same as the Wells Fargo Foothill Restated Credit Agreement.

**Other Covenants:** Same as the Wells Fargo Foothill Restated Credit Agreement.

**Events of Default:** Same as the Wells Fargo Foothill Restated Credit Agreement. Events of Default shall include default under the Wells Fargo Foothill Restated Credit Agreement and the Exit Financing Agreement.

**Cash Dominion:** The cash of Reorganized Mahalo shall be maintained in one or more accounts subject to the Blocked Account Control Agreement. For purposes of perfecting its liens in such accounts, Ableco shall be a party to such Blocked Account Control Agreement, and hold control rights thereunder, subject to the control rights of Wells Fargo Foothill.

**Governing Law:** Laws of the State of New York.

**Compromise:** In consideration of the undertakings of Ableco under the Plan, on the Effective Date, Ableco shall be deemed a Compromise Party for purposes of the provisions set forth in Section VI.B of the Plan.

**Restated Ableco Credit Agreement:** Reorganized Mahalo and Ableco shall enter into the Restated Ableco Credit Agreement, which shall be in a form acceptable to Ableco and Wells Fargo Foothill. The Restated Ableco Credit Agreement shall be subject to the Intercreditor Agreement.

The treatment set forth above shall be in full satisfaction of all of the Claims of Ableco against the Debtor and the property of the Estate. Ableco shall be deemed to agree to not receive a portion of the consideration available under the Plan to the holders of Allowed General Unsecured

Claims on account of the Ableco General Unsecured Deficiency Claim as against the debtor and property of the Estate.

### d.      Class 4 (Claims Of Williams).

Class 4 comprises the Williams Claims.  Class 4 is impaired under the Plan and the holders of Class 4 Claims are entitled to vote to accept or reject the Plan.  The Williams Claims will be treated either (1) pursuant to the "Williams Compromise Treatment," or (2) the "Williams Non-Compromise Treatment" which are described below in Section VIII.C.2.d(2).  Williams may elect to decline the Williams Compromise Treatment by indicating such election in writing on its Ballot and timely returning that Ballot to the Ballot Tabulator.

### (1)      Background.

### (i)      The Disputes.

Williams has asserted that its Class 4 Claims are Secured Claims in the approximate amount of $3.9 million.  Williams contends that it holds senior Liens on the interests of the Debtor in wells and/or mineral leases in which both the Debtor and Williams jointly hold interests (the "Mahalo/Williams Wells").  For the reasons discussed below, the Debtor believes that this position is wholly without merit and that the Class 4 Claims of Williams are not entitled to be treated under the Plan as anything other than General Unsecured Claims.

The Secured Lenders' Liens and security interests in the Debtor's interests in mineral leaseholds first arose in December 2005, and the Debtor believes these interests are senior to the Liens and security interests asserted by Williams.  *See* Section VII.B.1.  Further, the Debtor believes that the amount of the secured obligations under the Prepetition Credit Agreement far exceeds the value of the interests in which Williams asserts Liens (as well as the value of *all* of the Debtor's mineral interests).  As a result, the interests asserted by Williams in property of the Estate have no value, and the Claims it asserts are not secured claims within the meaning of the Bankruptcy Code. *See* 11 U.S.C. § 506(b).

Williams filed in June 2009 a lien notice in McIntosh County asserting that it was entitled to a statutory mechanics lien under 42 Okla. Stat. § 144 for goods and services provided in respect of Mahalo/Williams Wells in that county.  Williams contends that its lien under Section 144 relates back to a time that is prior to the recordation of the Union Bank Mortgage.  Williams' position is premised upon that portion of Section 144 providing that an oil and gas mechanics lien, once perfected by the recordation and delivery of an appropriate notice, relates back to "the furnishing of the first item of material or the date of the performance of the first labor or services."  In so doing, Williams contends that its Liens are senior to those of the Secured Lenders.

The problems with Williams' position, however, are numerous.[13]  First, the Debtor believes that the first services performed on the Mahalo/Williams Wells (and under the related leases) largely occurred after the recordation of the Union Bank Mortgage.  With respect to dozens of leaseholds on which the Mahalo/Williams Wells have been drilled, the first time a well was spudded on those

---

[13]  This is not intended to be an exhaustive discussion of all of the infirmities in the liens and claims asserted by Williams.  Nothing herein is intended nor should it be construed to limit the arguments of the Debtor or any other party in respect of these matters.  Likewise, nothing herein is intended to limit or prejudice the rights of Williams to present its own contrary arguments.

leaseholds (*i.e.,* initially drilled) occurred after December 16, 2005, the date on which the Union Bank Mortgage was recorded in Macintosh County, Oklahoma.

Even if it is assumed that some services were provided in connection with the drilling of wells on certain leaseholds shortly before their spudding, it appears that in most cases the very first services in respect of such wells would not have been provided until long after recordation of the Union Bank Mortgage, rendering any mechanics or materialmen lien asserted by Williams against the applicable leaseholds subsequent in time and therefore subordinate to the interests of the Secured Lenders asserted under that mortgage. The Debtor believes that the outstanding balances asserted by Williams in respect of such leaseholds is approximately $3 million.

Second, the unpaid amounts now claimed by Williams were incurred on account of goods and services provided long after recordation of the Union Bank Mortgage -- principally within a year or so of the Petition Date. Any Section 144 lien that Williams may have held in respect of goods and services provided for work performed in respect of a leasehold prior to December 2005 has long since been paid and extinguished. See 42 Okla. Stat. 1 ("A lien is a charge imposed upon specific property, by which it is made security for the performance of an act."); 42 Okla. Stat. 13 ("The existence of a lien upon property does not of itself entitle the person, in whose favor it exists, to a lien upon the same property for the performance of any other obligation than that which the lien originally secured"); 42 Okla. Stat. 20 (redemption from a lien is made by performing, or offering to perform, the act for the performance of which it is a security, and paying, or offering to pay, the damages, if any, to which the holder of the lien is entitled for delay). The common law rule in Oklahoma is that "the lien ceases to operate when the obligation it secures is extinguished" *U.S. Mortg. v. Laubach*, 2003 OK 67, 18 (Okla. 2003) (citing *Riverside Nat. Bank v. Manolakis*, 1980 OK 72, P9, 613 P.2d 438, 440-41 (when the underlying obligation for which security is given ceases to exist, a lien upon the security is automatically discharged; the lien cannot survive the life of the obligation it secured)).

Thus, the Liens that Williams now asserts did not first arise until after the recordation of the Union Bank Mortgage because the underlying claims did not exist until that time. This conclusion is supported by *Bank America Commercial v. Oklahoma Natural Gas Co. (In re N-Ren Corp.)* 773 P.2d 1269 (Okla. 1989). In *In re N-Ren,* a vendor of goods to a debtor claimed that its statutory mechanics/materialmen's lien under 42 Okla. Stat. § 97 related back to the beginning of its contractual relationship with the debtor, which spanned over 10 years. Section 97, like section 144, provides the lien will relate "from the commencement of furnishing labor, money, material or supplies. . . ." Notwithstanding this statutory language, the Oklahoma Supreme Court disagreed with the lien claimant. Instead, the court held that the lien related back only so far as the time the creditor sold goods to the debtor on account of which the lien arose, *i.e.*, were not paid for. See id. at 1270-73.

In *In re N-Ren*, the Oklahoma Supreme Court relied, in part, on *Clark v. Oklahoma Elec. Co.*, 288 P. 935 (Okla. 1930), in which it reached a similar conclusion, distinguishing between liens in favor of the same creditor for (i) the costs of constructing a newspaper plant and (ii) the more recent costs of supplying services necessary to the operation of the plan. Similarly, Williams's liens for the costs of operating and maintaining wells in the year or two prior to the Petition Date do not relate back to the time when Williams incurred costs to drill and construct those wells. The drilling and construction of those wells has long since been completed and paid for. Likewise, Williams' liens in respect of the costs of constructing new wells may not relate back to the time when *other* wells were first constructed and paid for.

In addition to the statutory liens it asserts, Williams contends that it holds common law liens arising directly from certain JOAs between Williams and the Debtor's predecessor in interest.[14]  To that end, Williams recorded in January 2009 a "Memorandum of Operating Agreement" in each of McIntosh County, Okfuskee County and  Pittsburg County.  Williams attached to each such Memorandum a description of the JOAs, but not the JOAs themselves.

According to the Oklahoma Supreme Court, it is essential to the perfection of a contractual lien based upon a JOA that a writing signed by the party granting the interest be recorded in the real estate records of the county in which the subject property is located.  *See Amarex, Inc. v. El Paso Natural Gas Co*, 1987 OK. 48 (1987).  Here, no such writing was executed by the Debtor.  Williams filing was nothing more than a "Memorandum" purporting to describe a JOA.  Moreover, the filing was made in 2009, long after the creation of the Secured Lenders' liens in 2005.  No principle of relation back has been adopted by the Oklahoma Supreme Court in respect of the common law JOA lien recognized under *Amarex, Inc. v. El Paso Natural Gas*.

Williams also asserts Liens under the Uniform Commercial Code ("UCC"), but again its UCC filings were made in January 2009, were subsequent in time to the UCC filings with respect to the security interests of the Secured Lenders, and therefore are junior.

Even if one or more of the liens and security interests asserted by Williams were senior to the liens and security interests held by the Secured Lenders, the Debtor believes that a substantial portion of those Liens apply to individual wells and/or leaseholds whose value is less than the debt asserted against them.  Pursuant to Bankruptcy Code section 506(b), such claims would not be allowed in their entirety as secured claims, but instead bifurcated between secured claims (to the extent of the value of the collateral), and unsecured deficiency claims.

Irrespective of Williams' asserted Liens, the Debtor holds various claims against Williams that should substantially diminish Williams' recovery on its claims.  For instance, the Debtor believes that Williams may be liable to the Estate for preferential transfers of at least $1,066,799.66.  Within the 90 days prior to the Petition Date, Clearwater, one of the Debtor's gas marketing firms, remitted the following payments to Williams from Mahalo's gas revenues, for the benefit of Mahalo: March 3, 2009 ($566,799.66), April 1, 2009 ($250,000), and May 1, 2009 ($250,000).

Likewise, the Debtor believes that it holds constructive fraudulent transfer claims against Williams.  Prior to the Petition Date, for instance, Williams applied approximately $115,000 of cash it received from the proceeds of the Mahalo/Williams wells to a debt allegedly owing to Williams in respect of a well called Missy 3-23V.  In point of fact, Mahalo had previously declined in writing to participate in the costs of drilling Missy 3-23V and was not liable to Williams for any costs associated with the well -- whether secured or unsecured.  As such, Mahalo's estate did not receive reasonably equivalent value in respect of that $115,000, and these funds are recoverable from Williams, for the benefit of the estate.

Additionally, the Debtor has disputes with Williams and potential causes of action regarding what it believes are excessive amounts billed on certain wells, billing of charges without

---

[14]   The Debtor's existing management has been unable to locate executed copies of these agreements.  Williams very recently has provided  copies of signed copies in electronic form. The Debtor is reviewing these documents and reserves all of its rights.

authorization, the billing of charges that are in error and other billing issues. The Debtor's analysis of these, and the other issues described above, is ongoing.

The Debtor understands that Williams disagrees with the Debtor's views on these issues, and undoubtedly has its own theories with respect to the validity of its Liens and claims, and with respect to its preference and fraudulent transfer liability. If Williams is correct in its positions and the value of the collateral securing each of its claims is greater than the aggregate amount of those claims, then Williams would hold a valid senior Lien against property of the Estate and would not be liable for any preference, although the validity of such Liens would not affect Williams' fraudulent transfer liability

### (ii)     Proposed Compromise.

The Debtor is prepared to litigate these issues before the Bankruptcy Court, but has proposed in the Plan the Williams Compromise Treatment, which is described in the following Section VIII.C.2.d(2). The purpose of this proposed compromise is to avoid the costs and risks (to both parties) that are associated with litigation, to conserve judicial resources and to achieve a fair resolution of the issues presented. The compromise treatment would provide Williams with $500,000 in cash, permit Williams to retain up to $600,000 in funds owing to the Debtor in respect of the Williams/Oklahoma Drilling Credits, grant Williams a release from a potential gross preference exposure of approximately $1 million in payments received within 90 days of the Petition Date, grant Williams a release from liability on other Williams Avoidance Actions, provide Williams with executed JOAs in respect of the Mahalo/Williams Wells, and provide Williams a general release from the Estate, including a release of the Williams Avoidance Actions.

If Williams opts for the Williams Non-Compromise Treatment, it will have the right and the burden to litigate whether and to what extent it has Secured Claims. This litigation likely would be time consuming and expensive. With respect to any Secured Claim ultimately allowed in favor of Williams, as described in more detail below, Reorganized Mahalo would pay the allowed amount of such Secured Claim over a period of 4 to 7 years or, at the option of Reorganized Mahalo, surrender the collateral securing such Secured Claim to Williams. With respect to any Unsecured Claim ultimately allowed in favor of Williams, as described in more detail below, such Claim will receive treatment in under Class 9, as discussed in Section VIII.C.2.i below. Williams likewise would not receive a release from the Estate.

Further, absent a compromise, Reorganized Mahalo will reject -- to the extent any such (written or implied) contract exists and is executory -- the JOAs asserted by Williams. Williams has asserted these JOAs confer upon Williams the exclusive right to operate all new Mahalo/Williams Wells that may be drilled in the future. Rejection would confirm that Williams does not hold any such right, and ensure that Reorganized Mahalo has the opportunity in the future to serve as the operator of new Mahalo/Williams Wells -- subject to the Oklahoma regulatory scheme and process that governs that determination. Rejection also would ensure that Reorganized Mahalo was relieved of the onerous provisions of the alleged JOAs and could result in Williams' losing its right to act as operator on certain Wells.

The Debtor believes that Williams Compromise Treatment is a fair and reasonable resolution of the issues between the Debtor and Williams, that it is mutually beneficial, and in the best interests of the Estate.

(2)    **Treatment.**

(a)    **Williams Compromise Treatment.**  Under this treatment, the Williams Claims will be treated as follows, in full satisfaction of such Claims:

(i)    Reorganized Mahalo will pay Williams $500,000, to be paid in four 4 equal quarterly installments beginning with the first full calendar quarter following the Effective Date, in full satisfaction of all the Williams Claims against or in respect of Mahalo and its property, including any Secured Claims or Trust Claims asserted by Williams.

(ii)    The obligations of Reorganized Mahalo under this Williams Compromise Treatment shall constitute general unsecured obligations of Reorganized Mahalo, and any asserted Lien or trust interest in respect of such Claim shall be deemed released and expunged on the Confirmation Date;

(iii)    Williams shall retain, and the both Reorganized Mahalo and the Estate will waive any right or entitlement to Oklahoma drilling credits received by Williams with respect to wells in which Williams is operator and Mahalo is a working interest holder, up to a maximum amount of $600,000;

(iv)    Reorganized Mahalo will satisfy any and all Allowed Administrative Claims owing to Williams on the later of (a) the Distribution Date and (b) the date on which such expenses become due and payable in the ordinary course of business; and

(v)    Reorganized Mahalo and Williams Production will enter into Joint Operating Agreements for each of the gas wells in which both entities hold working interests, in the form attached hereto as Exhibit D, effective as of the Effective Date.

(vi)    Upon the Effective Date, in consideration for Williams' undertakings under the Plan, Williams shall be a Compromise Party for purposes of the release set forth in Section VI.B of the Plan.

(b)    **Williams Non-Compromise Treatment.** If Williams does not elect to accept the Williams Compromise Treatment:

(i)    No later than 30 days following the Effective Date, Reorganized Mahalo (if Mahalo has not done so prior to the Effective Date) shall commence one or more adversary proceedings (combined with an objection to Claim) before the Bankruptcy Court against Williams seeking a determination that Williams does not hold an Allowed Secured Claim or Allowed Trust Claim, and asserting the Williams Avoidance Actions (all of such actions and proceedings being vested in Reorganized Mahalo, on and after the Effective Date) (collectively, the "Disputed Williams Lien Litigation");

(ii)    If the Bankruptcy Court determines that Williams holds an Allowed Secured Claim, Williams shall retain the Liens against the Collateral that secures such Allowed Secured Claim;  provided, however, that Williams' Lien, if any, on Suspense Funds securing such Allowed Secured Claim shall be deemed released on the Effective Date, and Williams shall receive, in exchange therefore, and as the indutiable equivalent thereof, a Lien against property of Reorganized Mahalo (other than Suspense Funds) of a value equal to the amount of the Suspense Funds securing such Allowed Secured Claim (the "Williams Replacement Lien").  The Williams Replacement Lien shall be senior to the Liens of the Secured Lenders in

41

such assets, but junior to any Vendor Liens granted pursuant to the O&G Drilling Vendor Program, as provided in Section III of the Plan;

(iii)  Reorganized Mahalo will satisfy any such Allowed Secured Claim of Williams as follows, at the option of Reorganized Mahalo, to be specified in a written notice Filed within seven (7) days following the Allowance Date of such Allowed Secured Claim (in either instance the following treatment shall be in full and complete satisfaction of such Allowed Secured Claim):

(A)  Reorganized Mahalo will distribute the amount of the Allowed Secured Claim in full over a period (the "Class 4 Deferred Payment Period") following the Allowance Date, plus simple interest accruing from the Effective Date on the outstanding balance at the per annum rate of LIBOR plus 2%, with principal amortized equally over the Class 4 Deferred Payment Period.  Interest will be adjusted quarterly starting retroactively with the first full calendar quarter following the Petition Date.  Interest and principal shall be paid quarterly, commencing with the first business day of the first full calendar quarter that begins after the Allowance Date.  The Debtor believes that this interest rate is appropriate under the circumstance because, in the event Williams is determined to hold an Allowed Secured Claim, such Claim will be senior to the Allowed Secured Claims of Wells Fargo Foothill and Ableco.  As a result, such a Claim would be substantially oversecured and the risk of non-recovery extremely low.

The Class 4 Deferred Payment Period shall depend upon the amount of the Allowed Secured Claim, pursuant to the following table:

| Amount of Allowed Secured Claim | Class 4 Deferred Payment Period |
|---|---|
| $1,000,000 or less | 4 years |
| $1,000,001 to $1,250,000 | 5 years |
| $1,250,001 to $1,500,000 | 6 years |
| $1,500,0001 or more | 7 years |

or

(B)  Promptly following the Allowance Date, Reorganized Mahalo, with the prior written consent of Wells Fargo Foothill and Ableco, shall transfer without representation or warranty express or implied to Williams the Collateral securing such Allowed Secured Claim.

(iv)  If the Court determines in the Disputed Williams Lien Litigation that Williams holds an Allowed Trust Claim, the amount of such Allowed Trust Claim shall be paid in full no later than fifteen (15) days following the Allowance Date thereof.

(v)  In no event shall Williams recover more than once on the same Claim.  If and only to the extent the Court determines that the same Williams Claim is both an Allowed Secured Claim and an Allowed Trust Claim, Williams shall be permitted to elect between the foregoing treatments with respect to such claim.

42

(vi)    To the extent the Court determines that a Williams Claim is not an Allowed Secured Claim satisfying the conditions specified in the foregoing clause (ii), or an Allowed Trust Claim satisfying the conditions specified in the foregoing clause (iii), such Claim will be treated as a General Unsecured Claim under Class 9, pursuant to Section II.C.9 of the Plan.

(vii)   Upon the occurrence of the Effective Date, any joint operating agreement to which Mahalo and Williams may be parties in respect of mineral leases in which both Mahalo and Williams have working interests, shall be deemed rejected, to the extent such an agreement exists and is executory;

(viii)  The operation of existing and future wells in respect of mineral leases in which both Mahalo and Williams have working interests will be determined in accordance with Oklahoma law; and

(ix)    Williams shall not be a Compromise Party under the Plan.

### e.    Class 5 (Compromised O&G Mechanics/Materialmen Claims).

#### (1)    Background.

This Class comprises two kinds of potential Claims involving providers of oil and gas services and related goods: (i) claimants asserting a mechanics/materialmen Lien and (ii) claimants asserting a trust entitlement to funds relating to a mechanics/materialmen Lien claim. Both types of Claims are referred to herein as the "O&G Mechanics/Materialmen Claims". The Debtor believes that both have extremely low prospects of recovery under the circumstances. Each is addressed in turn.

O&G Mechanics/Materialmen Lien Claims. Approximately 40 vendors and a handful of well operators have recorded lien notices or otherwise asserted Secured Claims against Mahalo and its various oil and gas interests, in an aggregate amount of approximately $8.8 million on account of labor or goods provided prior to the Petition Date, in the digging, drilling, torpedoing, completing, operating, or repairing of gas wells in which Mahalo holds a working interest. These Liens, if valid, arise by statute. *See* 42 Okla. Stat. § 144 (oil and gas mechanics and materialmen liens); 52 Okla Stat. § 87.1 (operator liens under forced pooling orders). The Debtor believes, however, that these Claims are not entitled to be treated under the Plan as Secured Claims, but instead as General Unsecured Claims.

As noted above, the Secured Lenders' Liens and security interests in the Debtor's mineral interests first arose in December 2005 and therefore are senior to the Liens and security interests asserted by these parties. *See* Section VII.B.1. This is true because the work and/or materials that form the basis of the O&G Mechanics/Materialmen Claims was first provided long after the Secured Lenders' Liens and security interests were created in 2005, and in many instances after the Secured Lenders made supplemental lien and financing statement filings in 2008.

Further, the amount of the secured debt under the Prepetition Credit Agreement far exceeds the value of the mineral interests in which they assert their Liens, and exceeds the value of all of the Debtor's mineral interests. As a result, the interests asserted by these junior lien creditors in property of the Estate have no value, and the Claims they assert are not secured claims within the meaning of the Bankruptcy Code. *See* 11 U.S.C. § 506(b).

<u>O&G Mechanics/Materialmen Trust Claims</u>.  At least one vendor asserting an O&G Mechanics/Materialmen Claim has asserted that its Claim is entitled to trust status under 42 Okla. Stat. § 144.2.  The Debtor believes that this contention, however, is without merit.  Section 144.2 narrowly confers a statutory trust on funds that are collected by a well operator from a working interest holder for the purpose of paying mechanics/materialmen lien claims due and owing as a result of an oil and gas well drilling contract reworking contract, or operating agreement.

A vendor pursuing a trust claim under 42 Okla. Stat. § 144.2 would find it difficult to prevail here because, among other things: (i) many of the wells operated by Mahalo are largely owned by Mahalo, with only small working interest positions held by third parties; (ii) as a result, the amount of the funds that Mahalo collected and held in "trust" from working interest holders in respect of many of wells was relatively small, and (iii) such funds were not segregated, and would have been commingled with other funds of the Debtor -- making it extremely difficult to trace those funds.

One or more holders of O&G Mechanics/Materialmen Claims undoubtedly may disagree with the Debtor's views on these issues, and have their own theories with respect to the validity of its alleged Liens and/or trust entitlements.  The Debtor is prepared to litigate these issues before the Bankruptcy Court, but has proposed in the Plan the Compromise O&G Mechanics/Materialmen Claim Treatment, which is described in the following Section VIII.C.2.e(2).  The purpose of this proposed compromise is to avoid the costs and risks that are associated with litigation (for all involved parties), to conserve judicial resources and to achieve a fair resolution of the issues presented.

The compromise treatment will provide a prompt distribution to the holders of the Compromised O&G Mechanics/Materialmen Claims listed on the Compromised O&G Mechanics/Materialmen Claims (Exhibit C to the Plan) in the amount specified on the Exhibit.  In each instance, the amount is equivalent to 7.5% of the such holder's Claim amount, as determined by the Debtor.  Payment would be made on the Distribution Date, *i.e.*, within 20 days of the Effective Date of the Plan.

As set forth the following Section, the holder of a Claim listed on the O&G Mechanics/ Materialmen Claims Exhibit may opt-out of the compromise treatment by making an election to do so on its Ballot.  If a holder makes that election, however, it will not be entitled to receive the compromise treatment in Class 5.  Instead, the holder will be treated as a Non-Compromised Lien/Trust Claim under Class 6, and the holder of the Claim will have to litigate whether it holds a Secured Claim under Bankruptcy Code section 506(b) and/or is entitled to recovery as a Trust Claim.

If, after litigating these issues, the Bankruptcy Court determines that the Claim is an Allowed Secured Claim, Reorganized Mahalo will, at the option of Reorganized Mahalo, either pay the allowed amount of such Secured Claim over a period of 4 to 7 years, or, surrender the collateral securing such Allowed Secured Claim.  If, after litigation, the claimant should succeed in proving that the Claim is an Allowed Trust Claim, Reorganized Mahalo would pay such claim with fifteen (15) days of the entry of a Final Order making that determination.

If, however, the claimant loses the litigation, and the Bankruptcy Court determines that its Claim is neither an Allowed Secured Claim or Allowed Trust Claim, the Claim will be treated, at best, as a General Unsecured Claim, under Class 9.

The Debtor believes that Compromise O&G Mechanics/Materialmen Claims Treatment is a fair and reasonable resolution of the issues between the Debtor and its lien claimants.  The compromise will avoid unnecessary litigation and administrative expense, and enable the holders of these claims to

44

realize a modest recovery, where the circumstances otherwise indicate that they are legally entitled to a substantially smaller recovery, if any, as the holders of under-water junior lien claims.

(2)    Treatment.

Each holder of a Class 5 Claim shall receive the following treatment with respect to its Claim (the "Compromise O&G Mechanics/Materialmen Claim Treatment"):

The "Claim Amount" indicated on the Compromised Mechanics/Materialmen Claims Exhibit (attached as Exhibit C to the Plan) shall be the deemed Allowed amount of all Claims held by the creditor listed in respect of such amount on such Exhibit.  On or before the Distribution Date, the holder of each Compromised O&G Mechanics/Materialmen Claim will receive the amount specified as the "Distribution Amount" for such creditor on the Compromised Mechanics/Materialmen Claims Exhibit (such amount constituting 7.5% of the Claim Amount listed thereon).  Any asserted Lien or trust interest in respect of such Compromised O&G Mechanics/Materialmen Claim shall be deemed released and expunged, including any Lien or trust interest asserted against Suspense Funds, upon remittance of the "Distribution Amount" to the holder of such Compromised O&G Mechanics/Materialmen Claim.  (Any Suspense Funds subject to such Lien or interest shall be remitted and released to Reorganized Mahalo as set forth in Section V.C. of the Plan).   The "Distribution Amount" shall constitute the only amount to which the holder of a Compromised O&G Mechanics/Materialmen Claim is entitled under the Plan on account of all of its Claims.

Upon the Effective Date, each holder of a Compromised O&G Mechanics/Materialmen Claim shall be a Compromise Party for purposes of the provisions set forth in Section VI.B of the Plan, and each such holder agrees that in consideration for the undertakings of Ableco under the Plan, including the funding of amounts necessary to make payments hereunder, each such holder shall not assert, and shall waive and release, any Rights of Action held by such holder against Ableco or a Related Compromise Party.

The holder of a Claim listed on the Compromised O&G Mechanics/Materialmen Claims Exhibit may opt-out of the treatment provided under Class 5 by making a written election to do so on its Ballot (the "Class 5 Opt-Out Election").

If the Class 5 Opt-Out Election is timely made, the Claim that is the subject of the Class 5 Opt-Out Election: (i) will be a Non-Compromised Lien/Trust Claim under Class 6, (ii) will not receive the Compromise O&G Mechanics/Materialmen Claim Treatment and (iii) will receive instead the treatment provided for Non-Compromised Lien/Trust Claims under Class 6.

In order to make the Class 5 Opt-Out Election, a Ballot indicating such election must be timely returned to the Ballot Tabulator by the Ballot Deadline.  The timely returned Ballot of any holder making the Class 5 Opt-Out Election will be tabulated as a Class 6 Ballot.

f.    Class 6 (Non-Compromised Lien/Trust Claims).

Class 6 comprises all Non-Compromised Lien/Trust Claims as to which the holder (the "Non-Compromised Lien/Trust Claimant") has timely Filed a proof of claim asserting a Secured Claim or Trust Claim.  A Non-Compromised Lien/Trust Claim as to which the holder has not satisfied the foregoing condition shall be classified and treated for all purposes under the Plan as a General Unsecured Claim pursuant to Class 9.

45

Class 6 is Impaired under the Plan. The holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

No later than 30 days following the Effective Date, Reorganized Mahalo (if Mahalo has not done so before the Effective Date) shall commence one or more adversary proceedings (combined with objections to Claims) before the Bankruptcy Court against the Non-Compromised Lien/Trust Claimant:

(a) seeking a determination that such holder's Non-Compromised Lien/Trust Claim is not an Allowed Secured Claim; and/or

(b) seeking a determination that such holder's Non-Compromised Lien/Trust Claim is not an Allowed Trust Claim.

Allowed Secured Claim Treatment. If the Bankruptcy Court determines that a Non-Compromised Lien/Trust Claimant holds an Allowed Secured Claim, such Non-Compromised Lien/Trust Claimant shall retain the Liens against the Collateral that secures such Allowed Secured Claim; provided, however, that such claimant's Lien, if any, on Suspense Funds securing such Allowed Secured Claim shall be deemed released on the Effective Date. The Non-Compromised Lien/Trust Claimant shall receive, in exchange therefor, and as the indubitable equivalent thereof, a Lien against property of Reorganized Mahalo (other than Suspense Funds) of a value equal to the amount of the Suspense Funds securing such claimant's Allowed Secured Claim ("Non-Compromised Lien Trust Replacement Lien"). Such Non-Compromised Lien Trust Replacement Lien shall be senior to the Liens of the Secured Lenders in such assets, but junior to any Vendor Liens granted pursuant to the O&G Drilling Vendor Program, as provided in Section III of the Plan.

Reorganized Mahalo will satisfy each such Allowed Secured Claim as follows, at the option of Reorganized Mahalo, to be specified in a written notice Filed within seven (7) days following the Allowance Date of such Allowed Secured Claim (in either instance the following treatment shall be in full and complete satisfaction of such Allowed Secured Claim):

(A) Reorganized Mahalo will satisfy the amount of such Allowed Secured Claim in full over a period (the "Class 6 Deferred Payment Period") following the Allowance Date plus simple interest accruing from the Effective Date on the outstanding balance at the per annum rate of LIBOR plus 2%, with principal amortized equally over the Class 6 Deferred Payment Period. Interest and principal shall be paid quarterly, commencing with the first business day of the first full calendar quarter that begins after such Allowance Date. Interest will be adjusted quarterly starting retroactively with the first full calendar quarter following the Petition Date. The Debtor believes that this interest rate is appropriate under the circumstance because, in the event a Class 6 Claimant is determined to hold an Allowed Secured Claim, such Claim will be senior to the Allowed Secured Claims of Wells Fargo Foothill and Ableco. As a result, such a Claim would be substantially oversecured and the risk of non-recovery extremely low.

The Class 6 Deferred Payment Period shall depend upon the aggregate amount of all Allowed Secured Claims in Class 6, pursuant to the following table:

| Aggregate Amount of Allowed Secured Claims in Class 6 | Class 6 Deferred Payment Period |
|---|---|
| $1,000,000 or less | 4 years |
| $1,000,001 to $1,250,000 | 5 years |
| $1,250,001 to $1,500,000 | 6 years |
| $1,500,0001 or more | 7 years |

or

(B)     Promptly following the Allowance Date, Reorganized Mahalo, with the prior written consent of Wells Fargo Foothill and Ableco, will transfer without representation or warranty express or implied to the holder of such Allowed Secured Claim the Collateral securing such Allowed Secured Claim.

Allowed Trust Claim Treatment.  To the extent pursuant to any such adversary proceeding such Non-Compromised Lien/Trust Claim is an Allowed Trust Claim, the amount of such Allowed Trust Claim shall be paid in full no later than fifteen (15) days after the Allowance Date .

In no event shall any holder of a Non-Compromised Lien/Trust Claim recover more than once on the same Claim.  If and only to the extent the Court determines that the same Claim is both an Allowed Secured Claim and an Allowed Trust Claim, the holder of such claim shall be permitted to elect between the foregoing treatments with respect to such claim.

Treatment Of Allowed Unsecured Claims.  To the extent the Court determines that a Non-Compromised Lien/Trust Claim constitutes a valid obligation of the Debtor, but that such Claim is not an Allowed Secured Claim or Allowed Trust Claim that is recoverable from any interest in property, such Claim (to the extent an Allowed Claim) will be treated as a General Unsecured Claim under Class 9 and any asserted Lien shall be deemed released and expunged.

### g.     Class 7 (Secured Tax Claims).

Class 7 comprises all Secured Tax Claims.  Class 7 is Impaired under the Plan.  The holders of Class 7 Claims are entitled to vote to accept or reject the Plan.  At the election of Reorganized Mahalo, unless Reorganized Mahalo and the holder of such Claim agree otherwise, each Allowed Secured Tax Claim (i) will be reinstated and paid on the date that such Allowed Secured Tax Claim first becomes due and payable in accordance with its terms, (ii) will be paid cash in the allowed amount of such Allowed Secured Tax Claim on the Distribution Date, or (iii) will be satisfied with a promissory note equal to the allowed amount of such Allowed Priority Tax Claim, bearing interest accruing from the Effective Date at the rate applicable under Bankruptcy Code section 511 or, if no such specific rate is established in conjunction with the Confirmation Hearing, at the Prime Rate in effect on the Effective Date, in equal quarterly installments beginning on the last day of the first full calendar quarter following the Effective Date, due no later than the fifth (5th) anniversary of the Petition Date.

Allowed Secured Tax Claims shall continue to be secured by the existing collateral securing such Claims, until such Claims are paid in full

### h.      Class 8 (Priority Claims).

Class 8 comprises all Priority Claims.  Class 8 is impaired under the Plan and the holders of Class 8 Claims are entitled to vote to accept or reject the Plan.  At the election of Reorganized Mahalo, unless Reorganized Mahalo and the holder of such Claim agree otherwise, each Allowed Priority Claim (i) will be reinstated and paid on the date that such Allowed Priority Claim first becomes due and payable in accordance with its terms, (ii) will be paid cash in the allowed amount of such Allowed Priority Claim on the Distribution Date, or (iii) will be satisfied with a promissory note equal to the allowed amount of such Allowed Priority Claim, bearing interest accruing from the Effective Date at the at the Prime Rate in effect on the Effective Date, payable in equal quarterly installments beginning on the last day of the first full calendar quarter following the Effective Date, due no later than the fifth (5th) anniversary of the Petition Date.

### i.      Class 9 (General Unsecured Claims).

Class 9 comprises all General Unsecured Claims, other than Small Claims, including prepetition Claims for goods and services provided to the Debtor, claims for payment on account of working interests in oil or gas wells operated by the Debtor, and intercompany claims.   Class 9 is Impaired under the Plan.  The holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

The Debtor estimates that the total General Unsecured Claims in Class 9 are approximately $26 million, which includes approximately $3.1 million in goods and services claims, and $900,000 in prepetition working interest claims arising from oil and gas interests as to which Mahalo is operator, and a $22 million intercompany claim held by the Parent; provided, however, that the total amount of Unsecured Claims in Class 9 may increase, depending on whether and to the extent creditors eligible for compromise treatment in Class 4 and Class 5 opt out of the compromise treatment proposed therein and litigate their claims, and the result of that litigation.  (To the extent their claims are determined to be unsecured, they will be treated as Class 9 Claims).  Likewise, to the extent other creditors assert that they hold Class 6, Non-Compromised Lien/Trust Claims but are determined by the Court to hold unsecured claims, the amount of Unsecured Claims will increase.

Further, to the extent Class 9 creditors voluntarily reduce their claims to $5,000 under the Small Claims election so that they may be treated under Class 10, the amount of the Claims in Class 9 may go down commensurately.

On the Effective Date, in full and complete satisfaction of their Claims, the holders of Allowed General Unsecured Claims shall receive a pro rata interest in the net proceeds of the Liquidating Trust (calculated after deduction for the professional fees and expenses and the other costs of the Liquidating Trust).

As set forth in Section V.D of the Plan, as of the Effective Date of the Plan, the Liquidating Trust will be vested with the Designated Avoidance Actions.

Additionally, if the Creditors' Committee timely Files a written election prior to the hearing on approval of the Disclosure Statement selecting Option A or Option B below, the Liquidating Trust also will receive assets pursuant to one of the following options:

48

Option A:  On the Effective Date, Reorganized Mahalo will (i) remit to the Liquidating Trust the sum of $50,000, and (ii) will quitclaim to the Liquidating Trust, pursuant to the Plan, the Specified Assets, free and clear of any Liens, claims and encumbrances of the Secured Lenders; the Liquidating Trust shall be entitled to retain any and all net proceeds from the development or sale of such interests; or

Option B:  On the Effective Date, (i) Reorganized Mahalo will remit to the Liquidating Trust the sum of $300,000, and (ii) the Specified Assets shall constitute Collateral securing the obligations under Wells Fargo Foothill Restated Credit Agreement, the Restated Ableco Credit Facility, and the Exit Financing (subject to the provisions specified in the Plan concerning the priority of the respective Liens securing such obligations), and the Liquidating Trust shall have no rights in such assets or the proceeds thereof.

If the Creditors' Committee fails to File a written election selecting between the foregoing options prior to the commencement of the hearing on approval of the Disclosure Statement, Option A shall be deemed to have been selected and shall govern the disposition of the Specified Assets under the Plan.  However, notwithstanding any of the foregoing, if for any reason a Specified Asset is not severable from an asset that does not constitute a Specified Asset, and/or is not transferable to the Liquidating Trust, title shall remain with Reorganized Mahalo but the Liquidating Trust shall have the right to develop and profit from such Specified Asset, provided that the Liquidating Trust bears all costs and liabilities associated therewith and indemnifies Reorganized Mahalo with respect thereto; and provided further that neither Reorganized Mahalo nor any of its other assets that do not constitute Specified Assets shall be liable for any costs or liabilities incurred by the Liquidating Trust.

If the Creditors' Committee elects Option A (which provides for the payment of only $50,000 in cash), an additional $250,000 will be available to fund the operations of Reorganized Mahalo.

Subject to the Plan, the Liquidating Trustee shall (i) prosecute, compromise, settle and/or abandon the Designated Avoidance Actions, in its reasonable discretion, for the benefit of the holders of Allowed General Unsecured Claims, (ii) object to General Unsecured Claims, it its reasonable discretion, (iii) liquidate the proceeds of the Liquidating Trust, and (iv) distribute the net proceeds of the Liquidating Trust to the holders of Allowed General Unsecured Claims, periodically, as determined by the Liquidating Trustee or otherwise set forth in the Liquidating Trust Agreement. All expenses incurred by or on behalf of the Liquidating Trust shall be borne by the Liquidating Trust.

### j.      Class 10 (Small Claims).

Class 10 comprises all Small Claims, which are (i) General Unsecured Claims that are equal or less than $5,000, and (ii) General Unsecured Claims and Compromised O&G Mechanics and Materialmen Claims that the holder has elected on its Ballot to reduce to $5,000.  Class 10 is Impaired under the Plan.  The holders of Class 10 Claim are entitled to vote to accept or reject the Plan.

On the Distribution Date, in full and complete satisfaction of their Allowed Claims, Reorganized Mahalo will remit to the holders of Allowed Small Claims cash equal to 30% of such holder's Allowed Class 10 Claim.  Notwithstanding the foregoing, the election of any holder of a General Unsecured Claim or Compromised O&G Mechanics and Materialmen Claim to reduce its

49

Claim to $5,000 (*i.e.,* so that it constitutes a Small Claim) will not affect whether such Small Claim is an Allowed Claim or a Disallowed Claim.

### k. Class 11 (Subordinated Claims).

Class 11 comprises all Subordinated Claims. Class 11 is Impaired under the Plan. Class 11 is deemed to reject the Plan. In the event the holders of Allowed General Unsecured Claims have been paid the full amount of such Allowed Claims plus interest thereon, as determined by the Court, the holders of any Allowed Subordinated Claims shall receive payment of their claims to the extent there are any available funds in the Liquidating Trust. Any Claim that is classified as of the Effective Date as a non-subordinated Claim under any Class other than Class 11, but that subsequently becomes a Subordinated Claim, shall be deemed reclassified as a Class 11 Claim as of the Effective Date.

### l. Class 12 (Interests).

Class 12 comprises all Interests. Class 12 is impaired under the Plan. Class 12 is deemed to reject the Plan. The holders of Interests in the Debtor will neither receive nor retain property under the Plan on account of such Interests.

## IX.

## OPPORTUNITY TO PARTICIPATE IN O&G DRILLING VENDOR PROGRAM

Each holder of a Claim that accepts the Plan may elect on its Ballot, in lieu of the treatment provided under the Plan for such holder's Claims under the Classe(s) in which they are classified, to participate in and undertake the obligations required to participate in the O&G Drilling Vendor Program, which is described on the O&G Drilling Vendor Program Summary attached hereto as Exhibit D (the "O&G Drilling Vendor Election"). Each holder of a Claim that makes the O&G Drilling Vendor Election agrees that in consideration for the undertakings of the Secured Lenders under the Plan, including the funding of amounts necessary to make payments under the Plan, that it shall not assert any Rights of Action against the Secured Lenders or a Related Compromise Party, and that it shall accept the amounts it receives under the program in full satisfaction of its Claims against the Debtor

If such holder of a Claim timely makes the O&G Drilling Vendor Election, the provisions of the O&G Drilling Vendor Program Summary shall constitute the sole satisfaction of such holder's Claim and such holder shall waive any other right to obtain recovery on account of such holder's Claim (and any Lien or trust claim on account of such Claim shall be null and void); provided, however, that the effectiveness of the O&G Drilling Vendor Program shall be conditioned on sufficient participation by O&G Drilling Vendors that is acceptable to Reorganized Mahalo, which determination shall be made by Reorganized Mahalo and communicated to holders that made the O&G Drilling Vendor Election on or before the Distribution Date. In addition, the right of such holder to participate in the O&G Drilling Vendor Election shall be conditioned on Reorganized Mahalo's determination that such holder renders goods or services that are likely to be utilized in the O&G Drilling Vendor Program, which determination shall be made by Reorganized Mahalo and communicated to holders that made the O&G Drilling Vendor Election on or before the Distribution Date.

If Reorganized Mahalo determines that there is insufficient participation in O&G Drilling Vendor Program such that the program will not become effective, then all O&G Drilling Vendor

50

Elections shall be null and void and such holders shall receive the treatment otherwise applicable to such Claims under the Plan.  In addition, if as to any individual holder making the O&G Drilling Vendor Election, Reorganized Mahalo determines that such holder renders goods or services that are likely to be utilized in the O&G Drilling Vendor Program, then such holder's O&G Drilling Vendor Election shall be null and void and such holders shall receive the treatment otherwise applicable to such Claim under the Plan.

Pursuant to the O&G Drilling Vendor Program, participants financing goods and services in respect of a new well to be drilled thereunder will share in a Lien, on a *pari passu* basis, on Reorganized Mahalo's working interest in such new well, to secure Reorganized Mahalo's obligations under the program.  Notwithstanding anything to the contrary contained in the Plan, each such Lien will be senior to (i) the Liens of the Secured Lenders, (ii) the Liens granted to secure the Exit Financing, and (iii) the replacement Liens granted hereunder in respect of Suspense Funds under Sections II.C.4 and II.C.6 under the Plan.

## X.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Executory Contracts and Unexpired Leases.

#### 1.    Rejected Contracts and Leases.

On the Effective Date, all executory contracts and unexpired leases of the Debtor will be rejected, including the contracts and leases listed on the Schedule of Contracts and Leases to be Rejected, provided, however, that the following contracts and leases shall not be rejected as of the Effective Date: (i) the contracts and leases listed on the Schedule of Assumed Contracts and Leases, (ii) contracts and leases already rejected or assumed by prior order of the Court, (iii) Confidentiality Agreements, and (iv) such other contracts and leases as to which the Plan or the Confirmation Order provide otherwise.

The Debtor reserves the right to amend the Schedule of Rejected Contracts and Leases at any time before the conclusion of the Confirmation Hearing to (1) delete any executory contract or unexpired lease and provide for its assumption under the Plan or otherwise, or (b) add any executory contract or unexpired lease and provide for its express rejection.  The Debtor will provide notice of any amendment to the Schedule of Rejected Contracts and Leases to the party or parties to the agreement affected thereby.

The Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

#### 2.    Bar Date for Rejection Damage Claims.

Any Rejection Damage Claim or other General Unsecured Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served on both Reorganized Mahalo and the Liquidating Trustee within thirty (30) days after the mailing of notice of the occurrence of the Effective Date (nothing in this provision is intended to extend the deadline for the filing of claims with respect to contracts or leases previously rejected).  Any such Claim that is not timely Filed and served will be entitled to no distribution under the Plan on account of such Claim and will be unenforceable against the Debtor, the Estate, Reorganized Mahalo, the Liquidating Trust, and their respective property, and entities holding such Claims will be barred by

51

the Confirmation Order from receiving any distributions under the Plan on account of such untimely Claims.

### B.    Assumption of Executory Contracts and Unexpired Leases.

#### a.    Assumed Contracts and Leases.

On the Effective Date, the executory contracts and unexpired leases listed on the Schedule of Assumed Contracts and Leases will be assumed, unless any of such contracts or leases previously was assumed or rejected by Final Order under Bankruptcy Code section 365.

The Debtor reserves the right to amend the Schedule of Assumed Contracts and Leases at any time before the conclusion of the Confirmation hearing to (1) delete any executory contract or unexpired lease an provide for its rejection under the Plan or otherwise, or (b) add any executory contract or unexpired lease and provide for its assumption, or assumption and assignment.  The Debtor will provide notice of any amendment to the Schedule of Assumed Contracts and Leases  to the party or parties to the agreement affected thereby.

The Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed Contracts and Leases.  The Debtor's oil, gas and mineral leases that are listed on the Schedule of Assumed Contracts and Leases do not constitute lease of non-residential real property for purposes of Bankruptcy Code section 365 and will not be treated as such under the Plan or otherwise.

#### b.    Cure Payments.

The Schedule of Assumed Contracts and Leases also identifies any amounts that the Debtor believes Bankruptcy Code sections 365(b)(1)(A) or (B) require be paid in order to cure defaults under the executory contracts and unexpired leases to be assumed under the Plan.  The Debtor reserves the right to amend the Schedule of Assumed Contracts and Leases, including modifying the proposed Cure Payments, up to the conclusion of the Confirmation Hearing.

As required by Bankruptcy Code section 365(b)(1), any and all monetary defaults under each executory contract and unexpired lease to be assumed under the Plan will be satisfied in one of the following two ways: (a) Reorganized Mahalo will pay to the non-debtor party to the executory contract or unexpired lease the Cure Payments set forth on the Schedule of Assumed Contracts and Leases, in cash on or before the Distribution Date; or (b) Reorganized Mahalo will satisfy any other terms that are agreed to by both the Debtor and the non-debtor party to an executory contract or unexpired lease that will be assumed.

If, however, a dispute arises regarding: (a) the amount of any proposed Cure Payments; (b) whether there is adequate assurance of future performance under an executory contract or unexpired lease to be assumed, to the extent required under the Bankruptcy Code; or (c) any other matter pertaining to a proposed assumption, the proposed Cure Payments will be made within 15 days after entry of a Final Order resolving the dispute and approving the assumption.

#### c.    Objections to Assumption Or Proposed Cure Payment.

Any person or entity that is a party to an executory contract or unexpired lease that will be assumed under the Plan and that either contends that the proposed Cure Payment specified on the

52

Schedule of Assumed Contracts and Leases is incorrect or otherwise objects to the contemplated assumption must File with the Court and serve upon the Debtor, the Debtor's Counsel, counsel to the Creditors' Committee and counsel to Ableco a written statement and supporting declaration stating the basis for its objection. This the Secured Lenders and declaration must be Filed and served by the later of: (a) ten (10) days before the Confirmation Hearing; or (b) five (5) days after the Debtor Files and Serves the Schedule of Assumed Contracts and Leases, or any amendments to the Schedule of Assumed Contracts and Leases (only with respect to an executory contract or unexpired lease added to the Schedule of Assumed Contracts and Leases by such an amendment, or with respect to any proposed Cure Payment that is reduced by such an amendment). Any entity that fails to timely File and serve such a statement and declaration will be deemed to waive any and all objections to the proposed assumption and the proposed Cure Payments.

**d.**      **Resolution of Claims Relating to Assumed Contracts and Leases.**

In accordance with the procedures set forth in Section IV.B.2 of the Plan relating to Cure Payments, payment of the Cure Payments with respect to executory contracts or unexpired leases that will be assumed under the Plan shall be deemed to satisfy, in full, any and all Claims arising therefrom, including any prepetition claim or Rejection Damage Claim asserted in a Filed proof of claim or listed in the Schedules, irrespective of whether the Cure Payment is less than the amount set forth in such proof of claim or the Schedules. Upon the tendering of the Cure Payment, such Claims shall be deemed satisfied, without further order of the Court or action by any party.

**XI.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**A.**      **Exit Financing.**

On and contemporaneously with the Effective Date, Ableco or an Affiliate designated by Ableco will furnish the Exit Financing to Reorganized Mahalo. As reflected in its Projections, see Section XIV, the Debtor does not anticipate that Reorganized Mahalo will need to draw on the Exit Financing to make any payments required under the Plan or to sustain operations. Nevertheless, the Debtor believes that having the Exit Financing will provide Reorganized Mahalo a liquidity "safety net" to address any unforeseen expenses and insulate the company from any issues relating to the timing of disbursement and receipts, and will encourage the extension of trade credit to Reorganized Mahalo following its exit from chapter 11. The Exit Financing will have the following material terms:

     **Principal Face Amount of Debt:** Up to $5,000,000.

     **Type of Loan:** Revolving facility.

     **Maturity Date**: Immediately after the maturity of the indebtedness owing to Wells Fargo Foothill under the Wells Fargo Foothill Restated Credit Agreement, provided that to the extent any Secured Claims are Allowed in favor of Williams or a Non-Compromised Lien/Trust Claim, the maturity date shall be the later of (i) immediately after the maturity of the indebtedness owing to Wells Fargo Foothill under the Wells Fargo Foothill Restated Credit Agreement and (ii) the payment in full of any such Allowed Secured Claim in accordance with the Plan.

53

**Interest Rate**:  The Exit Financing shall bear interest at a per annum rate equal to LIBOR plus 10%, adjusted quarterly.  Interest shall be paid monthly in cash.

**Securit**y:  The indebtedness under the Exit Financing shall be secured by the same Collateral securing the obligations under the Wells Fargo Foothill Restated Credit Agreement and the Restated Ableco Credit Agreement and shall constitute a senior Lien against such property subject only to (a) Liens that are adjudicated pursuant to a Final Order to be senior to the Liens in favor of the Secured Lenders and that constitute Allowed Secured Claims, (b) the Liens in favor of Wells Fargo Foothill securing the debt under the Wells Fargo Restated Debt Agreement, and (c) any such other liens as Exit Financing Lenders may permit pursuant to the Exit Financing Agreement.

**Financial Covenants:** Financial covenants shall be consistent with the Wells Fargo Foothill Restated Credit Agreement and the Restated Ableco Credit Agreement.

**Other Covenants:** Affirmative and negative covenants shall be based on such affirmative and negative contained in the Wells Fargo Foothill Restated Credit Agreement and the Restated Ableco Credit Agreement.

**Events of Default:**  Events of Default shall be based on such events of default as contained in the Wells Fargo Foothill Restated Credit Agreement and the Restated Ableco Credit Agreement.  Events of Default shall include default under the Wells Fargo Foothill Restated Credit Agreement and the Restated Ableco Credit Agreement.

**Cash Dominion:**  The cash of Reorganized Mahalo shall be maintained in one or more accounts subject to the Blocked Account Control Agreement.  For purposes of perfecting their liens in such accounts, the Exit Financing Lenders shall be parties to such Blocked Account Control Agreement, and hold control rights thereunder, subject to the control rights of Wells Fargo Foothill.

**Expense Reimbursement:**  The Exit Financing Lenders shall be entitled, upon closing, to payment of costs and expenses in respect of the Exit Financing, including attorneys fees and costs.

**Governing Law**:  Laws of the State of New York.

**Exit Financing Agreement:** Reorganized Mahalo and Ableco shall enter into the Exit Financing Agreement, which shall be in a form acceptable to Ableco.  The Exit Financing Agreement shall be subject to the Intercreditor Agreement.

**B.      Funding of the Plan.**

All obligations of Reorganized Mahalo under the Plan will be paid or caused to be paid by Reorganized Mahalo from cash on hand in the Estate and the proceeds of the Exit Financing.  The cash necessary for Reorganized Mahalo to make deferred cash payments provided for under the Plan will be derived from the post-Effective Date revenues of Reorganized Mahalo and advances under the Exit Financing.

All obligations of the Liquidating Trust to make disbursements to the holders of Allowed General Unsecured Claims shall be funded by the assets of the Liquidating Trust.

Case: 09-80795    Doc #: 445    Filed:  in USBC ED/OK on 10/16/09  Page 75 of 104

### C.     Vesting of Assets Generally; Suspense Funds.

Except as otherwise provided in the Plan, or in the Wells Fargo Foothill Restated Credit Agreement, the Restated Ableco Credit Agreement, and the Exit Financing Agreement, on the Effective Date, all property of the Estate shall vest in Reorganized Mahalo, free and clear of all claims, Liens, encumbrances and interests.  From and after the Effective Date, Reorganized Mahalo may operate its business and use, acquire and dispose of property without supervision by the Court, and free of  any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order, the Wells Fargo Foothill Restated Credit Agreement, the Restated Ableco Credit Agreement, and the Exit Financing Agreement.

Without limiting the generality of the foregoing paragraph, on the Effective Date:  all Suspense Funds remitted to the Debtor but held on deposit pursuant to an order of the Court or otherwise, and all rights to Suspense Funds to be remitted to the Debtor pursuant to an order of the Court or otherwise, shall be released to and vested in Reorganized Mahalo, free and clear of all claims, Liens, encumbrances and interests, in accordance with the applicable release provisions set forth in the Plan.

### D.     Preservation/Vesting of Rights of Action.

Except as expressly released and otherwise provided pursuant to the Plan, pursuant to Bankruptcy Code section 1123(b), Reorganized Mahalo shall be vested on the Effective Date with and shall retain and may enforce any and all Rights of Action that the Debtor, the Estate and/or the Creditors' Committee may hold or have against any entity, including (i) the Williams Avoidance Actions, (ii) any legal or equitable rights to subordinate and/or disallow Claims (excluding General Unsecured Claims), (iii) any derivative Rights of Action that may be brought by the Debtor or the Creditors' Committee on behalf of the Debtor and/or Estate; and (iv) any and all other Rights of Actino of any kind or nature of the Debtor or the Estate that may exist as a consequence of applicable bankruptcy law or nonbankruptcy law (collectively, the "Retained Actions"); provided that the Retained Actions shall not include the Designated Avoidance Actions.  Upon the Effective Date, Reorganized Mahalo and only Reorganized Mahalo shall have standing to assert the Retained Actions and may prosecute, abandon, settle or otherwise dispose of the Retained Actions in its discretion.  Notwithstanding the foregoing, the Retained Actions shall not include any claim, right or cause of action released pursuant to the Plan.

Except as expressly released and otherwise provided pursuant to the Plan, pursuant to Bankruptcy Code section 1123(b), the Liquidating Trustee, on behalf of the Liquidating Trust and the holders of Allowed General Unsecured Claims shall be vested on the Effective Date with the Designated Avoidance Actions.  Upon the Effective Date, the Liquidating Trustee and only the Liquidating Trustee shall have standing to assert the Designated Avoidance Actions and may prosecute, abandon, settle or otherwise dispose of the Designated Avoidance Actions in its discretion.

### E.     The Liquidating Trust.

#### 1.     Appointment of the Liquidating Trustee.

Pursuant to 11 U.S.C. § 1129(a)(5), consistent with the interests of creditors, and consistent with public policy, the Confirmation Order shall appoint, effective on the Effective Date, the Liquidating Trustee.  The Creditors Committee will designate and disclose the identity of the initial

Liquidating Trustee prior to the commencement of the Confirmation Hearing. If the Creditors' Committee refuses to do so, the Debtor will designate and disclose the identity of the Liquidating Trustee. The Liquidating Trustee shall consult with the Advisory Committee, but subject to the Liquidating Trust Agreement, shall be free to act as s/he deems appropriate, in his/her discretion, to effectuate the terms of the Plan as to which s/he has obligations, and the Liquidating Trust Agreement.

The Liquidating Trustee shall serve for the duration of the Liquidating Trust, subject to earlier death, resignation, incapacity or removal as provided in the Liquidating Trust Agreement. If the initial Liquidating Trustee appointed pursuant to the Confirmation Order is not able to serve for the duration of the Liquidating Trust, a successor shall be chosen by the Advisory Committee, subject to Bankruptcy Court approval.

The Liquidating Trustee shall perform his/her duties under the Plan without bond. The Liquidating Trustee shall have no liability to any person or entity entitled to receive a distribution pursuant to the Plan for any losses, damages, claims or causes of action, other than those primarily resulting from the Liquidating Trustee's action or failure to act arising out of, in connection with or resulting from the Liquidating Trustee's gross negligence or willful misconduct. The Liquidating Trust shall indemnify, defend and hold the Liquidating Trustee and his/her agents and advisors harmless from and against any claims, damages, costs, fines, penalties, liabilities, attorneys' and other professional fees and disbursements, suffered, incurred by, or asserted against any such party in connection with the rendition of services to the Liquidating Trust, provided that such indemnification shall not apply to the extent any such claims, damages, costs, fines, penalties, liabilities, attorneys' and other professional fees and disbursements, resulted primarily from gross negligence or willful misconduct of the Liquidating Trustee or his/her agents or advisors, as the case may be, as determined by a Final Order. Any such indemnification claims shall be paid or caused to be paid prior and in preference to any other payments or distributions to be made from the Liquidating Trust.

The Liquidating Trustee shall be authorized, without further order of the Bankruptcy Court, to employ such persons, including professionals, as deemed necessary to enable the Liquidating Trustee to perform his/her functions under the Plan, and the costs of such employment and other expenditures shall be paid or caused to be paid solely from assets of the Liquidating Trust in accordance with the Liquidating Trust Agreement.

The Liquidating Trustee and any professional to the Liquidating Trustee shall be entitled to receive, on a monthly basis, payment of fees and reimbursement of reasonable expenses from the assets of the Liquidating Trust in accordance with the Liquidating Trust Agreement, which shall provide, among other things, for the Liquidating Trustee and his/her professionals to serve an abbreviated monthly statement of such fees and expenses on the post-Effective Date service list and the U.S. Trustee. If no party timely objects to an abbreviated monthly statement within ten (20) days of service, the Liquidating Trustee or such professional shall be paid or caused to be paid 100% of its fees and reimbursed 100% of its expenses from the assets of the Liquidating Trust designated for such purposes.

The members of the Advisory Committee shall not be compensated for their time or efforts, but shall be eligible for reimbursement of any out-of-pocket travel expenses from the Liquidating Trust, to the extent assets are available in the Liquidating Trust to meet those expenses. The members of Advisory Committee shall not have recourse for any such expenses against the Debtor, the Estate or Reorganized Mahalo.

56

## 2.     Powers and Duties of the Liquidating Trustee.

Subject to the Plan, the Liquidating Trustee shall (i) prosecute, compromise, settle and/or abandon the Designated Avoidance Actions, in his/her reasonable discretion, for the benefit of the holders of Allowed General Unsecured Claims, (ii) object to General Unsecured Claims, in his/her reasonable discretion, for the benefit of the holders of Allowed General Unsecured Claims, (iii) manage and maintain an accounting of the Liquidating Trust, (iv) file all tax and regulatory forms, returns, reports and other documents required with respect to the Liquidating Trust; (v) distribute the net proceeds of the Liquidating Trust to the holders of Allowed General Unsecured Claims, and (vi) take all actions necessary and create any documents necessary to wind up the affairs of the Liquidating Trust.  All expenses incurred by or on behalf of the Liquidating Trustee or the Liquidating Trust shall be borne by the Liquidating Trust.

## 3.     Termination of the Liquidating Trust.

The Liquidating Trust shall terminate when the Liquidating Trustee has performed all of his/her duties with respect to the Liquidating Trust, including the final distribution of all the property of the Liquidating Trust, which date shall not be more than 24 months after the Effective Date; provided, however, that upon a motion filed by a party in interest, including the Liquidating Trustee, upon a showing of cause, the Bankruptcy Court may extend the duration of the Liquidating Trust so long as shall be necessary to liquidate and distribute property of the Liquidating Trust, but in no event more than 60 months after the Effective Date.

## 4.     Formation of the Advisory Committee.

On the Effective Date, the Advisory Committee shall be deemed established and shall be comprised of all former members of the Creditors' Committee as of  the Effective Date who consent to serve on the Advisory Committee.  The Advisory Committee shall be entitled to advise the Liquidating Trustee with respect to the liquidation and distribution of the assets of the Liquidating Trust in accordance with the Liquidating Trust Agreement, the Plan, and the Confirmation Order. The Creditors' Committee shall designate the members of the Advisory Committee by Filing a list of such members and serving it on counsel to the Debtor, counsel to Ableco, and the parties that have requested notice pursuant to Bankruptcy Rule 2002, no later than the Exhibit Filing Date.  The Advisory Committee shall have no authority other than as expressly stated in this paragraph.  The Advisory Committee will dissolve upon the termination of the Liquidating Trust.

## F.     Claim Objections.

Except as provided in Section II.B.1 of the Plan (regarding allowance of Administrative Claims), objections to any Claims shall be Filed and served upon the holder of such Claim no later than the Claim Objection Deadline.

On and after the Effective Date, Reorganized Mahalo shall have exclusive authority to prosecute, compromise, abandon or otherwise dispose of any objection to a Claim, other than a General Unsecured Claim.  On and after the Effective Date, the Liquidating Trustee shall have exclusive authority to prosecute, compromise, abandon or otherwise dispose of any objection to a General Unsecured Claim.

### G. Distribution of Property Under the Plan.

The following procedures set forth in the Plan apply to distributions made pursuant to the Plan by Reorganized Mahalo or the Liquidating Trustee, in each instance acting as a "Disbursing Agent" for purposes of the Plan, as described in this Section.

Each Disbursing Agent will serve without bond and shall make the distributions it is required to make under the Plan, except where otherwise provided. To the extent required by applicable law, each Disbursing Agent in making cash distributions under the Plan shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Each Disbursing Agent may withhold the entire cash distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit.

### 1. Manner of Cash Payments Under the Plan.

Cash payments to domestic entities holding Allowed Claims will be tendered in United States dollars and will be made by checks drawn on a United States domestic bank or by wire transfer from a United States domestic bank. Any domestic entity holding an Allowed Claim that wishes to receive a cash payment by wire transfer shall provide wire instructions to the Disbursing Agent. In any such case, the Disbursing Agent shall make the cash payment(s) by wire transfer in accordance with the wire instructions, provided that the costs of such wire transfer shall be deducted from such entity's distribution. Payments made to foreign creditors holding Allowed Claims may be paid or caused to be paid, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 2. No De Minimis Distributions.

Notwithstanding anything to the contrary in the Plan, no cash payment of less than $25 will be made to any entity. No consideration will be provided in lieu of the *de minimis* distributions that are not made under this Section.

### 3. No Distribution with Respect to Disputed Claims.

No payments of cash or distributions of other property or other consideration of any kind shall be made on account of any Disputed Claim unless and until such Claim becomes an Allowed Claim or is deemed to be such for purposes of distribution, and then only to the extent that the Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim. Unless otherwise provided in the Plan, any holder of a Claim that becomes an Allowed Claim after the Effective Date will receive any distribution that it would have received had its Allowed Claim been Allowed as of the Effective Date within fifteen (15) days from the date that such Claim becomes an Allowed Claim.

### 4. Delivery of Distributions and Undeliverable/Unclaimed Distributions.

#### (1) Delivery of Distributions in General.

The Disbursing Agent shall make distributions to each holder of an Allowed Claim and Allowed Trust Claim by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim or Allowed Trust Claim; (b) at the address set forth in any written notice of address change delivered to the Disbursing Agent after the date of any related proof of Claim; and (c) at the address reflected in the Schedules if no proof of Claim is filed and the

58

applicable Disbursing Agent has not received a written notice of a change of address.  To the extent the Debtor or Reorganized Mahalo has no current address as to the holder of an Allowed Claim or Allowed Trust Claim, Reorganized Mahalo shall withhold the remittance of any distribution to such holder unless and until the applicable Disbursing Agent is notified in writing of such holder's then-current address.

### (2)     Undeliverable and Unclaimed Distributions.

If the distribution is remitted to the holder of any Allowed Claim or Allowed Trust Claim is returned as undeliverable, no further distribution shall be made to such holder unless and until the applicable Disbursing Agent is notified in writing of such holder's then current address.  Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Disbursing Agent making the distribution pursuant to this Section until such time as a distribution becomes deliverable.  All undeliverable cash distributions will be held in one or more unsegregated, interest-bearing bank accounts for the benefit of the persons or entities entitled to such distributions. These persons and entities will be entitled to any interest actually earned on account of the undeliverable distributions.

Any holder of an Allowed Claim or Allowed Trust Claim who does not assert a claim in writing for any undeliverable distribution within two (2) years after such distribution was first made shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any distributions under the Plan, or from asserting a Claim against the Debtor, the Estate, Reorganized Mahalo, the Liquidating Trust, or their respective property, and the Claim giving rise to the undeliverable distribution will be barred.

Any undeliverable distributions on Allowed Claims or Allowed Trust Claims that are not claimed under this Section will be retained by the Reorganized Debtor.

### (3)     Estimation of Disputed Claims for Distribution Purposes.

Each Disbursing Agent may move for a Bankruptcy Court order estimating any Disputed Claim as to which such Disbursing Agent is responsible under the Plan.  The estimated amount of any Disputed Claim so determined by the Bankruptcy Court shall constitute the maximum recovery that the holder thereof may recover under the Plan.  In the event that the applicable Disbursing Agent does not seek an order estimating a Disputed Claim, the estimated amount of such Disputed Claim, for purposes of maintaining an appropriate reserve in connection with a distribution, shall be the amount set forth in the proof of claim evidencing the Disputed Claim (or in Debtor's schedules if no proof of claim has been filed), if any.

### 5.     Setoff, Recoupment and Other Rights.

Notwithstanding anything to the contrary contained in the Plan, Reorganized Mahalo may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the distributions to be made pursuant to the Plan on account of any Allowed Claim, any claims that the Debtor, the Estate, or Reorganized Mahalo may have against the entity holding the Allowed Claim; provided, however, that none of the failure to effect such a setoff or recoupment, the failure to assert counterclaims or withhold distributions, or the allowance of any Claim against the Debtor, the Estate or Reorganized Mahalo, or any partial or full payment during the Case or after the Effective Date in respect of any Allowed Claim, shall constitute a waiver or release by the Debtor, the Estate or Reorganized Mahalo of any claim that any of them may possess against such holder.

### 6. Cancellation of Interests.

On the Effective Date, without any further action by any party, all Interests in the Debtor shall be cancelled, retired, annulled, and extinguished and of no further force or effect, including each share of Existing Stock issued and outstanding or any other stock held in treasury and no consideration will be paid or caused to be paid or delivered with respect thereto. Holders of such stock shall not be required to surrender such stock to Debtor.

### H. Reorganized Mahalo.

#### 1. Board of Reorganized Mahalo.

On the Effective Date, without further action by any party, the existing members of the board of directors for the Debtor shall be deemed removed as directors of the Debtor and replaced with the New Board Members. Following the Effective Date, the membership of the board of directors of Reorganized Mahalo will be determined in accordance with its Articles and Bylaws.

#### 2. Officers of Reorganized Mahalo.

As of the Effective Date, the officers of Reorganized Mahalo will serve at the discretion of the board of directors for Reorganized Mahalo.

#### 3. Articles of Incorporation and Bylaws.

As of the Effective Date, the Articles of Incorporation and Bylaws shall (a) prohibit the issuance of non-voting equities securities as required by Bankruptcy Code section 1123(a)(6), subject to amendment of such Articles of Incorporation and Bylaws as permitted by applicable law, and (b) effectuate the provisions of the Plan, including the cancellation of all Interests and the issuance of New Common Stock, in each case without any further action by the shareholders or directors of the Debtor or Reorganized Mahalo.

#### 4. Terms of the New Common Stock.

Each share of New Common Stock shall entitle the holder thereof to one vote in all matters to be voted on by the shareholders of Reorganized Mahalo. Subject to preferences that may be applicable to any preferred stock that may be issued and outstanding at the time, holders of New Common Stock will be entitled to receive ratably such dividends, if any, as may be declared from time to time by Reorganized Mahalo's board of directors out of funds legally available for that purpose; provided, however, that no such dividends shall be paid until the amounts due under the wells Fargo Foothill Restated Credit Agreement have been indefeasible paid in full in cash. In the event that Reorganized Mahalo liquidates, dissolves or winds up, holders of New Common Stock will be entitled to share ratably in all assets remaining after payment of liabilities and the liquidation preferences of preferred stock, if any, outstanding at the time. The rights, preferences and privileges of holders of New Common Stock are subject to, and may be materially adversely affected by, the rights of the holders of any shares of preferred stock that the board of directors of Reorganized Mahalo may designate and issue in the future. Any additional rights, preferences and restrictions associated with New Common Stock shall be determined by the board of directors and shall be set forth in the Articles of Incorporation and Bylaws of Reorganized Mahalo.

### 5. Securities Exemption.

The exemption from the requirements of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and any state or local law requiring registration or qualification for the offer or sale of a security provided under Bankruptcy Code section 1145 shall apply to the New Common Stock issued and distributed under the Plan.

### 6. Employee Equity Incentive Plan.

The Debtor expects that promptly following the Effective Date, the board of Reorganized Mahalo will adopt an employee equity incentive plan ("Employee Equity Incentive Plan") pursuant to which a number of shares of New Common Stock of up to 10% of the outstanding New Common Stock on the Effective Date will be available for issuance pursuant to the Employee Equity Incentive Plan.

### 7. Employee Benefit Plans.

The Reorganized Debtor will establish new employee benefit plans, programs and benefits (other than those pertaining to rights to acquire or receive Interests in the Debtor) containing substantially the same terms as those existing immediately prior to the Effective Date as to persons employed on the Effective Date and retained by Reorganized Mahalo.

### I. Dissolution of the Creditors' Committee.

On the Effective Date, the Creditors' Committee shall be dissolved and released and discharged from the rights and duties arising from or related to the Case, except with respect to final applications for professional compensation. The professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications by such professionals or Creditors' Committee members for allowance of compensation and reimbursement of expenses pending on the Effective Date or timely Filed after the Effective Date as provided in the Plan, as approved by the Court.

### J. Post-Confirmation U.S. Trustee Fees.

To the extent U.S. Trustee Fees are due and owing under 28 U.S.C. § 1930 with respect to periods following the Confirmation Date, but prior to the entry of a final decree closing the Case, Reorganized Mahalo shall be obligated to satisfy such fees; provided, however, that if Reorganized Mahalo requests the entry of a final decree closing the case and the Liquidating Trustee opposes the entry thereof or requests (formally or informally) a delay in the entry thereof, the Liquidating Trust shall be obligated for all U.S. Trustee Fees relating to any period of time following the date on which Reorganized Mahalo made its request for entry of a final decree.

# XII.

## EFFECT OF CONFIRMATION OF THE PLAN

A.     **Binding Effect of Plan/Injunction.**

UPON THE EFFECTIVE DATE, BANKRUPTCY CODE SECTION 1141 SHALL BECOME APPLICABLE WITH RESPECT TO THE PLAN AND THE PLAN SHALL BE BINDING ON ALL PARTIES TO THE FULLEST EXTENT PERMITTED BY BANKRUPTCY CODE SECTION 1141(a).  IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1141, AND SUBJECT TO THE TERMS OF THIS PLAN, INCLUDING THE LIENS GRANTED PURSUANT TO THE WELLS FARGO FOOTHILL RESTATED CREDIT AGREEMENT, THE RESTATED ABLECO CREDIT AGREEMENT AND THE EXIT FINANCING AGREEMENT, THE PROPERTY DEALT WITH BY THE PLAN SHALL BE VESTED IN THE REORGANIZED DEBTOR (AND TO THE EXTENT APPLICABLE, VESTED IN THE LIQUIDATING TRUST) FREE AND CLEAR OF ALL CLAIMS AND INTERESTS OF CREDITORS AND EQUITY SECURITY HOLDERS.

UPON THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES SHALL BE PERMANENTLY ENJOINED BY THE PLAN FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYING ANY PROCESS, ASSERTING OR UNDERTAKING AN ACT TO COLLECT, RECOVER, OR OFFSET, DIRECTLY OR INDIRECTLY, ANY CLAIMS, RIGHTS, CAUSES OF ACTION, LIABILITIES OR INTERESTS IN OR AGAINST ANY PROPERTY VESTED IN THE REORGANIZED DEBTOR (OR THE LIQUIDATING TRUST) OR DISTRIBUTED OR TO BE DISTRIBUTED UNDER THE PLAN, BASED UPON ANY ACT, OMISSION, TRANSACTION, OR OTHER ACTIVITY THAT OCCURRED BEFORE THE CONFIRMATION DATE, EXCEPT TO THE EXTENT A PERSON OR ENTITY HOLDS AN ALLOWED CLAIM UNDER THE PLAN, IS ENTITLED TO A DISTRIBUTION UNDER THE PLAN IN ACCORDANCE WITH ITS TERMS, AND SEEKS TO ENFORCE ITS RIGHTS TO PAYMENT UNDER THE PLAN.

UPON THE EFFECTIVE DATE, EXCEPT TO THE EXTENT EXPRESSLY PRESERVED UNDER THE PLAN, INCLUDING THE LIENS GRANTED PURSUANT TO THE WELLS FARGO FOOTHILL RESTATED CREDIT AGREEMENT, THE RESTATED ABLECO CREDIT AGREEMENT AND THE EXIT FINANCING AGREEMENT, AND THEREAFTER TO THE EXTENT THE BANKRUPTCY COURT DETERMINES THAT A LIEN IS NOT AN ALLOWED SECURED CLAIM OR ALLOWED TRUST CLAIM, ANY LIEN OR OTHER INTEREST IN OR AGAINST PROPERTY OF THE DEBTOR, THE ESTATE AND/OR REORGANIZED MAHALO SHALL BE VOID AND OF NO FORCE AND EFFECT, IRRESPECTIVE OF WHETHER SUCH LIEN OR OTHER INTEREST REMAINS AS A MATTER OF RECORD WITH RESPECT TO THE TITLE TO SUCH PROPERTY.  NOTWITHSTANDING THE FOREGOING, UPON AND AFTER THE EFFECTIVE DATE, AND THEREAFTER TO THE EXTENT THE BANKRUPTCY COURT DETERMINES THAT A LIEN IS NOT AN ALLOWED SECURED CLAIM OR ALLOWED TRUST CLAIM, ALL STATE, COUNTY, OR OTHER GOVERNMENT OFFICIALS WITH THE RESPONSIBILITY OF MAINTAINING OFFICIAL RECORDS WITH RESPECT TO THE OWNERSHIP OF SUCH PROPERTY AND/OR LIENS AGAINST SUCH PROPERTY SHALL, UPON THE REQUEST OF REORGANIZED MAHALO, IMMEDIATELY REMOVE FROM THE TITLE TO SUCH PROPERTY ALL LIENS VOIDED UNDER OR AS A RESULT OF THE OPERATION OF THE PLAN,

**WITHOUT REQUIRING THE EXECUTION OF ANY INSTRUMENT, THE ISSUANCE OF ANY COURT ORDER OR ANY OTHER ACTION OTHERWISE REQUIRED BY APPLICABLE LAW TO EFFECTUATE SUCH REMOVAL.**

### B.     Compromise of Claims By The Debtor.

The Debtor's request for entry of the Confirmation Order shall constitute a motion to compromise claims as to the Compromise Parties and the Related Compromise Parties under Bankruptcy Rule 9019.  The Compromise Parties comprise: (i) the Secured Lenders, (ii) each holder of a Compromised O&G Mechanics/Materialmen Claim that does not timely exercise the Class 5 Opt-Out Election, and (iii) in the event Williams elects to accept the Williams Compromise Treatment, Williams.  The Related Compromise Parties comprise the Affiliates, parent companies, subsidiaries, members, shareholders, partners, predecessors-in-title, successors, heirs, assigns, representatives, attorneys, accountants, agents, investment bankers, consultants, financial advisors and officers and directors thereof, whether past or present of any Compromise Parties.

The compromises being entered into by the Debtor and the Estate to the Compromise Parties and Related Compromise Parties are reasonable and appropriate under the circumstances.  Ableco, for instance, is funding the Plan through the Exit Financing, restructuring and extending the secured debt owed by the Debtor to facilitate its rehabilitation, and waiving any distribution on account of the Ableco General Unsecured Deficiency Claim and the Ableco Adequate Protection Claim.  Additionally, the Plan provides that the WFF Debt also will be restructured and extended.  Without these accommodations (particularly those being provided by Ableco), the Plan would not be possible, and it is not likely that any alternative plan would be possible.

Under the compromise embodied in the Plan, the Debtor and the Estate, among other things, are waiving any rights with respect to the nature and breadth of the collateral securing the Claims of the Secured Lenders or the enforcement of that portion of those Claims that comprises the $10 million Facility Fee owing to Ableco.  Subject to the disclosures contained herein regarding certain unencumbered properties (which are acknowledged by Ableco and are of *de minimis* value), the Debtor does not believe that there are any material issues with respect to the validity of any Liens securing the debt under the Prepetition Credit Agreement.  Further, although Ableco contends that the $10 million Facility Fee is fully enforceable, the release of Estate claims relating to it is of no real no impact on the Estate, because the value of the Ableco Unsecured Deficiency Claim is at least $10 million and, as noted, the Plan does not provide any distribution to Ableco on account that Claim.

Likewise, to the extent that Williams does not opt out of the Williams Compromise Treatment, and the holders of Compromised O&G Mechanics/Materialmen Claim do not opt out of the compromise treatment provided in Class 5, granting releases to these parties and related entities is reasonable and appropriate.  To the extent these claims are compromised, the Estate will avoid the costs and risks associated with the litigation of these claims, the Liens that purportedly secure them, the competing Liens that secure the indebtedness owed to the Secured Lenders and, in some cases, potential preference actions or other Avoidance Actions against these entities.  The assertion of competing Liens by these parties and the prospect of extensive litigation has been one of the greatest challenges to achieving a restructuring in this Case.  To the extent these parties agree to compromise their claims, avoid litigation, and accept the proposed distribution offered under the Plan (which is substantially less than the face amount of their claims), the Debtor believes it is reasonable and appropriate to grant the releases embodied in the Plan, as part of a comprehensive compromise.

Specifically, the Plan provides the following with respect to these compromises:

AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE DEBTOR (ON BEHALF OF ITSELF AND THE ESTATE) COMPROMISES, RELEASES AND FOREVER WAIVES ALL RIGHTS OF ACTION AGAINST THE COMPROMISE PARTIES AND EACH OF THE RELATED COMPROMISE  PARTIES AND THE DEBTOR SHALL CONCLUSIVELY BE DEEMED THE HOLDER OF ALL SUCH CLAIMS AND RIGHTS AS SOLE REPRESENTATIVE OF THE ESTATE; **PROVIDED**, **HOWEVER**, THAT THE FOREGOING ANY OTHER RELEASE UNDER THE PLAN SHALL NOT EFFECTUATE A RELEASE OF ANY CONTINUING OBLIGATION OF A COMPROMISE PARTY OR ANY RELATED COMPROMISE PARTY ENTITY UNDER THE PLAN, ANY CONFIDENTIALITY AGREEMENT WITH THE DEBTOR.  THE RELEASES SET FORTH IN THIS PARAGRAPH AND OTHERWISE UNDER THE PLAN SHALL BE BINDING UPON AND SHALL INURE TO THE BENEFIT OF THE DEBTOR, REORGANIZED DEBTOR, THE LIQUIDATING TRUSTEE, AND ANY CHAPTER 7 TRUSTEE, IN THE EVENT THE CASE IS SUBSEQUENTLY CONVERTED TO CHAPTER 7.  TO THE EXTENT WILLIAMS AND ANY HOLDER OF A COMPROMISED O&G MECHANICS/MATERIALMEN CLAIM IS A COMPROMISE PARTY UNDER THE PLAN, THE PLAN SHALL NOT RELEASE ANY CONTINUING OBLIGATION OF SUCH ENTITY WITH RESPECT TO ANY PERFORMANCE RENDERED AFTER THE PETITION DATE; AND **PROVIDED FURTHER**, THAT NEITHER THIS SECTION NOR ANY OTHER PROVISION OF THE PLAN IS INTENDED, NOR SHOULD IT BE CONSTRUED, TO ALTER, MODIFY, OR PREJUDICE THE RIGHTS OF THE SECURED LENDERS AGAINST THE PARENT OR ITS ASSETS, ALL OF WHICH RIGHTS ARE EXPRESSLY PRESERVED.

C.    Exculpation and Limitation of Liability.

NEITHER THE DEBTOR, THE REORGANIZED DEBTOR, THE SECURED LENDERS OR THEIR RESPECTIVE ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, RESTRUCTURING CONSULTANTS, OTHER CONSULTANTS AND FINANCIAL ADVISORS, NOR ANY OF THEIR RESPECTIVE  OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, EMPLOYEES, OR ANY OTHER PERSON ACTING OR PURPORTING TO ACT ON THEIR BEHALF, WHETHER IN THE PAST OR CURRENTLY, SHALL HAVE OR INCUR ANY LIABILITY TO ANY PERSON OR ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO THE FORMULATION, NEGOTIATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, ADMINISTRATION, CONFIRMATION OR CONSUMMATION OF THE PLAN, OR ANY OTHER CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTOR, **PROVIDED**, **HOWEVER**, THAT THE FOREGOING PROVISIONS SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY PERSON OR ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

D.    Injunctive Relief Relating To Claims and Releases.

**THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED OR EXCULPATED PURSUANT TO THE PLAN, INCLUDING CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED UNDER THE PLAN.**

## XIII.

## OTHER PLAN PROVISIONS

### A.      The Effective Date.

The Plan will not become binding or effective until and unless the Effective Date occurs. The Effective Date will be the first Business Day, as determined by the Debtor, in its reasonable discretion, on which the following conditions have been satisfied:

(1)      At least fourteen (14) days have elapsed following the Confirmation Date;

(2)      The Confirmation Order, in form and substance reasonably satisfactory to Ableco, Wells Fargo Foothill and the Exit Financing Lenders, has been entered and is not stayed; and

(3)      All agreements and other documents reasonably necessary to implement the Plan have been executed and delivered in a form acceptable to Ableco; provided that (i) with respect to the Wells Fargo Foothill Restated Credit Documents and the Intercreditor Agreement, the form of such documents also must be acceptable to Wells Fargo Foothill; and (ii) with respect to the Exit Financing Documents and the Intercreditor Agreement, the form of such documents also must be acceptable to the Exit Financing Lenders.

(4)      Any modifications to the Plan are in a form acceptable to Ableco; provided that with respect to a provision regarding the treatment of the Claims of Wells Fargo Foothill under the Plan, and any other provision of the Plan that will adversely affect Wells Fargo Foothill or the treatment of the Claims of Wells Fargo Foothill in any material respect, such form also must be acceptable to Wells Fargo Foothill.

Ableco shall have the right to waive any of the foregoing conditions, with the exception of subparagraph (2); provided that with respect to subparagraph (3) and (4), Wells Fargo Foothill and the Exit Financing Lenders shall have the right to waive their respective rights thereunder, to the extent of such rights.

### B.      Stay of Confirmation Order Shortened.

The stay otherwise applicable to the Confirmation Order under Federal Rule of Bankruptcy Procedure 3020(e) shall be shortened to three (3) days following entry of the Confirmation Order.

### C.      Revocation of Plan/No Admissions.

Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will: (a) be deemed to be an admission by the Debtor with respect to any matter

set forth in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any Interests in, the Debtor, or of any claims of the Debtor; or (c) prejudice in any manner the rights of any party in any further proceedings.

### D.   Exemption from Certain Transfer Taxes.

In accordance with Bankruptcy Code section 1146(a), neither (i) the issuance, transfer or exchange of a security, nor (ii) the delivery of an instrument or transfer under the Plan shall be taxed under any law imposing a stamp or similar tax.  The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

### E.   Modifications of Plan.

Subject to the restrictions set forth in Bankruptcy Code section 1127, the Debtor and Reorganized Debtor reserve the right, to alter, amend, or modify the Plan before its substantial consummation (and such amendment or modification shall be deemed to be granted  absent objection within two Business Days following written notice of any such proposed change); provided that any such alteration, amendment or modification is in a form acceptable to Ableco; provided further, that with respect to a provision regarding the treatment of the Claims of Wells Fargo Foothill under the Plan, and any other provision of the Plan that will adversely affect the treatment of the Claims of Wells Fargo Foothill in any material respect, such form also must be acceptable to Wells Fargo Foothill.

### F.   Cram-Down.

The Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b) if one or more Impaired Classes votes to reject the Plan (provided the other requirements of Bankruptcy Code section 1129 are satisfied).

### G.   Post-Effective Date Effect of Evidences of Claims or Interests.

Commencing on the Effective Date, notes, certificates, warrants, and other evidences of Claims against or Interests in the Debtor constitute only the right to receive the distributions, if any, to the extent set forth under the Plan.

### H.   Post-Effective Date Notices.

Following the Effective Date, other than Reorganized Mahalo, the Liquidating Trustee, Wells Fargo Foothill, Ableco, and the United States Trustee, who shall receive notices of all pleadings Filed in the Case without any further action, all parties in interest who wish to receive, or continue to receive, notices of all pleadings Filed in the Case must File a new request for special notice and serve it on Reorganized Mahalo, the Liquidating Trustee, wells Fargo Foothill, Ableco and the United States Trustee and their respective counsel.  Reorganized Mahalo shall maintain and keep current the post-Effective Date special notice list, and make it available to all parties in interest upon written request.  All pleadings, notices and other papers Filed in the Case following the Effective Date (other than the notice of Effective Date) must be served on the parties on the post-Effective Date special notice list.

**I.      Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity, whether or not such entity's Claim is Impaired under the Plan and whether or not such entity has accepted the Plan.

**J.      Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

**K.      Headings.**

The headings used in the Plan are inserted for convenience only and do not constitute a portion of the Plan or in any manner affect the provisions of the Plan or their meaning.

**L.      Severability of Plan Provisions.**

If before confirmation the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.  That term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.  The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid, enforceable, and, as of the Effective Date, binding under its terms.

**M.      Governing Law.**

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws thereof.

**N.      Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case after the Effective Date to the fullest extent provided by law, including the jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, establish the priority or secured or unsecured status of, estimate, or limit any Claim;

2.      Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

4.      Resolve any and all applications, motions, adversary proceedings, and other matters involving the Estate that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan, provided that the Liquidating Trustee and the Liquidating Trust shall reserve the right to prosecute Causes of Action in any proper jurisdiction;

5.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with the Plan;

6.      Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's rights or obligations in connection with the Plan;

7.      Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code section 1127, or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

8.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

9.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

10.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; and

11.     Enter an order closing the Case.

If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter, this Section shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Notwithstanding the foregoing, and any provision in Section VII.N of the Plan, jurisdiction and venue with respect to any dispute arising under the Wells Fargo Foothill Restated Credit Documents, the Restated Ableco Credit Documents, or the Exit Financing Documents shall in each case be determined respectively by the terms of such documents (including any forum selection clause therein) and applicable non-bankruptcy law; the Bankruptcy Court shall not retain jurisdiction over any such dispute.

### O.  Plan Embodies Settlements.

As described in this Disclosure Statement, the Plan constitutes a good faith compromise and settlement of certain claims and interests between and among the parties subject thereto and binding on all other parties in interest in accordance with Bankruptcy Code section 1123(b).

### P.  Term of Bankruptcy Injunctions or Stays.

All injunctions or stays provided for in the Case under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### Q.  Objections to Confirmation.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE COURT.

### R.  Notices.

Any notice required or permitted to be provided under the Plan or in connection with the Plan, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) overnight delivery service, freight prepaid, and addressed as follows:

For the Debtor:

Kline, Kline, Elliott & Bryant, P.C.
Attn:  G. David Bryant, Esq., Stephen W. Elliott, Esq. & Mark Monfort, Esq.
720 NE 63rd Street
Oklahoma City, OK  73105

For the Creditors' Committee:

Baker & McKenzie
Attn: Ali M. Mojdehi, Esq.
12544 High Bluff Drive, Suite 300
San Diego, CA  92130

Baker & McKenzie
Attn:  David W. Parham, Esq. and Laurie D. Babich, Esq.
2001 Ross Avenue, Suite 2300
Dallas, TX  75201

For Ableco:

Klee, Tuchin, Bogdanoff & Stern LLP
Attn: Lee R. Bogdanoff, Esq. and Martin R. Barash, Esq.
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA  90067-5061

For Wells Fargo Foothill:

Schulte, Roth & Zabel LLP
Attn: Lawrence V. Gelber, Esq. and James T. Bentley, Esq.

919 Third Avenue
New York, New York 10022


For the United States Trustee:

Office of the U. S. Trustee
Attn:  Katherine Vance, Esq.
224 S. Boulder, Suite 225
Tulsa, OK  74103


# XIV.

## FINANCIAL PROJECTIONS AND FEASIBILITY

Exhibit 4 hereto provides financial projections for the Debtor and Reorganized Mahalo (collectively, the "Projections").  The Projections show financial information on a monthly basis following the anticipated Effective Date, through fiscal year 2014.  The Projections have been prepared under the direction of the Debtor.  To the best of the Debtor's knowledge, the Projections present the expected financial results of the Debtor and Reorganized Mahalo for the periods projected, subject to the various assumptions set forth therein.  Based thereon, the Debtor believes that the Plan is feasible.  Readers are urged to review carefully all of the notes and assumptions including the projections and to consult with their own financial and legal advisors regarding the same.

The Projections are based upon a variety of estimates and assumptions, which though considered reasonable at the time they were prepared, may not be realized and are inherently subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the Debtor's control.  The Debtor cautions that no representations can be made as to the accuracy of the Projections or Reorganized Mahalo's ability to achieve the projected or illustrated results.  Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the projections were prepared, but which were not then known to the Debtor, may differ materially from those assumed.  The Projections therefore may not be relied upon as a guarantee or other assurance of the actual results that will occur.  (See Section XVI.B for a more detailed explanation of the risk factors associated with the business of the Reorganized Debtor, the Plan, and the Projections).

Prepetition, the Debtor's financial statements were consolidated with its Parent.  The Debtor has not incurred the expense post-petition to generate separate financial statements for the pre-petition period, except for May of 2009.  Instead, the Debtor has included as Exhibit 3 to this Disclosure Statement a copy of the 2007 and 2008 year-end audited, consolidated financial statements prepared for its Parent, which is the best information currently available to the Debtor.  However, parties in interest are strongly cautioned that the consolidated nature of the historical financials included as part of the Disclosure Statement, coupled with subsequent changes in the economy and at both the Parent and subsidiary levels, renders those historical financials of extremely limited relevance to providing adequate information to make an informed decision about the Plan.  The unconsolidated, unaudited financials the Debtor prepared for May of 2009 are also included as part of Exhibit 3, and also provide post-petition information for June through August of 2009.

# XV.

## LIQUIDATION ANALYSIS AND "BEST INTERESTS" TEST

Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or Interest in an Impaired Class either (i) vote to accept the Plan, or (ii) receive or retain under the Plan cash or property of a value, as of the effective date, of the Plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. This is referred to as the "best interests of creditors" test.

In a chapter 7 case, a trustee or trustees would be elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid from the proceeds of sale of the properties securing their Liens. If any assets are remaining after the satisfaction of secured claims, administrative expenses generally are next to receive payments. Unsecured claims are paid from any remaining sales proceeds, according to their rights to priority. Unsecured claims with the same priority share in proportion to the amount of their allowed claim in relation to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Thus, for the Court to confirm the Plan, the Court must find that all creditors and shareholders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a hypothetical chapter 7 liquidation.

The Debtor's liquidation analysis is attached as Exhibit E to the Disclosure Statement ("Liquidation Analysis"). The liquidation analysis shows that the holders of General Unsecured Claims would receive no distribution in the event the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code, other than an undetermined distribution in respect of recoveries on Designated Avoidance Actions. Moreover, the undersecured creditors who are receiving compromise treatment under the Plan would be relegated to the status of holders of General Unsecured Claims (unless they incurred the time, cost and expense to litigate the priority and value of their Liens over those of the Secured Lenders and ultimately succeeded in doing so).

Under the Plan, the Liquidating Trustee will be vested with the Designated Avoidance Actions. Under the both the Plan scenario and a chapter 7 scenario, these actions would be liquidated and reduced to money. Under the Plan, however, a greater recovery will inure to the holders of General Unsecured Claims due to decreased costs. Absent the Plan, the chapter 7 trustee would be required to investigate, analyze, and litigate the complex competing Lien issues in this case. Even if the chapter 7 trustee sought consensual resolutions, s/he would have to negotiate dozens of separate settlement agreements to resolve the issues that will be compromised under the Plan. Under the Plan, Liquidating Trustee will have far fewer responsibilities, will be able to focus on realizing a recovery from the Designated Avoidance Actions, and will incur less costs -- resulting in a greater recovery for the holders of Unsecured Claims.

Although the Designated Avoidance Actions vested in the Liquidating Trust under the Plan by definition exclude some potential actions (*i.e.*, those listed on the Avoidance Action Exceptions Exhibit), the Plan also provides that the Liquidating Trust will receive unencumbered cash with which to fund its activities and prosecute the Avoidance Actions. These funds would not be available to the chapter 7 trustee in a liquidation case, as all of the cash of the Debtor is subject to the first priority Liens of the Secured Lenders.

The Debtor has estimated the liquidation value of its assets based upon the most accurate information that is currently available. Because those estimates are a prediction of what could be obtained in the future if such assets were liquidated, there is no way to guarantee that the estimates are entirely accurate. It is possible that the actual liquidation of the assets would generate either more or less than the estimated values set forth in the Liquidation Analysis.

## XVI.

## RISKS

The Debtor's ability to perform its obligations under the Plan is subject to various factors and contingencies, some of which are described in this section. The following discussion summarizes only some material risks associated with the Plan and Reorganized Mahalo and is not exhaustive. Moreover, this section should be read in connection with the other disclosures contained in the Plan and Disclosure Statement. Each Claim holder and Interest holder, in conjunction with its advisors, should supplement the following discussion by analyzing and evaluating the Plan and the Disclosure Statement as a whole. THE RISKS ASSOCIATED WITH THE PLAN AND REORGANIZED MAHALO MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN.

This discussion assumes that the Plan is confirmed and that the Effective Date occurs. However, the occurrence of the Effective Date of the Plan is subject to a number of conditions (set forth in Section XIII.A of the Plan), the failure of any one of which may delay the Effective Date, or prevent the Effective Date from occurring at all.

A.     **Certain Bankruptcy Considerations.**

1.     **Undue Delay in Confirmation May Significantly Disrupt the Operation of the Debtor.**

The impact that a prolonged confirmation process may have on the operations of the Debtor cannot be accurately predicted or quantified. Continuation of the case for an extended period of time, particularly if the Plan is not promptly approved, could adversely affect the Debtor's operations and relations ships with its vendors, employees, customers and regulators.

If confirmation and implementation of the Plan do not occur expeditiously, the Case could result in, among other things, increased costs, professional fees, and similar expenses. Prolonging the Case also may make it more difficult for the Debtor to retain and attract management and other key personnel and would require senior management to spend a significant amount of time and effort dealing with the Debtor's reorganization instead of focusing on the operation of the Debtor's business.

2.     **The Debtor May Fail to Obtain Confirmation or Consummation of the Plan.**

As discussed throughout this Disclosure Statement, the Bankruptcy Code establishes numerous requirements for confirmation of a chapter 11 plan. Although the Debtor believes that the Plan will meet such requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Plan is not confirmed, it is unclear whether a restructuring of the Debtor could be implemented and what distributions holders of Allowed Claims or Interests ultimately would receive. If an alternative feasible reorganization could not be proposed, it is possible that the Debtor would have to liquidate its assets, in which case, as set forth in the liquidation analysis, it is likely that holders of Claims and Interests would receive substantially less favorable treatment than

they would receive under the Plan.

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order and the fulfillment of certain prerequisites to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that the conditions to the Effective Date will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur under the Plan.

### 3. The Debtor May Object to the Amount, Security or Priority Status of a Claim and Procedures for Contingent and Unliquidated Claims.

The Debtor reserves the right to object to the amount, or the secured or priority status, of any Claim or Interest. The estimates set forth in the Disclosure Statement cannot be relied on by any creditor or equity holder whose Claim or Interest is subject to an objection. Any such holder of a Claim or Interest may not receive a share of the contemplated distributions described in the Disclosure Statement.

### B. Risks Related to Reorganized Debtor's Business and Financial Condition.

### 1. Reorganized Mahalo May Not be Able to Reach Its Financial Forecasts.

Reorganized Mahalo may not be able to meet its projected financial results or achieve the revenue or cash flow that the Debtor has assumed in projecting Reorganized Mahalo's future business prospects. If Reorganized Mahalo does not achieve the projected revenue or cash flow levels, it may lack sufficient liquidity to continue operating as planned after the Effective Date. The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations. The Projections do not, however, guarantee Reorganized Mahalo's future financial performance.

### 2. The Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They are Based.

The Projections are based on numerous assumptions including: timely Confirmation and consummation pursuant to the terms of the Plan; the anticipated future performance of Reorganized Mahalo; oil and gas industry performance; general business and economic conditions; and other matters, many of which are beyond the control of Reorganized Mahalo, some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of Reorganized Mahalo's operations. These variations may be material and may adversely affect the ability of Reorganized Mahalo to make payments with respect to indebtedness following consummation. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as an assurance of the actual results that will occur.

### 3. The Disclosure Statement Does Not Reflect Events That May Occur Subsequent to the Date of the Disclosure Statement.

Such events may have a material impact on the information contained in the Disclosure Statement. Neither the Debtor nor Reorganized Mahalo intends to update the Projections. The Projections, therefore, will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

4.    **Transfer Restrictions.**

Holders of securities issued pursuant to the Plan who are deemed to be "underwriters" as defined in Bankruptcy Code section 1145(b), including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable freely to transfer or to sell their securities except pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws, or (c) pursuant to the provisions of Rule 144 under the Securities Act or another available exemption from registration requirements.

5.    **Natural Gas Price Declines and Volatility Could Adversely Affect Reorganized Mahalo's Income.**

Prices for gas fluctuate widely. The availability of a ready market for gas production depends on numerous factors beyond the control of Reorganized Mahalo, including the demand for and supply of oil and gas, the proximity of our natural gas reserves to pipelines, the capacity of such pipelines, fluctuations in production and seasonal demand, the effects of inclement weather, governmental regulation, the price and availability of alternative fuel sources; and overall economic conditions. New gas wells may be shut in for lack of a market until a gas pipeline or gathering system with available capacity is extended into the area. Successful exploration wells, especially offshore wells, may have production delayed until production facilities and pipelines are constructed.

6.    **The Oil and Gas Industry Has Numerous Operating Risks; Insurance May Not Be Adequate to Protect Against All These Risks.**

The oil and gas business involves a variety of operating risks, including but not limited to: fires and explosions; uncontrollable flows of oil and gas; natural disasters; and environmental hazards such as spills, pipeline ruptures and discharges of toxic gases.

If any of these events occur, Reorganized Mahalo could incur substantial losses as a result of: injury or loss of life; severe damage to and destruction of property, natural resources, and equipment; pollution or other environmental damage; regulatory investigation and penalties; clean-up responsibilities; suspension of operations; repairs to resume operations; and loss of productive energy.

Reorganized Mahalo will maintain insurance against some, but not all, potential risks and losses affecting operations. There can be no assurance that the insurance will be adequate to cover all losses or liabilities. Also, the continued availability of insurance at current costs cannot be assured.

7.    **Operations are Subject to Numerous Risks Related to Gas Drilling and Production Activities.**

Gas drilling and production are subject to numerous risks, including the risk that no commercially productive reserves will be found. The cost of drilling and completing wells is often uncertain. Gas drilling and production activities may be shortened, delayed, or cancelled as a result of a variety of factors, many of which are beyond Reorganized Mahalo's control. These factors include: unexpected drilling conditions; pressure or irregularities in formations; equipment failures or accidents; shortages in experienced labor or shortages in delays in the delivery of equipment; blowouts and surface cratering; pipe or cement failures; casing collapse; and embedded drilling and

74

service tools.

### 8. Possibility of Production Curtailments.

Due to contract terms, pipeline interruptions, weather conditions or other factors, the producing wells which Reorganized Mahalo will own and/or operate may, from time to time, be subject to production curtailments. Curtailments may range from production being partially restricted to wells being completely shut in. The duration of curtailments may vary from a few days to several months.

### 9. The Oil and Gas Industry is Subject to Regulation.

Exploring for, producing and selling gas (and oil) are subject to a variety of federal, state, local and international governmental regulations, including regulations concerning the discharge or emission of materials into the environment, the conservation of natural gas and oil production, permits for drilling, production, and transportation operations, drilling and plugging and abandonment bonds and other financial assurances, reports concerning operations, the spacing of wells, the unitization and pooling of properties, the cleanup of well sites and various other matters, including taxes. Laws and regulations protecting the environment are stringent and may in certain circumstances impose strict and joint and several liability, rendering a person liable for environmental damage without regard to negligence or fault on the part of such person. Such laws and regulations may expose Reorganized Mahalo to liability for the conduct of operations or conditions caused by others or for the acts of the Debtor or Reorganized Mahalo that were in compliance with all applicable laws at the time such acts were performed. Environmental laws generally provide for civil, criminal and administrative penalties for noncompliance, including any unauthorized discharges of oil and other hazardous substances.


# XVII.

# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the legal alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan.

### A. Liquidation under Chapter 7.

If no plan can be confirmed, the Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would liquidate and distribute the Estate's assets in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests is set forth in Section 0 of this Disclosure Statement regarding "Liquidation Analysis and Best Interests Test". The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan.

### B. Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtor (or any other party in interest) could attempt to formulate a different plan. Such a plan might involve a reorganization and continuation of the Debtor's business, or an orderly liquidation of the Debtor's assets. Prior to the Petition Date, the

Debtor explored various alternatives to transactions contemplated by the Plan. The Debtor believes that the Plan enables creditors to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtor's assets would be sold in an orderly fashion over a more extended time than a liquidation under chapter 7, possibly resulting in somewhat greater, but indeterminate, recoveries than would be obtained in chapter 7. Given that the assets of the Debtor are fully encumbered, however, the value realized by the holders of Allowed Unsecured Claims would not be substantially different than the value realized in a chapter 7 liquidation – and therefore would not provide a greater recovery than the value to be realized by such holders under the Plan.

<h1 style="text-align:center">XVIII.</h1>

<h2 style="text-align:center">SECURITIES LAW MATTERS.</h2>

The securities law considerations detailed below pertain to the issuance of New Common Stock under the Plan. The following discussion relates to certain securities laws that restrict transfers of New Common Stock and that may be applicable to transfers of New Common Stock subsequent to their issuance under the Plan.

The Debtor does not intend to file a registration statement under the Securities Act or any other federal or state securities laws with respect to the issuance or resale of any New Common Stock. To the extent set forth herein, the Debtor and Reorganized Mahalo will rely on Bankruptcy Code section 1145(a) to exempt from registration under the Securities Act and any applicable state securities laws the offer, sale and issuance of the New Common Stock pursuant to the Plan.

Generally, Bankruptcy Code section 1145(a)(1) exempts the offer and sale of securities pursuant to a plan of reorganization from such registration requirements if the following conditions are satisfied: (i) the securities are issued by a debtor (or its Affiliate or successor to the debtor) under a plan of reorganization; (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor; and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly for cash or property."

There is no public market for the New Common Stock, and none is expected to develop in the foreseeable future. Recipients of the New Common Stock should be prepared to hold the New Common Stock for an indefinite period of time and must be able to afford the complete loss of their investment.

In principal, in the event there is a public market for the New Common Stock, the New Common Stock distributed under the Plan pursuant to the exemption provided under Bankruptcy Code section 1145 may be eligible for resale by the holders thereof, except for any such holder that is deemed to be an "underwriter" as defined in Bankruptcy Code section 1145(b)(1) with respect to the New Common Stock. Generally, Bankruptcy Code section 1145(b)(1) defines an "underwriter" as any person who (i) purchases a claim against, or an interest in, a debtor with a view towards distribution of any security to be received in exchange for such claim or interest, (ii) offers to sell securities issued pursuant to a bankruptcy plan for the holders of such securities, (iii) offers to buy securities issued pursuant to a bankruptcy plan from persons receiving such securities, if the offer to buy is made with a view towards distribution of such securities, or (iv) is an issuer within the meaning of Section 2(11) of the Securities Act. Section 2(11) of the Securities Act provides that the term "issuer" includes all persons who, directly or indirectly, through one or more intermediaries, control, or are controlled by, or are under common control with, an issuer of securities. Under Rule 405 of Regulation C under the Securities Act, the term "control" means the possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor (or its Affiliate or successor) under a plan of reorganization may be deemed to "control" such debtor (and therefore be an underwriter for purposes of Bankruptcy Code section 1145), particularly if such management position is coupled with the ownership of a significant percentage of a debtor's (or its Affiliate's or successor's) voting securities.

Holders of New Common Stock who are deemed to be "underwriters" within the meaning of Bankruptcy Code section 1145(b)(1) or who may otherwise be deemed to be "underwriters" of, or to exercise "control" over, Reorganized Mahalo within the meaning of Rule 405 of Regulation C under the Securities Act should, assuming all other conditions of Rule 144A are met, be entitled to avail themselves of the safe harbor resale provisions thereof. Rule 144A, promulgated under the Securities Act, provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities which are not securities of the same class of securities then listed on a national securities exchange (registered as such under Section 6 of the Exchange Act) or quoted in a U.S. automated interdealer quotation system (*e.g.*, NASDAQ). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons (*e.g.*, "dealers" registered as such pursuant to Section 15 of the Exchange Act and "banks" as defined in Section 3(a)(2) of the Securities Act), any entity which purchases securities for its own account or for the account of another qualified institutional buyer and which (in the aggregate) owns and invests on a discretionary basis at least $100 million in the securities of unaffiliated issuers.

At the Confirmation Hearing, the Debtor will request that the exemption from the requirements of Section 5 of the Securities Act, 15 U.S.C. § 77e, and any state or local law requiring registration or qualification for the offer or sale of a security, provided under Bankruptcy Code section 1145 shall apply to the issuance by Reorganized Mahalo of the New Common Stock and the distribution of such New Common Stock pursuant to the Plan.

Because of the fact that no public market will exist for the New Common Stock, and because of the complex, subjective nature of the question of whether a particular person may be an underwriter, the Debtor makes no representation concerning the ability of any person to dispose of the New Common Stock. Therefore, a recipient of New Common Stock should consult with legal counsel concerning the eventual disposition of the New Common Stock.

## XIX.

## CERTAIN POTENTIAL TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtor and certain holders of Claims. The following summary does not address the federal income tax consequences to holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan, such as holders of Allowed Administrative Claims.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt concerning any issue discussed herein. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which the Debtor is a party will be respected for federal income tax purposes in accordance with their form. There is no assurance, however, that the IRS will not take contrary positions to those described herein or upon which this summary is based.

Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or Interest. All holders of Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable under the Plan.

### A. Tax Consequences to the Debtor.

#### 1. Cancellation of Debt.

Generally, income from the cancellation of indebtedness ("COD income") is includable in a taxpayer's gross income. However, Section 108(a) of the Tax Code provides that gross income does not include any COD income if the cancellation of indebtedness occurs in a bankruptcy case and the cancellation is granted by a court with proper jurisdiction under the Bankruptcy Code or pursuant to a plan approved by such a court.

The debtor in a bankruptcy case must reduce certain of its tax attributes—such as its current-year "net operating loss" ("NOL"), NOL carryforwards, tax credits and the tax basis in its assets—by the amount of any COD income that is excluded from gross income under Section 108(a) of the Tax Code. The reduction of these tax attributes is made after the federal income tax liability for the year of the debt cancellation has been determined.

COD income realized by a debtor equals the amount by which the indebtedness discharged exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD realized (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent that the amount of COD income excluded from gross income pursuant to Section 108(a) of the Tax Code exceeds the tax attributes available for reduction, the excess COD income is simply excluded from gross income without any further tax consequences.

As a result of the Plan's treatment of the various claims of its creditors, Reorganized Mahalo is expected to realize a significant amount of COD income. The extent of such COD income and the resulting tax attribute reduction will depend, in part, on the fair market value of the consideration paid in satisfaction of Claims and Interests, including the New Common Stock issued by Debtor to the Ableco pursuant to the Plan.

## 2.      Limitation on NOL Carryforwards.

The utilization of part of the Debtor's NOL carryforwards may be subject to limitation under Section 382 of the Tax Code and Treasury Regulations promulgated thereunder, which limitation, if applicable, would effectively prevent the Debtor from offsetting such NOL carryforwards against taxable income in future years.  Section 383 imposes similar limitations on capital loss carryforwards and tax credits.

Under Section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation.  Such limitation also may apply to certain losses or deductions that are "built-in" (*i.e.*, economically accrued but unrecognized for tax purposes) as of the date of the ownership change and subsequently recognized.  In general, an "ownership change" is a more than 50 percentage point cumulative change in ownership during the relevant testing period (not to exceed three years).  If a holder of 50% or more of the loss corporation's stock treats the stock as worthless for federal income tax purposes but continues to retain the stock ownership at the end of the year it was treated as worthless, then the shareholder is treated as a "new" shareholder as of the first day of the year following the year of worthlessness for purposes of determining whether a 50 percentage point ownership change has occurred.

(a)      General Section 382 Limitation.  The amount of the annual limitation to which a loss corporation may be subject depends, in part, on whether the corporation is in bankruptcy and the ownership change occurs pursuant to a plan of reorganization confirmed by the Bankruptcy Court.  As discussed below, under a special bankruptcy exception, a corporation in bankruptcy may also be able to avoid any annual limitation.

In general, the amount of the annual limitation to which a corporation would be subject would be equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs.  If a corporation is in bankruptcy, and the corporation undergoes the ownership change pursuant to a confirmed plan, the fair market value of the corporation's stock generally is determined immediately after (rather than before) the ownership change.  The Tax Code provides for the reduction of such value in certain circumstances, including, for example, where the corporation has substantial non-business assets.

Any unused limitation in a taxable year may be carried forward for 20 years, thereby increasing the annual limitation in the subsequent taxable year.  However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, it will not be able to utilize the NOLs at all.

(b)      Special Bankruptcy Exception.  An exception to the general annual limitation described above applies where the stockholders and/or qualified creditors of a debtor retain or receive (other than for new value) at least 50% of the vote and value of the stock pursuant to a confirmed bankruptcy plan.  Under this exception, the use of a debtor's pre-change losses is not limited on an annual basis, although the pre-change losses which may be carried to a post-change year must be reduced by the amount of interest paid or accrued by the debtor on indebtedness that is converted to stock pursuant to a bankruptcy case during (i) any taxable year ending during the three-year period preceding the taxable year in which the ownership change occurs, and (ii) the portion of the taxable year in which the ownership change occurs on or before the change date.  In addition, if

the bankruptcy exception to the application of Section 382 applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

3. **Alternative Minimum Tax.**

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated, including NOL carryforwards. Only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

4. **Abandonment of Collateral.**

Under the Plan, Debtor has the option of satisfying certain Allowed Secured Claims under Class 4 and Class 6 either by paying cash equal to the amount of the Allowed Claim over time, or releasing the collateral securing the Claim. To the extent Debtor satisfies such a Claim by abandoning the collateral securing the Claim, Debtor will be deemed to have sold such collateral at its fair market value and will recognize taxable income in an amount equal to the difference between the fair market value of the collateral and its adjusted basis in the collateral. The Debtor would also realize COD income to the extent the Allowed Claim exceeds the fair market value of the abandoned collateral.

B. **Consequences to Certain Creditors of the Debtor.**

Pursuant to the Plan, the holders of certain Allowed Claims will be entitled to cash distributions Each of the holders of such Allowed Claims will recognize gain or loss in an amount equal to the difference between (x) the amount received by such holder in satisfaction of its Claim and (y) the holder's adjusted tax basis in its Allowed Claim.

Where gain or loss is recognized by the holder of an Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed Claim constitutes a capital asset in the hands of the holder, how long it has been owned by the holder, whether the Allowed Claim was acquired at a market discount, and whether and to what extent the holder of the Allowed Claim previously had claimed a bad debt deduction on the Allowed Claim.

If an Allowed Claim that is paid in full exceeds $250,000, a portion of each installment paid may be deemed to be interest under the "original issue discount" principles of Section 1274 of the Tax Code and taxable as ordinary income.

1. **Withholding/Reporting Requirements.**

All distributions to holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding." Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and

80

that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment, which may be refunded to the extent such advance payment results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

# XX.

## RECOMMENDATION AND CONCLUSION

The Debtor believes that the Plan provides the greatest possible recovery to holders of Claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative would result in a significantly reduced recovery to holders of Claims, as well as delay, uncertainty, and expense. Accordingly, the Debtor urges holders of Impaired Claims to vote to accept the Plan, by so indicating on their Ballots, and returning them as specified in this Disclosure Statement and on their Ballots.

Dated: October 16, 2009

Respectfully submitted,

MAHALO ENERGY (USA) INC.

By: _____

Its: _____
     David Burton, President and CEO

/s/G. David Bryant
G. David Bryant, OBA #1264
Stephen W. Elliott, OBA #2685
KLINE KLINE ELLIOTT & BRYANT, PC
720 NE 63rd Street
Oklahoma City, OK 73105
(405) 848-4448; (405) 842-4539 (fax)
dbryant@klinefirm.org
selliott@klinefirm.org


ATTORNEYS FOR THE DEBTOR IN
POSSESSION, MAHALO ENERGY (USA) INC